1   Andrew S. Friedman, Esq. (005425)
    afriedman@bffb.com
2   Francis J. Balint, Jr. (007669)
    fbalint@bffb.com
3   **BONNETT FAIRBOURN FRIEDMAN & BALINT, P.C**.
4   2325 East Camelback Road, Suite 300
    Phoenix, Arizona 85016
5   Telephone: (602) 274-1100

6
    Robert C. Finkel (Admitted *Pro Hac Vice*)
7   rfinkel@wolfpopper.com
8   **WOLF POPPER LLP**
    845 Third Avenue, 12th Floor
9   New York, New York 10022
    Telephone: (212) 759-4600
10

11  *Attorneys for Plaintiff*

12              **UNITED STATES DISTRICT COURT**
                    **DISTRICT OF ARIZONA**
13

14  | Ronald L. Jackson, as Trustee Under | Case No. 2:18-cv-02914-JJT |
    | Agreement Dated 01/05/2012 by Ronald L. | |
15  | Jackson, Individually, and on Behalf of All | CLASS ACTION |
    | Others Similarly Situated, | |
16  | | **AMENDED COMPLAINT FOR** |
17  | Plaintiff, | **VIOLATION OF THE FEDERAL** |
    | | **SECURITIES LAWS** |
18  | v. | |
    | | **DEMAND FOR JURY** |
19  | Microchip Technology Inc.; Steven Sanghi; | |
20  | Ganesh Moorthy; and J. Eric Bjornholt, | |
21  | Defendants. | |

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.   NATURE OF THE ACTION ....................................................................... 2

II.  JURISDICTION AND VENUE ................................................................. 5

III. PARTIES ..................................................................................................... 6

   A.  Plaintiff ................................................................................................. 6

   B.  Defendants ............................................................................................ 6

IV. CLASS ACTION ALLEGATIONS ........................................................... 8

V.  SUBSTANTIVE ALLEGATIONS ........................................................... 11

   A.  Background Allegations ...................................................................... 11

      1.  Background on Microchip ............................................................. 11

      2.  Microchip Used Acquisitions to Drive Revenue Growth............... 11

      3.  Background on Microsemi ............................................................. 15

      4.  The Litigation by Microsemi's Senior Officers Against Defendants and Others.................................................................................................. 16

      5.  Defendants Were Keenly Aware of the Stark Difference Between GAAP (Sell-In) and Non-GAAP (Sell-Through) Results ...................................... 18

      6.  Defendants Were Keenly Aware of Microchip's Inventory Levels and the Importance of Inventory to a Semiconductor Manufacturer ........................ 23

   B.  Microchip's Prior Acquisitions Demonstrate Defendants' Knowledge of the Need to Conduct Thorough Due Diligence of Targets...................................... 27

   C.  Microsemi Only Reported Company Inventory Levels on a Quarterly Basis; Not Distributor Inventory and Only Reported GAAP Sales, Not Non-GAAP Sales ... 29

   D.  Microchip Pursues the Acquisition of Microsemi ................................. 30

   E.  Microchip Did Extensive Due Diligence on Microsemi's Business..................... 31

   F.  Microchip's Financial Results, and News of the Transaction Leaking, Pressures Microchip to Close the Transaction ........................................................ 36

      1.  News Reports Cause Microsemi's Stock Price to Rise ................................... 36

      2.  Microchip Reports Reduced March Quarter Prospects ..................................... 36

      3.  News of the Transaction Leaks to the Press .............................................. 38

4.   The Acquisition Was All Cash, Placing Pressure on Microchip's Balance Sheet .................................................................................. 39

G.   Defendants Announce the Merger ........................................................ 40

1.   Defendants' Statements on March 1, 2018 Were Materially False and Misleading ................................................................. 45

2.   Investors, Analysts, and the Market React Positively to Defendants' False Statements ...................................................... 48

H.   Defendants Continue Their Due Diligence after the March 1, 2018 Announcement and Before the Merger Closes ...................................... 50

I.   Microchip Releases Fourth Quarter Fiscal 2018 Operating Results ...................... 55

J.   The Fiscal 2018 Form 10-K ................................................................. 63

K.   Defendants File a Materially False and Misleading Form 8-K Updating Investors on the Microsemi Acquisition ......................................... 67

L.   The Microsemi Acquisition Closes ....................................................... 69

M.   The May 31, 2018 Press Release and Conference Call Perpetuates Defendants' False Statements. ............................................................... 71

N.   Defendants Continue to Make Their False Statements ........................... 75

O.   Defendants Reveal the Truth with Respect to the Microsemi Acquisition ............ 80

P.   Microchip's Debt is Downgraded Following the Revelations Regarding Inventory ............................................................................. 86

Q.   The Defendants Acted with Scienter ..................................................... 88

1.   The Individual Defendants Knew or Were Reckless in Not Knowing That Microsemi Had Shipped Excess Inventory in the Distribution Channel and to End Users and the Negative Impact Such Prior Inventory Shipments Would Have ............................................................................. 89

2.   Sanghi's History of Praising Acquisition Targets When Announcing a Merger, and Then Identifying Problems Immediately After Closing, is Supportive of Scienter ....................................................... 94

3.   Defendants Continued to Misrepresent the Truth in Analyst Meetings During June 2018 ............................................................. 96

4.   Defendants Were Motivated to Close the Transaction Because of Reduced Revenue and Earnings Growth ...................................... 96

5.   Termination of Microsemi's Executives Evidences Knowledge ................... 97

6.   Bonuses and Executive Compensation Motivated the Defendants to Complete Acquisitions ............................................................................................. 98

7.   Restrictive NDAs ............................................................................... 101

8.   Microchip's Scienter ......................................................................... 101

R.   Loss Causation .................................................................................... 102

VI. CAUSES OF ACTION ................................................................................. 104

COUNT I ............................................................................................................. 104

COUNT II ........................................................................................................... 106

VII. PRAYER FOR RELIEF ............................................................................. 107

VIII.   DEMAND FOR TRIAL BY JURY ................................................. 108

Court-appointed Lead Plaintiff Ronald L. Jackson, as Trustee Under Agreement Dated 01/05/2012 by Ronald L. Jackson ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, hereby brings this Amended Class Action Complaint for Violation of the Federal Securities Laws against Microchip Technology Inc. ("Microchip" or the "Company"), Steven Sanghi, Ganesh Moorthy, and J. Eric Bjornholt (collectively, "Defendants").

Plaintiff's allegations are based on his personal knowledge as to his own acts, and on information and belief or documentary proof as to all other matters, such information and belief having been informed by the investigation conducted by Lead Counsel, which includes analyses of, among other things (a) regulatory filings made by Microchip with the United States Securities and Exchange Commission ("SEC"); (b) press releases, investor presentations, and conference calls issued or conducted by Microchip; (c) news stories, articles, analyst reports, internet postings, and other publicly available information concerning Microchip; (d) interviews of former employees of Microsemi Corporation ("Microsemi") and Microchip (including former employees identified as Confidential Witnesses ("CWs")); (e) court filings and exhibits in *Peterson v. Sanghi*, No. 8:18-cv-2000-JLS (ADSx) (C.D. Cal.); and (f) other information readily obtainable on the Internet.

Lead Counsel's investigation into the matters alleged herein is continuing. Many relevant facts are known only to, or are exclusively within the possession of the Defendants.

Moreover, Defendants have insisted that former Microchip and Microsemi employees enter into Non-Disclosure Agreements ("NDAs") as a condition to receiving severance payments. Those NDAs, as described to Plaintiff by former employees, are over-inclusive, and go beyond protecting trade secrets, but also preclude former employees from cooperating with Plaintiff's investigation into Defendants' fraud.

Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

1

## I.     NATURE OF THE ACTION

1.     This is a federal securities fraud class action on behalf of a "Class" consisting of all persons who purchased or otherwise acquired Microchip common stock on a U.S. open market during the class period March 2, 2018 through August 9, 2018, both dates inclusive (the "Class Period").  Excluded from the Class are Defendants, the officers and directors of the Company during the Class Period (the "Excluded D&Os"), members of Defendants' and Excluded D&Os' immediate families, legal representatives, heirs, successors or assigns and any entity in which Defendants or the Excluded D&Os have or had a controlling interest.

2.     On March 1, 2018, Microchip and Microsemi announced that they had entered into a Merger Agreement (as defined herein) by which Microchip would acquire all outstanding Microsemi common shares for $68.78 per Microsemi share in cash plus the assumption of $1.8 billion in Microsemi's net debt (the "Merger," "Transaction," or "Acquisition").  The total enterprise value of the Transaction ($10.15 billion) was to be financed by cash on hand at the two companies plus $8.6 billion in new debt.

3.     Investors and stock-analysts expressed concern with the cost of the transaction and Microchip's ability to service the $8.6 billion in debt.  *See, e.g.*, ¶¶ 186-88, 237.  In response, Defendants repeatedly assured investors that although the cost of the transaction was steep, the debt would be paid rapidly through free cash flow generated by the combined entities after the Merger.  *See, e.g.*, ¶¶ 204-05, 211-12.

4.     Defendants misrepresented that the debt was only a 4.7 multiple of EBITDA (a proxy for cash flow) to be generated by the Merger.  Defendants failed to disclose that the $8.6 billion in debt was a five times multiple of cash flow expected to be generated by the Acquisition. The Transaction closed on May 29, 2018, and thereafter Microchip and Microsemi reported operations on a consolidated basis.  Actual cash flow generated by the Merger, beginning on May 29, 2018, was approximately $110 million less than represented to Microchip's investors because of Microsemi's higher inventory levels.  These higher levels were caused, according to Microchip, because historically toward the end of each

quarter Microsemi had sold inventory to distributors and end users for cash at discounted prices in excess of their current needs.

5.      Defendants had done extensive due diligence on the Transaction, and knew by March 1, 2018 that Microsemi's distributors were holding excess inventory that would need to be whittled down and brought into line with Microchip's inventory and business practices. Defendants also knew that future cash generated from sales of Microsemi products to those distributors would be materially lower than the amount represented to investors.

6.      Defendants also misrepresented Microsemi's GAAP revenue (*i.e.*, sales to distributors and end users). Defendants knew that Microsemi had higher inventory levels, levels so high in fact that Defendants accused Microsemi of "stuffing" their distribution channel prior to the Class Period. Defendants, moreover, failed to disclose that Microsemi's historically reported GAAP revenue was not representative of true user demand.

7.      Defendants further misrepresented that Microchip anticipated $160 to $180 million of anticipated Microsemi non-GAAP revenue (*i.e.*, sales to ultimate customers) in June 2018. Defendants knew that towards the end of each quarter Microsemi offered direct purchasers discounted prices to induce purchases of what Microsemi believed was excess product. Defendants knew that those purchasers as well would need to whittle down their inventory and would purchase fewer products from Microchip in the near future than had been represented by Defendants.

8.      Defendants had knowledge of the true facts that were misrepresented to investors. Inventory levels were very important to Defendants as part of their due diligence prior to the Microsemi acquisition. Defendants made a point in press releases, SEC filings, and conferences calls of discussing Microchip's own inventory levels, inventory levels at distributors, as well as targeted inventory ranges, in Microchip's quarterly earnings press releases.

9.      Microchip recognized GAAP revenue on direct sales primarily to distributors. Non-GAAP "sell-through" net sales, or sales to end users, was however the more important revenue metric to Defendants. On numerous occasions before and throughout the Class

3

Period, Defendants stated that they managed Microchip on the basis of sell-through revenue, not sell-in (sales to distributors).

10.    Microsemi, however, did not publicly report inventory levels at distributors or non-GAAP sell-through net sales, only GAAP sell-in net sales.   Because distribution inventory levels, and sell-through net sales were such important metrics to the Defendants, they knew, or were reckless in not knowing, Microsemi's inventory at distributors or non-GAAP sell-through net sales, and how the higher inventory at Microsemi would result in lower sell-through (non-GAAP) revenue, lower free cash flow, lower EBITDA, and a lower ability to delever the combined company through paying down debt.

11.    The failure of Microchip to disclose non-GAAP revenue and distributor inventory levels was a red flag to Microchip, and it begs belief that Microchip would not have conducted extreme due diligence on those facts and learned the truth prior to consummating a $10.3 *billion* acquisition of Microchip.

12.    Defendants had experienced inventory issues, and the resulting impact on financial results, in Microchip's own operations and in prior acquisitions by Microchip, such as the acquisition of Atmel Corporation ("Atmel").   Thus, Defendants had a heightened awareness of potential inventory problems.

13.    Moreover, Microsemi set up a Data Room (as defined herein) in which all material facts concerning Microsemi's operations were disclosed and Microsemi's senior officers cooperated with Defendants throughout due diligence both prior to and during the Class Period (until their termination in late May 2018).   Microsemi disclosed all material facts to Microchip and was transparent as to the inventory its distributors "held in the channel."

14.    Defendants turned a blind eye to the information.   The Individual Defendants were highly sophisticated businessmen, who had acquired at least 17 companies in the years before the Merger.   The thought that sophisticated business people such as Defendants would incur $8.6 billion of debt without knowing the amount of inventory in the channel and the cash to be generated from Microsemi's business is farcical.

4

15.     On August 9, 2018, a little more than two months after the Merger closed, Defendants announced the truth that Microsemi had four plus months of inventory in Microsemi's distribution channel and, as a result, Microchip had $110 million less of net free cash flow and higher debt leverage (5.0 v. 4.7 times EBITDA).

16.     Defendants attributed this higher level of inventory in numerous public statements to Microsemi's intentional channel stuffing.  After Microchip terminated price discounts and other inducements that had stimulated purchases in excess of current demand, Microchip sold in excess of $200 million less Microsemi product to distributors and end users during the June and September quarters, resulting in approximately $110 million of reduced cash generation (after cost of goods sold and other expenses) and ability to pay off the $8.6 billion in debt.

17.     As a result of Defendants' announcement on August 9, 2018, Microchip common stock fell $10.67 per share, causing significant damages to members of the Class.

18.     Defendants made false statements concerning the Transaction, among other things, to mitigate the interest charges on $8.6 billion of debt, and to accelerate the closing of the Transaction.  Furthermore, for the first half of the Class Period, Microchip was in the process of working with Microsemi to close the transaction and (arguably) were reticent to criticize Microsemi's operations to investors.  Notwithstanding their motive, Defendants, when they spoke about the Transaction, had an obligation to disclose the truth, and failed to do so.

## II.     JURISDICTION AND VENUE

19.     The claims in this class action are asserted pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

20.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and federal question jurisdiction (28 U.S.C. § 1331).

21.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. §1391(b), as the Company's principal place of business is located within this District and the Company resides within this District.

22.     In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of a national securities exchange.

### III.    PARTIES

**A.    Plaintiff**

23.     Plaintiff purchased Microchip common stock in reliance on Defendants' materially false and misleading statements and omissions of material facts, and on the integrity of the market for Microchip common stock, at artificially inflated prices during the Class Period, and was damaged when the truth about Microchip was revealed to the market. Plaintiff's certification, with a listing of transactions in Microchip common stock during the Class Period, is annexed to Plaintiff's initial Complaint (ECF No. 1-2).  Plaintiff suffered an out-of-pocket loss exceeding $200,000 as a result of the federal securities law violations and material false and misleading statements alleged herein.  *See* ECF No. 1-2.

**B.    Defendants**

24.     Defendant Microchip is a Delaware corporation with its principal executive offices located in Chandler, Arizona.  Microchip common stock trades on the NASDAQ Global Market ("NASDAQ") under the stock symbol "MCHP."

25.     Defendant Sanghi has served as the Company's Chief Executive Officer ("CEO") since October 1991 and as Chairman of Microchip's Board of Directors ("Board") since October 1993.  Sanghi served as the President of Microchip from August 1990 to February 2016 and has served as a director of Microchip since August 1990.  Sanghi's incentive-based stock compensation, fueled by record reported operating results, has made Sanghi a very wealthy man.  Under Sanghi's leadership, Microchip pursued an aggressive M&A strategy, closing on at least seventeen acquisitions prior to the Microsemi Merger.

26.     Defendant Moorthy has served as the Company's President since February 2016 and as Chief Operating Officer ("COO") since June 2009.  Defendant Sanghi refers to Defendant Moorthy as his "right hand man."   Defendant Moorthy has had a close professional relationship with Defendant Sanghi since 1981, when Sanghi hired Moorthy, then a recent college graduate, to work with him at Intel.  When Moorthy was appointed to be Microchip's President in 2016, Sanghi announced:  "As Microchip continues to grow and with our pending acquisition of Atmel, our largest acquisition ever, I will need more bandwidth to manage expanded operations worldwide with many more sites.  Ganesh and I will jointly manage the worldwide consolidated enterprise of Microchip and Atmel."  Defendant Moorthy's total annual compensation, according to information publicly available on Bloomberg, is over $3 million.

27.     Defendant Bjornholt has served as the Company's Vice President and Chief Financial Officer ("CFO") since January 2009, and has served as Corporate Secretary since 2003.  Prior to his employment at Microchip, Bjornholt was employed by KPMG LLP, one of the "Big Four" auditors.

28.     Sanghi, Moorthy, and Bjornholt are referred to collectively herein as the "Individual Defendants."

29.     The Individual Defendants were listed in Microchip's Form 10-K for the fiscal year 2017 (ending March 31, 2018), filed with the SEC on May 18, 2018 (the "2018 Form 10-K"), as "Executive Officers of the Registrant [Microchip]."  2018 Form 10-K at 3.  In addition, the Individual Defendants are, and from the beginning of the Class Period were, listed on Microchip's website as among Microchip's six "Corporate Officers."  *See* www.microchip.com/about-us/leadership (last visited Feb. 18, 2019).

30.     As alleged herein, the Defendants made, authorized to be made, or issued materially false or misleading statements and/or signed or authorized signing documents alleged to include materially false and misleading statements.

1

2      ### IV.   CLASS ACTION ALLEGATIONS

3      31.    Plaintiff brings this federal securities fraud action as a class action pursuant to

4      Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all persons

5      who purchased or otherwise acquired Microchip common stock on a U.S. open market

6      during the Class Period.  Excluded from the Class are Defendants, the Excluded D&Os,

7      members of Defendants' and Excluded D&Os' immediate families, legal representatives,

8      heirs, successors or assigns and any entity in which Defendants or the Excluded D&Os have

9      or had a controlling interest.

10      32.    The members of the Class are so numerous that joinder of all members is

11     impracticable.  Throughout the Class Period, Microchip common stock was actively traded

12     on the NASDAQ, an efficient market.  While the exact number of Class members is

13     unknown to Plaintiff at this time and can be ascertained only through appropriate discovery,

14     Plaintiff believes that there are hundreds or thousands of members in the proposed Class.

15     During the Class Period, there were over 234 million shares of Microchip common stock

16     outstanding.  Also during the Class Period, over 274.1 million shares of Microchip common

17     stock were traded on the NASDAQ, an average of approximately 2.45 million shares per

18     day.   Record owners and other members of the Class may be identified from records

19     maintained by Microchip or its transfer agent and may be notified of the pendency of this

20     action by mail, using the form of notice similar to that customarily used in securities class

21     actions.

22      33.    Plaintiff's claims are typical of the claims of the members of the Class as all

23     members of the Class are similarly affected by Defendants' wrongful conduct in violation

24     of federal law that is complained of herein.

25      34.    Plaintiff will fairly and adequately protect the interests of the members of the

26     Class and has retained counsel competent and experienced in class and securities litigation.

27     Plaintiff has no interests antagonistic to or in conflict with those of the Class.

28

35.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

      a.   whether the federal securities laws were violated by Defendants' acts as alleged herein;

      b.   whether Defendants made, issued, or caused to be made or issued untrue statements of material fact to the investing public during the Class Period;

      c.   whether Defendants omitted to state material facts necessary in order to make statements made, in the light of the circumstances under which they were made, not misleading;

      d.   whether Defendants acted knowingly or recklessly in issuing false and misleading statements or omitting to state material facts;

      e.   whether the prices of Microchip common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

      f.   whether the members of the Class have sustained damages and, if so, what is the proper measure of damages?

36.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

37.   Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

      a.   Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

9

b.      the omissions and misrepresentations were material;

c.      Microchip common stock is traded in an efficient market;

d.      Microchip common stock was liquid and traded with heavy volume during the Class Period;

e.      Microchip common stock traded on the NASDAQ, an efficient market;

f.      Microchip was covered by multiple analysts during the Class Period, including analysts at J.P. Morgan Securities; Morningstar Equity Research; Morgan Stanley & Co. LLC; SunTrust Robinson Humphrey, Inc.; Jefferies, LLC; Credit Suisse Equity Research; Susquehanna Financial Group, LLLP; Raymond James & Associates, Inc.; Piper Jaffray Companies; KeyBanc Capital Markets, Inc.; Needham & Company, LLC; and Bank of America Merrill Lynch;

g.      the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

h.      Plaintiff and members of the Class purchased, acquired and/or sold Microchip common stock between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

38.     Based upon the foregoing, the market for Microchip stock promptly digested current material information regarding Microchip from all publicly available sources and reflected such information in Microchip's stock price.  Under these circumstances, all purchasers of Microchip stock during the Class Period suffered similar injury through their purchase of Microchip stock at artificially inflated prices.

39.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## V.    SUBSTANTIVE ALLEGATIONS

**A.    Background Allegations**

**1.    Background on Microchip**

40.    Microchip was founded in 1987 when General Instrument formed its microelectronics division as a wholly owned subsidiary.

41.    In 1989, Microchip became an independent company when it was acquired by a group of venture capitalists.

42.    Microchip became a publicly traded company in 1993.

43.    According to Microchip's 2018 Form 10-K, Microchip "develop[s], manufacture[s] and sell[s] specialized semiconductor products used by our customers for a wide variety of embedded control applications…. Our synergistic product portfolio targets thousands of applications worldwide and a growing demand for high-performance designs in the automotive, communications, computing, consumer and industrial control markets."

44.    A semiconductor is a solid substance that has conductivity between an insulator and most metals, either due to the addition of an impurity or because of temperature effects.   Devices made of semiconductors are essential components of most electronic circuits.

45.    Microchips, or chips or integrated circuits, are essential elements of all modern electronics.   They act as the "brain" of modern electronics.   A microchip is typically made up of individual electronic components, layered and put together on semiconductor material. With the right combination of relatively simple circuits, a microchip can then perform complex tasks.

46.    Microchip operates on an April 1 to March 31 fiscal year.   Microchip's first quarter ends June 30; second quarter ends September 30; third quarter ends December 31; and fourth quarter (and fiscal year) ends March 31.

**2.    Microchip Used Acquisitions to Drive Revenue Growth**

47.    Microchip is a repeat Mergers & Acquisitions ("M&A") player in the semiconductor industry.   As stated by Bjornholt on Microchip's March 1, 2018 Conference

Call announcing the Microsemi Transaction, Microchip conducted "17 acquisitions since 2008." Mar. 1, 2018 Tr. at 35.

48.    The following slide from the Analyst Day Slide Show (as defined below) reflects the acquisitiveness of Microchip in the past decade:



49.    These seventeen acquisitions fueled Microchip's growth. For example, for fiscal year 2007 (ending March 30, 2008), Microchip's net sales were $1.0357 billion. For fiscal year 2017 (ending March 31, 2018), Microchip's net sales were $3.9808 billion.

50.    Ray Zinn, the CEO and President of Micrel, Inc. ("Micrel"), which was acquired by Microchip in 2015, said as much in an *Electronic Engineering Times* ("*EE Times*") from May 2016 titled "Microchip, Micrel dispute simmers": "Microchip has been on an acquisition spree since 2010, buying up a string of ever larger companies, in part to prop up its revenue growth." Zinn also stated that Microchip's "organic [product revenue] growth has not been so good, that's why he [Sanghi] has to keep acquiring companies to

12

grow." Zinn added that "[a]t some point you hit the wall and can't keep acquiring companies because the debt ratio becomes too high, and he will have to grow organically."

51.     Sanghi acknowledged at Microchip's August 14, 2018 annual meeting (the "August 14, 2018 Annual Meeting," a transcript of which was prepared by Bloomberg LP ("Bloomberg") and is publicly available) that for the first twelve years or so of Microchip's existence, "we've had very, very substantial market share mostly organic." Aug. 14, 2018 Tr. at 5.  However, he acknowledged that "in the last several years, the market share gains have also been achieved through acquisitions.  The big jump in calendar year 2016 is a result of acquisition of Atmel which had a significant microcontroller business." *Id.*  "So…in the last decade, we've also been expanding our solutions through a large number of acquisitions…." *Id.* at 6.

52.     Generally, for one year after an acquisition, Microchip was able to report substantial year-over-year revenue and earnings growth and record revenue and income. However, after that first year, that growth would largely dissipate and Defendants would be able to report only much slower organic growth.

53.     For example, on May 9, 2017, Microchip reported financial results for the fourth quarter after the Atmel acquisition closed (the fourth quarter of fiscal year 2017 ending March 31, 2017).  Microchip reported quarterly GAAP net sales of $902.7, an increase of 61.9% over the prior year's fourth quarter.  Microchip also reported non-GAAP net sales of $902.7 million, a year-over-year increase of 58.8%.

54.     However, on August 3, 2017, Microchip reported financial results for the fifth quarter after the Atmel acquisition closed (the first quarter of fiscal 2018 ending June 30, 2017).  Microchip only reported a 21.6% year-over-year growth in GAAP net sales, and a 15.2% year-over-year growth in non-GAAP net sales.

55.     Thus, by June 2017, Microchip was required to launch into a new acquisition to continue to fuel growth.

56.     However, due to the significant consolidation that had occurred in the semiconductor industry over the preceding three years, there were not many candidates.  As

discussed in the September 14, 2017 article by Alan Patterson in the *EE Times* titled "Chip Consolidation Nearly Over, Analyst Says":

> After about three years and hundreds of billions of dollars in mergers and acquisitions, the consolidation of the global semiconductor industry is pretty much finished, according to Bill Wiseman, a senior partner with management consultancy McKinsey.
>
> "The issue is that there aren't a whole lot of deals left," said Wiseman, who prior to joining McKinsey in 2001 was designing mixed-signal integrated circuits for IBM and before that was a U.S. Navy Seal. "There aren't that many deals left because there aren't that many attractive targets out there."
>
> Most of the consolidation has been based on cost and synergy, Wiseman said at the grand opening keynote session of Silicon Taiwan this week. The industry has been in a slow-growth rut for quite a long time, he added.
>
> Those doldrums may be past as the outlook is for overall industry revenue to soar to $400 billion this year from $339.7 billion in 2016, and consolidation starts to pay off, Wiseman said. For the first time in years, semiconductor prices are increasing, and that doesn't just mean memory chips, he said.

57.     According to the *Peterson* Complaint (an action brought by former executives of Microsemi against the Defendants and others, as discussed and defined below in Paragraphs 69-77), Microchip's "growth-through-acquisition strategy has accelerated along with the recent consolidation trend in the semiconductor industry." *Peterson* Compl. ¶ 76.

58.     Put another way, Microchip has attempted to keep up with the times, drawing on considerable debt to finance ambitious mergers of related semiconductor and wireless companies, with the goal of outpacing its competitors.

59.     The *Peterson* Complaint provides additional insight into Microchip's aggressive M&A strategy. Specifically:

> The commoditization of Microchip's products has also presented challenges in the marketplace. An increased acceptance of semiconductor industry-wide standards has driven the growth of commoditized ARM [advanced RISC [reduced instruction set computing] machine] microcontrollers that compete against Microchip's products. Microchip thus faces increased competition and slimmer margins for its flagship products. [*Peterson* Compl. ¶ 75.]

### 3.   Background on Microsemi

60.   Microsemi was founded in Culver City, California in 1959 under the name Microsemiconductor.

61.   According to Microsemi's Form 10-K for the fiscal year 2017, filed with the SEC on November 14, 2017 (the "Microsemi 2017 Form 10-K"), Microsemi was "a leading designer, manufacturer and marketer of high-performance analog and mixed-signal semiconductor solutions differentiated by power, security, reliability and performance." Microsemi 2017 Form 10-K at 5.

62.   The principal end markets served by Microsemi products "included Aerospace & Defense, Communications, Data Center, and Industrial."  Microsemi products are "found in applications such as: communications infrastructure systems, both wireless and wired LAN systems, implantable pacemakers and defibrillators, radar systems, military and commercial satellites and aircraft, and enterprise storage and hyperscale data centers."  *Id.*

63.   Microsemi was acquired by Microchip in the Transaction announced March 1, 2018, and closed May 29, 2018.  Prior to its acquisition by Microchip, Microsemi common stock traded on the NASDAQ under the symbol "MSCC."

64.   Microsemi operated on an October through September fiscal year.

65.   In fiscal 2017, Microsemi performed very well financially.  On November 9, 2017, Microsemi issued a press release reporting its financial results for the fourth quarter of and fiscal year 2017 ("Microsemi November 9, 2017 Press Release").  Microsemi reported net sales exceeding $1.81 billion and gross profits of $1.16 billion for fiscal 2017, and forecast first quarter net sales to be between $448 million and $472 million.

66.   Microsemi's positive performance continued into the first half of fiscal 2018. On January 25, 2018, Microsemi reported net sales for the first quarter of fiscal 2018 (ending December 31, 2017) of $468 million, at the high end of its November 2017 guidance and an increase of 7.6% year-over-year.  Microsemi forecast net sales for the second quarter of fiscal 2018 to be between $477 million and $502 million.

15

67.     On April 27, 2018, Microsemi reported on page 20 of its Form 10-Q net sales for the second quarter of fiscal 2018 (ending April 1, 2018) of $492.2 million, again at the high end of guidance, and an increase of 11.1% year-over-year.

68.     Microsemi's robust success was predicated on their strong focus on innovation and continued investment in research and development as the market created a booming demand for its products.

**4.      The Litigation by Microsemi's Senior Officers Against Defendants and Others**

69.     From July 2017, through the closing of the Merger, James J. Peterson was the Chairman of the Board of Directors and CEO of Microsemi; Frederick Goerner was Microsemi's Executive Vice President, Worldwide Sales; Paul Pickle was Microsemi's President and COO; and Philip Sansone was Microsemi's Vice President, Global Distribution Sales.

70.     On or about October 9, 2018, Peterson, Goerner, Pickle, and Sansone (collectively, the "*Peterson* Plaintiffs")) filed a Complaint for (1) Slander *Per Se*; (2) Libel *Per Se*; (3) Trade Libel; and (4) Unfair Competition in Violation of Cal. Bus. & Prof. Code § 17200 (the "*Peterson* Complaint") against Defendants Sanghi, Moorthy, Bjornholt, and Microchip, as well as Mitch Little and Does 1-10 (collectively, the "*Peterson* Defendants").

71.     Mitch Little has served as Vice President, Worldwide Sales and Applications of Microchip since July 2000.  Microchip's 2018 Form 10-K lists Little as one of the "Executive Officers of the Registrant [Microchip]."  Microchip 2018 Form 10-K at 11.  In addition, Little is, and from the beginning of the Class Period was, listed on Microchip's website as one of Microchip's six "Corporate Officers."  *See* www.microchip.com/about-us/leadership (last visited Feb. 18, 2019).

72.     Among other things, the *Peterson* Plaintiffs allege in the *Peterson* Complaint that Microsemi provided all of its inventory, distribution, and sales data to Microchip as part of the due diligence process in connection with the Acquisition.  This documentation included, among many other things, comprehensive historical data going back at least three

16

years describing each Microsemi product line's channel inventory levels.  The *Peterson* Plaintiffs allege that Sanghi and others falsely claimed that they only learned of those facts after the Acquisition closed.

73.     The action, titled *Peterson v. Sanghi*, was originally filed in the Superior Court of the State of California, County of Orange, under docket number 30-2018-01023948-CU-DF-CJC.  On or about November 8, 2018, the *Peterson* Defendants removed the action to the United States District Court for the Central District of California, Southern Division, under docket number 8:18-cv-2000-JLS (ADSx).  This Complaint refers to the litigation as the "*Peterson* Litigation."

74.     On December 7, 2018, the *Peterson* Defendants moved to dismiss the *Peterson* Complaint.  That motion to dismiss did not challenge the truth of the allegations of the *Peterson* Complaint.  Rather, the *Peterson* Defendants moved to dismiss on the grounds that (a) the complaint lacked facts showing the alleged defamatory statements referred to the *Peterson* Plaintiffs, (b) the alleged defamatory statements were protected by qualified privileged, (c) a claim for trade libel was not alleged because the alleged defamatory statements did not concern products or services, (d) elements of a claim for unfair competition were not alleged, and (e) the *Peterson* Complaint was a strategic lawsuit against public participation ("SLAPP," or an "Anti-SLAPP Motion").  *Peterson* Litig. ECF No. 11.

75.     The *Peterson* Defendants' motion to dismiss was fully briefed and argued on February 1, 2019.  On February 14, 2019, the Court issued an order that (a) struck the *Peterson* Defendants Anti-SLAPP motion for failure to meet and confer with the *Peterson* Plaintiffs in accordance with local rules, (b) denied the motion to dismiss the slander and libel claims, and (c) granted the motion to dismiss as to the trade libel claims.  The *Peterson* Plaintiffs voluntarily dismissed the unfair competition claims at the February 1, 2019 hearing.  *Id*.

76.     Throughout this Complaint, Plaintiff will reference facts pled in the *Peterson* Complaint, which is appropriate given the court's denial in part of the *Peterson* Defendants' motion to dismiss.  In denying in part the motion to dismiss, the court "accept[ed] as true all

17

'well-pleaded factual allegations'" in the *Peterson* Complaint and found that the *Peterson* Complaint contained "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id*. at p. 10 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) and *Bell Atl. Cor. v. Twombly*, 550 U.S. 544, 555 (2007)).

77.     Reliance on the allegations of the *Peterson* Complaint is also appropriate because they were made in accordance with California Code of Civil Procedure Section 128.7, which is similar to Federal Rule of Civil Procedure 11.  Section 128.7 provides, in relevant part, that:

> (b) By presenting to the court…a pleading…an attorney…is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, all of the following conditions are met:
>
> (1) It is not being presented primarily for an improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.
>
> (2) The claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law.
>
> (3) The allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

### 5.     Defendants Were Keenly Aware of the Stark Difference Between GAAP (Sell-In) and Non-GAAP (Sell-Through) Results

78.     In the year leading up to when Microchip first approached Microsemi about a potential acquisition, Microchip reported on both a GAAP and non-GAAP basis its net sales, gross margins, operating income, net income from continuing operations, and earnings per share ("EPS").

79.     While GAAP required that revenue be recognized when products were sold to distributors, Defendants favored managing Microchip's business based on non-GAAP sell-through revenue recognition, or recognizing revenue when products were sold to end users,

1    not distributors.  Defendants strongly believed that non-GAAP information based on sell-

2    through to ultimate customers was a better reflection of product demand.

3        80.    For example, Microchip issued quarterly press releases announcing its

4    financial results on (a) February 7, 2017 for the third quarter of fiscal year 2017 (the

5    "February 7, 2017 Press Release"); (b) May 9, 2017 for the fourth quarter and fiscal year

6    2017 ending March 31, 2017 (the "May 9, 2017 Press Release"); (c) August 3, 2017 for the

7    first quarter of fiscal year 2018 ending June 30, 2017 (the "August 3, 2017 Press Release");

8    (d) November 6, 2017 for the second quarter of fiscal year 2018 ending September 30, 2017

9    (the "November 6, 2017 press release); and (e) February 6, 2018 for the third quarter of

10   fiscal year 2018 ending December 31, 2017 (the "February 6, 2018 Press Release).

11       81.    Each of the February 7, 2017, May 9, 2017, August 3, 2017, and February 6,

12   2018 Press Releases listed Bjornholt as the Investor Relations Contact for the press release.

13       82.    Each of the February 7, 2017, May 9, 2017, August 3, 2017, and February 6,

14   2018 Press Releases was filed by Microchip with the SEC as an attachment to a Form 8-K

15   on the same day it was issued.  The November 6, 2017 Press Release was filed by Microchip

16   with the SEC as an attachment to a Form-8-K on November 7, 2017.  Each of those Form

17   8-Ks were signed by Bjornholt on behalf of Microchip.  Because of the significance of the

18   documents, the Individual Defendants, by virtue of their positions as the top executives of

19   Microchip, would have reviewed the press releases and have ultimate control over their

20   content.

21       83.    In each of the February 7, 2017, May 9, 2017, August 3, 2017, November 6,

22   2017, and February 6, 2018 Press Releases, Defendants reported net sales, gross margins,

23   operating income, net income from continuing operations, and EPS on both a GAAP and

24   non-GAAP basis.

25       84.    Microchip also held earnings conference calls with analysts on February 7,

26   2017, May 9, 2017, August 3, 2017, November 6, 2017, and February 6, 2018 to discuss

27   Microchip's quarterly financial results (respectively, the "February 7, 2017 Conference

28   Call," "May 9, 2017 Conference Call," "August 3, 2017 Conference Call," "November 6,

19

2017 Conference Call," and the "February 6, 2018 Conference Call").  Transcripts of the February 7, 2017, May 9, 2017, August 3, 2017, November 6, 2017, and February 6, 2018 Conference Calls were prepared by Bloomberg and are publicly available.

85.     On each of the February 7, 2017, May 9, 2017, August 3, 2017, November 6, 2017, and February 6, 2018 Conference Calls, Sanghi and Bjornholt discussed Microchip's net sales, gross margins, operating income, net income from continuing operations, and EPS on both a GAAP and non-GAAP basis.

86.     For example, in the February 7, 2017 Conference Call, Sanghi, in discussing operating results, reported on Microchip's "net sales" both on a GAAP and non-GAAP basis. As noted by Sanghi, "GAAP net sales were $46.8 million lower than non-GAAP net sales, because for GAAP accounting purposes we began recognizing revenue on a sell-through basis for the Atmel Asia distributors on October 1, 2016, and inventory sitting in the distribution channel on that date was not recognized as revenue in our GAAP financial statements when it was subsequently sold by the distributors."  Feb. 7, 2017 Tr. at 2.

87.     Similarly, in the May 9, 2017 Conference Call, Sanghi reported on net sales both on a GAAP and non-GAAP basis.  Specifically, Sanghi noted that "For fiscal 2017, on a non-GAAP basis net sales were a record $3.502 billion" while "GAAP net sales were a record $3.408 billion."  May 9, 2017 Tr. at 2.

88.     Bjornholt also discussed on the May 9, 2017 Conference Call the differences between GAAP and non-GAAP net sales.  Specifically, an analyst noted that "there is a FASB [Financial Accounting Standards Board] pronouncement that's going to require you to transition to sell-in rev rec [revenue recognition]" and inquired on whether this development changed "the timing and anticipated impact on your reported financials."  Bjornholt responded:

> Yeah, so that change will be effective for Microchip April 1, 2018, so the beginning of our next fiscal year.  We are going through the planning process associated with that.  I guess what should be important from an investor standpoint is we are not going to change in any way our go-to-market strategy with our distributors, the way that we price our products, the way that we interact with them. *But the reporting will have to be on a sell-in basis, where*

*essentially you're making an estimation of what the net sales price of the product that you're shipping in is going to be.  So our accounting team is working through that* and will be effective for us next year.  [*Id*. at 11.[1]]

89.     On the August 3, 2017 Conference Call, Defendant Bjornholt, noted that "[w]e have posted a full GAAP to non-GAAP reconciliation on the Investor Relations page of our website…which we believe you will find useful when comparing GAAP and non-GAAP results."  Aug. 3, 2017 Tr. at 1-2.

90.     Defendant Sanghi, for his part, continued to tout the benefits of reporting non-GAAP results, "given all the complications of accounting for the acquisitions including amortization of intangibles, restructuring charges *and inventory write-up on acquisitions*." *Id*. at 6.

91.     On the November 6, 2017 Conference Call, Sanghi repeated his statement that non-GAAP reporting was appropriate given "all the complications of accounting for the acquisitions" and given "inventory write-up on acquisitions" and Bjornholt repeated his statement that a full "GAAP to non-GAAP reconciliation" was available on Microchip's website.  Nov. 6, 2017 Tr. at 5.

92.     On the February 6, 2018 Conference Call, Sanghi re-emphasized that Microchip was "relentlessly marching towards" a non-GAAP "model" given "all the complications of accounting for the acquisitions" and given "inventory write-up on acquisitions."  Feb. 6, 2018 Tr. at 5.  Bjornholt repeated his statement that a full "GAAP to non-GAAP reconciliation" was available on Microchip's website.  Sanghi also alluded to issues in prior acquisitions, noting that "'we're not in a massive inventory correction mode of any kind."  *Id*. at 15.

93.     Also, on each of the February 7, 2017, May 9, 2017, August 3, 2017, November 6, 2017, and February 6, 2018 Conference Calls, Sanghi asked the analysts to report earnings on a non-GAAP basis: "We believe that non-GAAP results provide more meaningful comparison to prior quarters, and we request that the analysts continue to report

---

[1] All emphasis throughout the Complaint is added unless otherwise indicated.

the non-GAAP estimates to first call."  Feb. 7, 2017 Tr. at 6; May 9, 2017 Tr. at 6; Aug 3, 2017 Tr. at 6; Nov. 6, 2017 Tr. at 5; Feb. 6, 2018 Tr. at 5.

94.    A review of Microchip's executive compensation structure also demonstrates that the Individual Defendants were aware of the distinctions between GAAP and non-GAAP recognition of revenue.

95.    Specifically, Microchip's Annual Proxy dated July 13, 2017 (the "2017 Proxy," the annual proxy preceding announcement of the Microsemi Merger) stated that the Individual Defendants' compensation was based on certain performance metrics under the Company's Executive Management Incentive Compensation Plan ("EMICP").  2017 Proxy at 19-21

96.    While these metrics "may be based on either GAAP or non-GAAP financial results at the discretion of the Compensation Committee," *id.* at 20, the Proxy stated that the Committee "typically uses non-GAAP information when setting the [EMICP] targets."  The Proxy then goes on to note the consequence of this committee decision, namely, that "[o]ur non-GAAP results exclude, as applicable,… *preclusion of revenue recognition under GAAP for inventory in the distribution channel on the acquisition dates of our acquisitions, [and] revenue recognition changes related to Atmel and Micrel distributors."  Id.* at 20.

97.    In other words, the Individual Defendants' compensation was based on considerations which specifically took into account the distinction between GAAP and non-GAAP treatment of inventory in the distribution channel.  Compensation was also based on considerations related to changes in revenue recognition following a merger.

98.    It is reasonable to infer that the Individual Defendants were well aware of their own compensation structures during the Microsemi merger process.  What follows is that the Individual Defendants understood that, like Atmel and Micrel, two companies previously acquired by Microchip, it was very likely that Microsemi recognized revenue in a manner differently than Microchip.

99.    Therefore, at the time immediately prior to approaching Microsemi about a potential transaction to acquire Microsemi, Defendants were keenly aware of the stark

difference between GAAP and non-GAAP result calculations, and the stark difference between sell-in and sell-through net sales revenue.

**6.   Defendants Were Keenly Aware of Microchip's Inventory Levels and the Importance of Inventory to a Semiconductor Manufacturer**

100.   In the year leading up to when Microchip approached Microsemi about a potential transaction, Defendants repeatedly informed the public about Microchip's current and expected days of inventory, current inventory balance, and current inventory at distributors.  The Defendants also discussed inventory target levels, and/or compared current and expected inventory to those levels.

101.   Of note, for each quarter ending December 31, 2016 through December 31, 2017, Microchip and Bjornholt announced Microchip's inventory as well as inventory at distributors.

102.   For example, the February 7, 2017 Press Release stated "Microchip's inventory days at March 31, 2017 are expected to be 98 to 106 days.  Our actual inventory level will depend on the inventory that our distributors decide to hold to support their customers, overall demand for our products and our production levels."

103.   On the February 7, 2017 Conference Call, Bjornholt stated "[o]ur inventory balance at December 31, 2016 was $419.6 million.  Microchip had 104 days of inventory at December 31, 2016, up one day from the end of the September quarter.  Inventory at our distributors was at 31 days and at the same level as the September quarter."  Feb. 7, 2017 Tr. at 2.

104.   The May 9, 2017 Press Release stated "Microchip's inventory days at June 30, 2017 are expected to be 98 to 107 days.  Our actual inventory level will depend on the inventory that our distributors decide to hold to support their customers, overall demand for our products and our production levels."

105.   Bjornholt stated on the May 9, 2017 Conference Call that "Our inventory balance at March 31, 2017 was $417.2 million.  Microchip had 103 days of inventory at the end of the quarter, down one day from that of the end of the December quarter.  Inventory

23

at our distributors was at 33 days and up two days from the December quarter."  May 9, 2017 Tr. at 2.

106.    Bjornholt was quoted in the August 3, 2017 Press Release as stating:

Our inventory at June 30, 2017 was at 100 days and was the lowest in 7 years. Our distributor inventory at 31 days was also on the low end of our normal range.  Despite our recent manufacturing ramp, we have not been able to grow our inventories since all of the additional output is getting shipped for revenue. We are projecting Microchip's inventory at September 30, 2017 to be between 99 and 101 days, which is essentially flat to the June quarter levels.

107.    The August 3, 2017 Press Release further stated that "Microchip's inventory days at September 30, 2017 are expected to be 99 to 101 days.  Our actual inventory level will depend on the inventory that our distributors decide to hold to support their customers, overall demand for our products and our production levels."

108.    On the August 3, 2017 Conference Call, Bjornholt again updated the public about Microchip's inventory levels and target inventory days:

our inventory balance at June 30, 2017 was $426.8 million.  Microchip had 100 days of inventory at June 30, down three days from the end of the March quarter.  Inventory days are at a seven year low and we don't expect inventory days to grow in the current quarter as our capacity increases are hardly keeping pace with the increases in demand we are seeing in the business.  Inventory at our distributors was at 31 days and that was down two days from the March quarter levels.  [Aug. 3, 2017 Tr. at 2.]

109.    Bjornholt was quoted in the November 6, 2017 Press Release as stating: "Our inventory at September 30, 2017 was 105 days and grew by five days from the June quarter levels.  Inventory days are still well below our targeted levels, but we are starting to see improvement from our continued capacity expansion efforts."

110.    Sanghi was quoted in the November 6, 2017 Press Release as stating "We are seeing improvement in our inventory position and our lead times are improving for many of our products."

111.    The November 6, 2017 Press Release further stated that:

Microchip's inventory days in the December 2017 quarter are expected to grow as we continue to make progress in moving towards our longer-term target of 115 to 120 days of inventory.  Our actual inventory level will depend

24

1

on the inventory that our distributors decide to hold to support their customers, overall demand for our products and our production levels.

2

112.    Bjornholt discussed Microchip's inventory levels on the November 6, 2017

3

Conference Call:

4

Our inventory balance at September 30, 2017 was $456.9 million.  Microchip had 105 days of inventory at September 30, 2017, up five days from the end of the June quarter.  Inventory days are still well below our targeted levels, but are starting to improve from our significant capacity expansion efforts as well as selective and opportunistic buy ahead of constrained materials.  Inventory at our distributors in the September quarter continued to be low at 31 days and were flat to the June quarter levels.  [Nov. 6, 2017 Tr. at 2.]

5

6

7

8

9

113.    The February 6, 2018 Press Release stated:  "Microchip's inventory days in

10

the March 2018 quarter are expected to be in the range of our longer-term target model of

11

115 to 120 days of inventory.  Our actual inventory level will depend on the inventory that

12

our distributors decide to hold to support their customers, overall demand for our products

13

and our production levels."

14

114.    On the February 6, 2018 Conference Call, Bjornholt discussed Microchip's

15

inventory levels:

16

our inventory balance at December 31, 2017, was $487.1 million.  Microchip had 115 days of inventory at the end of the December quarter, our targeted inventory levels are between 115 and 120 days.  Inventory at our distributors in the December quarter were at 34 days and up 3 days from the prior quarter, and in the normal historical range for distribution inventory.  [Feb. 6, 2018 Tr. at 2.]

17

18

19

20

115.    Also on the February 6, 2018 Conference Call, Sanghi and Bjornholt

21

responded to a question from analyst William Stein of SunTrust Robinson Humphrey, Inc.

22

("SunTrust") concerning inventory:

23

William Stein: I'm wondering if the inventory build is something that you had expected at the start of the quarter or if that occurred more as a result of perhaps orders not coming in with turn rates as fast as you might have expected when the quarter started?

24

25

Sanghi: So the inventory was pretty much right on target what we had guided to and what we achieved.  The turns rate in December quarter was not soft. We beat the December quarter from the midpoint of our guidance so I don't think there was any issue in terms of our bookings in December quarter, which will have changed the inventory.

26

27

28

Bjornholt: Yeah.  And you can see from the guidance that we had on our release, we think we're going to continue to be within our inventory target range of 115 to 120 days in the quarter that we're in right now, so I think inventory is well managed.  [*Id*. at 6.]

116.    Analyst Harsh Kumar of Piper Jaffray Companies ("Piper Jaffray") also asked about inventory, and Sanghi answered his question:

Harsh Kumar: So Steve, as my follow-up, you guys always run the company for the long-term, and historically in lean times even you've grown inventories, your target level of inventory is 115 to 120 days.  You just hit 115 days now.  By all metrics, end markets are still pretty good.  Does it actually make sense for you to – can you make the case that you should actually be growing your inventory levels even further and beyond the 115 days? So why stop here?

Sanghi: Well, if our inventories get below 100, then we don't have usually all the right product in the right place and all the permutations and combinations and SKUs and permutations and combinations and SKUs and flavors available, and then you go on support and you're expediting and you're going to have a lot of manufacturing challenges.  When you are in the 115, 120 days of inventories and I think we can manage our business reasonably well.  I mean, I wouldn't distinguish between 115, 120 or a few days left or a few days even more than that on the outer side.  But we don't want to have – keep going, like you said, to have 135, 140, 150 days of inventory, because then you're not really making the right use of that inventory.

We don't need that much inventory and you have the opposite risk of obsolescence where certain products, customer changes are flavored.  They want to use a different package and we packaged it in and we want to keep most of the inventory and [ph] die (00:30:23) inventory.  And when you do that, then its dollar value doesn't grow as much versus if you put it in the finished goods.

So I think that's well-tried over the years, that's really the right kind of number.  And when we are lower than that, we're trying to grow inventory, when we are higher than that we're trying to decrease inventory, and that's kind of still the right number.  [*Id*. at 7.]

117.    Therefore, at the time immediately prior to approaching Microsemi about a potential transaction to acquire Microsemi, Sanghi, Bjornholt and Microchip were keenly aware of Microchip's inventory levels and inventory at its distributors, the importance of those inventory levels to a semiconductor producer, and the importance of inventory and inventory at its distributors (in the supply chain).

118. Moorthy, by virtue of his high level position as COO of Microchip, and the fact that he "co-managed the worldwide consolidated enterprise of Microchip" with Sanghi after the Atmel acquisition, was also keenly aware of this information and its importance.

**B.    Microchip's Prior Acquisitions Demonstrate Defendants' Knowledge of the Need to Conduct Thorough Due Diligence of Targets**

119. By virtue of Microchip's many earlier acquisitions, Defendants had extensive knowledge of variations in sales and inventory levels of acquired companies, and had the ability to analyze those metrics during due diligence.

120. For example, on January 19, 2016, Microchip announced in a press release that it would acquire Atmel, a designer and manufacturer of microcontrollers based in San Jose, for $8.15 per share in a combination of $7.00 per share in cash and $1.15 per share in stock, for a total equity value of approximately $3.56 billion. In the announcement press release, Sanghi and Moorthy praised the Atmel acquisition:

> Sanghi: We are delighted to welcome Atmel employees to Microchip and look forward to closing the transaction and working together to realize the benefits of a combined team pursuing a unified strategy. As the semiconductor industry consolidates, Microchip continues to execute a highly successful consolidation strategy with a string of acquisitions that have helped to double our revenue growth rate compared to our organic revenue growth rate over the last few years. The Atmel acquisition is the latest chapter of our growth strategy and will add further operational and customer scale to Microchip

> Moorthy: Microchip and Atmel have a strong tradition of innovation, stretching across microcontroller, analog, touch, and connectivity and memory solutions.

121. Sanghi elaborated on these sentiments during Microchip's investor call held that day. A transcript of the investor call was prepared by Bloomberg and is publicly available.

> Like Microchip, Atmel serves a diverse global customer base with over 80% of the revenue coming from outside the Americas. Also like Microchip, Atmel has a diverse channel through which they reach customers with 60% of their revenue coming through the distribution channel. Atmel has a tradition of technology leadership and innovation through their organic efforts as well as the acquisitions they have made. This has resulted into very good products and solutions in the marketplace. [Jan. 19, 2016 Tr. at 2.]

122.  Sanghi noted that "the combination of Microchip and Atmel will create an MCU [*i.e.* Microcontroller], powerhouse and move Microchip from the number four to the number three market position in microcontrollers…." [*Id.*]

123.  In order to acquire Atmel, Microchip had to outbid Dialog Semiconductor plc, which had already entered into a merger agreement with Atmel.

124.  On April 4, 2016, Microchip announced that it had completed the acquisition of Atmel.  In the press release announcing completion of the transaction, Sanghi stated:

> The performance of Atmel since we engaged in discussions in August of 2015 has been disappointing.  We believe that the large drop in Atmel revenue in the March 2016 quarter is *likely the result of an inventory correction in the distribution channel as distributors reduced inventory levels*, overall weak business conditions, and concerns on the part of distributors surrounding the impact of the sale of Atmel to Microchip.  We took some of this weakness into consideration in dropping the final acquisition price from our original offer.

125.  The Defendants elaborated on the inventory correction issues during the investor call held that day.  A transcript of that investor call was prepared by Bloomberg and is publicly available.  For example, Sanghi noted that "in calendar year 2015 [the immediately preceding calendar year] Atmel's distributors, *where revenue is recognized on a sell-in basis*, increased their inventory levels significantly."  Apr. 4, 2016 Tr. at 2.  Sanghi continued:

> Subsequently, Atmel saw a severe inventory contraction in the distribution channel across its entire business.  Atmel recognized revenue in Americas and Europe based on sell-through from distribution but recognize[d] revenue in Asia based on sell-in to distribution.  *This is a typical peril of sell-in revenue recognition that we have discussed with investors for years.*  Microchip will consolidate Atmel's results into Microchip on a non-GAAP basis based on sell-through revenue recognition from the very beginning to provide a more reasonable estimate of the size of the business.  [*Id.*]

126.  Bjornholt noted that "we need to get the inventory portion of the distributors. We know distributor inventory came down significantly.  Whether there is any more to come, I think it's a little too early for us to comment on that.  But I think a large piece for the correction has happened at this point."  *Id.* at 5.

28

127.   Clearly, the Defendants understood (at the very least, by no later than the Atmel acquisition) that distinctions between sell-in and sell-through models were crucial metrics, and the difference between the two, and inventory in the channel, needed to be examined in any potential acquisition target.  This should have alerted Microchip and its senior executives to be more thorough in the Microsemi due diligence and examine inventory levels and revenue recognition of Microsemi.

C.   <u>**Microsemi Only Reported Company Inventory Levels on a Quarterly Basis; Not Distributor Inventory and Only Reported GAAP Sales, Not Non-GAAP Sales**</u>

128.   Microsemi only disclosed company inventory levels in its quarterly conference calls.  It did not disclose distributor inventory.  Transcripts of the Microsemi's quarterly conference calls discussed below were prepared by Bloomberg and are publicly available.

129.   On Microsemi's January 26, 2017 conference call, John W. Hohener, Microsemi's Executive Vice President and CFO stated: "At the end of the first quarter…Inventories were $210.4 million and days of inventory were 120, also the same as last quarter."  Jan. 26, 2017 Tr. at 3.

130.   On Microsemi's April 27, 2017 conference call, Hohener stated: "At the end of the second quarter…Inventories were $213.6 million and days of inventory increased from 120 days to 122 days as we position our inventories to support revenue growth in the next two quarters."  Apr. 27, 2017 Tr. at 3.

131.   On Microsemi's July 27, 2017 conference call, Hohener stated: "At the end of the third quarter… Inventories were $231.9 million and days of inventory improved from 122 days to 121 days."  July 27, 2017 Tr. at 3.

132.   On Microsemi's November 9, 2017 conference call, Hohener stated: "At the end of the fourth quarter…Inventories were $239.1 million, with days of inventory at 127 days."  Nov. 9, 2017 Tr. at 3.

133.    On Microsemi's January 25, 2018 conference call, Hohener stated: "At the end of the first quarter of 2018...Inventories were $270.7 million and a days of inventory of 123 days." Jan 25, 2017 Tr. at 3.

134.    The Microsemi 2017 Form 10-K also discussed Microsemi's distributors and inventory, and the fact that Microsemi recognized revenue on sales to distributors (sell-in), as opposed to Microchip's preferred (and championed) method to recognize revenue on sales to end users (sell-through):

> We generate a portion of our sales through third-party distribution and seller agreements.
>
> *        *        *
>
> We primarily recognize revenue from customers, including distributors, when title and risk of loss have passed to the customer provided that: 1) evidence of an arrangement exists; 2) delivery has occurred; 3) the fee is fixed or determinable; and 4) collectability is reasonably assured.  For substantially all product sales, revenue is recognized, net of estimated returns and discounts, at the time the product is shipped.  [Microsemi 2017 Form 10-K at 16, 34.]

135.    Unlike Microchip, Microsemi did not disclose distributor inventory or non-GAAP sell-through to ultimate customers – both of which were important metrics to Microchip in the operation of its company.  This was a red flag with respect to Microsemi's inventory management and but for a reckless disregard for the truth would have been a focus of Microchip's due diligence.

**D.    Microchip Pursues the Acquisition of Microsemi**

136.    Against this backdrop, Microchip sought out Microsemi beginning in July 2017.  Microchip and Microsemi had few overlapping product lines and in Microchip's estimation, Microsemi made a good merger partner.

137.    On July 27, 2017, J.P. Morgan Securities LLC ("J.P. Morgan"), a financial advisor to Microchip, contacted a member of the Board of Directors of Microsemi and stated that Microchip might be interested in exploring a business combination transaction with Microsemi.  Microsemi April 19, 2018 Schedule 14A ("Microsemi Proxy") at 30.

138.    On July 27, 2017, Microsemi's stock price closed at $53.65 per share.

139.   From September 2017 through November 2017, Sanghi and Peterson had various communications where Sanghi reiterated Microchip's interest in a possible business combination with Microsemi. *Id*. at 30.

140.   Microchip made its first offer to acquire Microsemi on November 9, 2017 for $63.00 per share, "approximately 35% to 40% of which would be paid in Microchip common stock and the remainder of which would be paid in cash.  No exchange ratio was specified." *Id*.

**E.     Microchip Did Extensive Due Diligence on Microsemi's Business**

141.   As befits a $10 billion plus acquisition, and consistent with its prior experience with acquisitions of companies with inconsistent inventory levels, Microchip did extensive due diligence on Microsemi's business.

142.   Microchip's due diligence team for the Transaction contained at least 25 members. *Peterson* Complaint ¶¶ 5, 99.

143.   On November 30, 2017, "Peterson and [Steven Litchfield, Executive Vice President and Chief Strategy Officer of Microsemi] had lunch with [Sanghi and Moorthy] to continue discussions regarding a potential strategic transaction between Microsemi and Microchip as well as Microsemi's and Microchip's respective businesses."  Microsemi Proxy at 31.

144.   "[I]n December 2017, well before the Merger Agreement was signed, Goerner gave a PowerPoint presentation to Sanghi and other Microchip executives that detailed Microsemi's relationships with its largest customers and the incentive programs Microsemi had put in place to drive sales, showing the proportion of Microsemi's revenue that was attributable to sales to distributors." *Peterson* Compl. ¶ 104.

145.   The "December 2017,…PowerPoint presentation to Microchip executives…provided explicit data regarding Microsemi's revenue sources, including information sufficient to show the proportion of revenue attributable to distributors versus customers." *Id*. ¶ 7.

146.   "On December 11, 2017… J.P. Morgan, Microchip's financial advisor, sent Qatalyst Partners [Microsemi's financial advisory] a list of follow-up diligence questions relating to Microsemi's business."  Microsemi Proxy at 31.

147.   "From December 12, 2017 through early January 2018, Microsemi and representatives of Qatalyst Partners shared information with Microchip and J.P. Morgan, and provided various materials in response to Microchip's follow-up diligence questions." *Id*.

148.   "Separately during [the time around January 7, 2018], Microsemi and representatives of Qatalyst Partners provided Microchip and representatives of J.P. Morgan various materials in response to Microchip's additional follow-up questions regarding Microsemi's business, including the anticipated effect of the new U.S. tax legislation." *Id*. at 33.

149.   "On January 11, 2018, [Microsemi] management and Microchip held a conference call, which was also attended by representatives of Qatalyst Partners and J.P. Morgan, to provide Microchip with additional due diligence information regarding various tax matters." *Id*.

150.   On January 31, 2018, Microchip made its "best and final" non-binding proposal to purchase all of Microsemi's outstanding common stock at a price of $68.78 per share in cash, subject to Microsemi's agreement to enter into a 30-day exclusivity agreement. The exclusivity agreement was entered into later that same day. *Id*. 35.

151.   "On February 2, 2018, Microsemi received a written due diligence request list from Microchip, and Microsemi provided Microchip with access to Microsemi's virtual data room [(the "Data Room")]." *Id*.

152.   Microchip and the Individual Defendants were provided with a significant amount of information concerning Microsemi, including information related to Microsemi's inventory practices and inventory positions at Microsemi's distributors.

153.   "Microsemi granted Microchip unrestricted access to 15.3 gigabytes of data (more than 4,650 files) consisting of years of confidential financial and operational information that had been collected in the Data Room." *Peterson* Compl. ¶ 100.

154.   Microsemi's Data Room was populated on or before January 7, 2018, almost a month before Microchip asked for access.  In fact, on January 7, 2018, Microsemi gave another party interested in acquiring Microsemi "access to its [Data Room] in response to its diligence request list."  Microsemi Proxy at 33.

155.   "Microchip, including Sanghi, and its attorneys had unfettered access to the Data Room and received notifications whenever documents were added.  Microsemi and its attorneys could see whether information and documents in the Data Room had been accessed." *Peterson* Compl. ¶ 101.

156.   "Sanghi and Microchip had unfettered access to all the information necessary to understand the manufacturing lead times for Microsemi's products, consumer demand to both Microsemi and its distributors, historic inventory levels in the distribution channel, and the proper bases for Microsemi's revenue recognition practices." *Id*. ¶ 122.

157.   CW1 was Microsemi's Vice President of Sales through the end of May 2018, when CW1 was laid off immediately following the closing of the Merger.  In CW1's position as Vice President of Sales, CW1 reported to Goerner and worked closely with the *Peterson* Plaintiffs.  The sales leaders of Microsemi's five major geographical sales areas – North America, Europe, Middle East, and Africa ("EMEA"), Japan, Korea, and Greater China – reported to CW1, as did the sales leaders of Microsemi's dedicated vertical markets, including data center, communications systems, and aerospace and defense.

158.   CW1 stated that Sansone was responsible for managing the "asset side" of Microsemi's global distribution, including negotiating the long-term contracts between Microsemi and the distributors, as well as being involved in managing the "day to day inventory levels" and negotiating prices.

159.   CW1 managed "demand creation" for Microsemi's products – driving sales to end-user customers that would order the products they wanted from Microsemi's

33

1  distributors.  CW1 was also responsible for dealing with Microsemi's Asian distributors,

2  including negotiating inventory levels, because CW1 had long-term relationships with these

3  distributors that made it more practical for CW1 to oversee them than Sansone.

4        160.  CW1 and Sansone collaborated closely with each other to ensure the

5  distributors had sufficient inventory to meet the demand created by CW1's sales team.

6        161.  CW1 stated that CW1 was aware of the information in the Data Room because

7  it was CW1's responsibility to make sure that documents and information created or received

8  in the normal course of Microsemi's business was available to be put into the Data Room,

9  including inventory reports and point of sale ("POS") reports.  CW1 stated that distributor

10 level inventory data was put into the Data Room in spreadsheets and perhaps PowerPoint

11 documents.

12       162.  While CW1 did not upload the data into the Data Room personally, CW1

13 spoke with those responsible for uploading the data and understood data was in the Data

14 Room multiple times, understood that all the data was collected, and that there was an

15 administrative process for that data to be placed into the Data Room.  For example, CW1

16 stated that Pickle was in charge of the Data Room, and that Pickle told CW1, both before

17 the Merger closed and after the Merger closed, that data concerning inventory levels at

18 distributors and in the distribution channel was uploaded into the Data Room.  Pickle

19 specifically told CW1 that all the data that Microchip and the Individual Defendants later

20 claimed was misrepresented by Microsemi or was not provided by Microsemi was in the

21 Data Room.  The *Peterson* Plaintiffs make the same assertion in *the Peterson* Litigation.

22 *Peterson* Compl. ¶ 102.

23       163.  CW1 stated that information concerning what a distributor's inventory levels

24 were came to Microsemi from the distributors themselves.  Microsemi required the

25 distributors to submit POS reports, as well as their inventory levels, on a monthly basis.

26 Data from some distributors was available at Microsemi in real time.  The data was received

27 from other distributors within ten days of the end of each month.  These reports were

28 received and aggregated by Sansone and Microsemi's finance department.  CW1 received

34

this data for Microsemi's Asian distributors in an aggregated form and reviewed it briefly to ensure there was nothing out of the ordinary. Sansone also had access to the same data from Microsemi's Asian distributors at the same time CW1 received the data.

164. CW1 said that the distributor inventory level data would be reported by way of multiple Enterprise Resource Planning ("ERP") systems in use at Microsemi.

165. CW1 also stated that Microsemi had constant access to data on inventory levels at distributors and in the distribution channel. Some of this data was real time, and some was reported on a quarterly basis, usually within ten days after the quarter closed if not already available in real time. Any new or updated inventory data was uploaded into the Data Room. CW1 also stated that territory managers would continuously submit updates on delinquencies of inventory data from distributors in Microsemi's distribution chain. CW1 stated that Microsemi would not wait until the end of the quarter if there was something out of the ordinary with inventory distribution data.

166. CW2 worked at Microsemi from August 2013 through June 2018. From January 2016 through June 2018, a period that coincides with the Class Period, CW2 was Vice President of Sales for the Americas. CW2 reported to CW1.

167. CW2 also confirmed that the Data Room contained files and data on Microsemi's inventory positions with its distributors. CW2 was told this fact by Sansone, Goerner, and Pickle after the Merger closed. CW2 further stated that CW2 believes Pickle, based on Pickle's position at Microsemi, was in charge of what data was included in and uploaded into the Data Room.

168. CW2 further stated that it was easy to calculate the amount of inventory Microsemi's distributors had by taking the amount of inventory that Microsemi shipped to the distributors and then subtracting the amounts that the distributors shipped to end-user customers. CW2 stated this was easily available in Microsemi's ERP system. CW2 had access and capability to run these reports.

169. "During the remainder of February 2018, Microsemi, Microchip and their respective advisors participated in diligence calls and Microsemi and its advisors responded

35

to additional due diligence requests from Microchip and its advisors."  Microsemi Proxy at 35.

170.    On February 13, 2018, Microsemi's Board of Directors (which included Peterson), was updated with a "description of the diligence that had taken place to date." *Id*. at 36.

171.    Microchip "continued to conduct due diligence" up "to March 1, 2018." *Id*. at 37.

172.    CW2 stated that by March 1, 2018, there was a process underway in connection with providing whatever Microchip needed for its due diligence for the acquisition of Microsemi.

173.    Microsemi had the same access to due diligence in the Microsemi transaction that it acknowledged having in the Atmel transaction.

**F.    Microchip's Financial Results, and News of the Transaction Leaking, Pressures Microchip to Close the Transaction**

     **1.    News Reports Cause Microsemi's Stock Price to Rise**

174.    On January 23, 2018, Bloomberg reported that Microchip was rumored to be among the potential acquirers for Microsemi.

175.    The news report caused Microsemi's stock price to jump from $58.97 on January 22, 2018 to $62.35 on January 23, 2018.

     **2.    Microchip Reports Reduced March Quarter Prospects**

176.    On February 6, 2018, after the market for Microchip common stock closed for the day, Microchip issued the February 6, 2018 Press Release announcing its financial results for the third quarter of fiscal year 2018 (ended December 31, 2017).  The February 6, 2018 Press Release announced decreases for the third quarter of fiscal year 2018 in GAAP and non-GAAP net sales "sequentially," or from the previous quarter, for the December 2017 quarter.  Microchip announced:

> GAAP net sales of $994.2 million, down 1.8% sequentially and up 19.2% from the year ago quarter….

Non-GAAP net sales of $994.2 million, down 1.8% sequentially and up 12.8% from the year ago quarter.

177.   Later that afternoon, the Defendants convened the February 6, 2018 Conference Call, on which Sanghi discussed Microchip's financial guidance for the fourth quarter of fiscal 2018:

So now let's go into the non-GAAP guidance for the March quarter.  We expect total net sales in the March quarter to be down 3% to up 1% sequentially, giving us a midpoint of the guidance at minus 1%, which is right at seasonality that I explained about.

*          *          *

In September quarter last year, our net sales were up 15.8% from a year ago quarter.  In December quarter, our net sales were 12.8% from a year ago quarter.  In March 2018 quarter, we are guiding the net sales to be up 9% from a year ago quarter, clearly demonstrating the soft landing scenario that we have been talking to the investors.

*          *          *

we expect gross margin for the March quarter to be between 61.3% and 61.7% of sales.  We expect overall operating expenses to be between 22% and 22.4% of sales.  We expect operating profit percentage to be between 38.9% and 39.7% of sales.  And we expect earnings per share to be between $1.30 and $1.39 per share.  [Feb. 6, 2018 Tr. at 5.]

178.   Stock research analysts were quick to react to Microchip's disappointing earnings guidance.

179.   On February 6, 2018, Credit Suisse Equity Research ("Credit Suisse") issued a research report, stating that "While management attributed the F4Q miss to normal seasonal patterns, we believe it represents a modest 'downtick' that is (1) consistent with decelerating but NOT negative growth, (2) vindicating of our tactical cyclical caution, and (3) still not at odds with our LT [long term] secular bullishness."

180.   On February 7, 2018, Morgan Stanley & Co. LLC ("Morgan Stanley") lowered its price target for Microchip common stock from $99 per share to $96 per share, noting that "While it looks like weaker Atmel seasonality is influencing guidance for the March quarter, the bigger fundamental question is how customers respond to lower lead times after accumulating some inventory over the past 12 months.  This will heighten the

37

focus on the June quarter, where we model for 4.5% sequential revenue growth compared to normal seasonality in the 5% range."

181.    On February 7, 2018, Microchip's common stock closed at $82.91 per share, a decline of $9.01 per share from its February 6, 2018 closing price of $91.92 per share. Microchip common stock's trading volume on February 7, 2018 was approximately 13.6 million shares, just less than 2.5 times its trading volume of 5.5 million shares on February 6, 2018, indicating the materiality of the operating results to investors.

182.    The *Peterson* Complaint provides context regarding Microchip's underwhelming results, and how Microchip's under-performance motivated the Individual Defendants to close on a Merger.  Specifically, "[b]y early 2018, Defendants must have known that Microchip's performance was flagging and that a poor earnings report [for the first quarter of 2018] was virtually certain.  Defendants would thus have been incentivized to find someone or something to take the blame when the other shoe inevitably dropped." *Peterson* Complaint ¶185.

183.    Microchip's underwhelming third quarter fiscal 2018 net sales and fourth quarter prospects put pressure on the Defendants to close the Microsemi Transaction so that Defendants could report combined Microchip-Microsemi net sales, a figure that would not be comparable to stand alone Microchip's fiscal 2017 results.

184.    On  February 14, 2018, after the market for Microchip common stock closed, while Microchip was still in the process of negotiating the acquisition with Microsemi, Microchip issued a press release scheduling its inaugural Analyst and Investor Day for March 1, 2018 at 2:30 p.m. Mountain Standard Time (4:30 p.m. Eastern Time) ("Analyst Day").  The press release stated that Analyst Day would take place in person for those who were invited, and also be available via live webcast.

### 3.    News of the Transaction Leaks to the Press

185.    On February 27, 2018, several minutes after midnight *The Wall Street Journal*, reported that, based on "people familiar with the matter," Microchip was close to finalizing an acquisition of Microsemi, with consideration in the mid $60s per share range.  In an article

released at 7:21 a.m. later that morning, the authors of the story noted that "[a] deal could be struck this week, though there's no guarantee there will be one *and the two sides still have significant issues to agree on*," according to a person familiar with the matter.  The article noted that Microsemi, which had a closing price the previous day of $64.24, had a market valuation of more than $7.5 billion.

186.   On February 27, 2018 Bloomberg Intelligence issued a report expressing concern over the impact to Microchip's balance sheet of an all-cash transaction:

> An all-cash deal for Microsemi would likely translate into a multi-notch downgrade for Microchip Technology, though the loan and credit markets can accommodate a hypothetical $10 billion in aggregate issuance.  Pro forma leverage of about 5x, assuming modest synergies and excluding the company's deep-in-the-money convertible bonds, would be consistent with single-B ratings.  A 2-to-1 debt-equity split, combined with capacity to reduce leverage more than 0.5 turns annually, may be enough for BB ratings.

> S&P has a BB (unsolicited) corporate credit rating on Microchip, with BB+ rating on the senior secured revolving credit facility and B+ rating on the convertible notes.

187.   Barron's Tech-Trader Daily Blog similarly commented on February 27, 2018 that "one wrinkle in our opinion is the current debt load at Microchip."

188.   Also on February 27, 2018, Morgan Stanley issued an analyst report and stated that a potential negative of a Microchip/Microsemi deal was "Substantially higher debt load - $3.8bn increase in net debt even if MCHP uses half stock with total net debt of $6.6bn."

**4.     The Acquisition Was All Cash, Placing Pressure on Microchip's Balance Sheet**

189.   Out of concern for the impact to its balance sheet, Microchip sought Microsemi's agreement to a partial stock deal.  On November 9, 2017, Microsemi proposed a transaction price of $63.00 per share, with 35-40% of the price being paid in Microchip common stock and the balance paid in cash.  On January 24, 2018, Microchip proposed a transaction price of $65.00 per share, with 30-35% of the price being paid in Microchip common stock and the balance paid in cash.  Microsemi Proxy at 30, 33.

190.   Microsemi counter-offered on January 24, 2018 at $70.00 per share in cash. Microsemi Proxy at 33.  As confirmed by Sanghi on Analyst Day, Microsemi "didn't want equity."  Mar. 1, 2018 Tr. at 15.

191.   Microsemi's insistence on an all cash deal put pressure on Microchip's balance sheet.

192.   As shown later, the analyst and media reports expressing concern with Microchip's debt levels motivated Microchip to misrepresent the cash generation potential of the acquisition and ability to service debt.  *See, e.g.*, ¶¶ 186-88, 204-05, 211-12, 237.

193.   On February 28, 2018, Needham & Company, LLC ("Needham")  also issued a research report linking Microchip's motive to do a deal with its weak guidance for the March 2018 quarter.

**G.     Defendants Announce the Merger**

194.   On March 1, 2018, after the close of the market for Microchip common stock, Microchip issued a press release updating and narrowing the range for fourth quarter 2018 projections (period ending March 31, 2018).  The press release stated that "Microchip now expects consolidated net sales for the March quarter to be flat to down 2% with a mid-point of down 1%.  GAAP earnings per share is now expected to be between $0.73 and $0.79 and non-GAAP earnings per share is expected to be between $1.32 and $1.37 per share."

195.   Microchip's reduced expectations, first announced on February 6, 2018, was an added incentive for Microchip to close the Microsemi deal.

196.   On March 1, 2018, also after the close of the market, Microchip and Microsemi issued a joint press release announcing that they had signed a definitive agreement for Microchip to acquire all outstanding Microsemi common stock for $68.78 per share in cash (the "March 1, 2018 Press Release"):

> Microchip Technology Incorporated (NASDAQ: MCHP), a leading provider of microcontroller, mixed-signal, analog and Flash-IP solutions, and Microsemi Corporation (NASDAQ: MSCC), a leading provider of semiconductor solutions differentiated by power, security, reliability and performance, today announced that the two companies have signed a definitive agreement pursuant to which Microchip will acquire Microsemi for $68.78 per

share in cash.  The acquisition price represents a total equity value of about $8.35 billion, and a total enterprise value of about $10.15 billion, after accounting for Microsemi's cash and investments, net of debt, on its balance sheet at December 31, 2017.

197.   The March 1, 2018 Press Release listed Bjornholt as the Microchip contact responsible for the press release.  The Press Release was also filed by Microchip with the SEC as an attachment to a Schedule 14A on March 1, 2018.

198.   As stated by Sanghi at Analyst Day, he desired to announce the Microsemi acquisition on Analyst Day, and pushed the Transaction forward rapidly so that the announcement could take place on March 1, 2018.

> We know we gave you a very short notice, about a couple of weeks, to arrange your trips to come to this Analyst Day.  Hopefully, you know why.  We wanted to coincide the acquisition with this Analyst Day.  There are a lot of moving parts when you do an acquisition.  To bring all these things together in a given day is a herculean task.  [Mar. 1, 2018 Tr. at 1.]

> *          *          *

> We set this Analyst Day about 2.5 weeks ago, and we've been working on this acquisition probably for about 4 months now.  And trying to have it land on the day, I signed the deal one minute before market close today, 3:59 PM New York time, this was a Herculean task.  We probably all lost some weight trying to get there.  [*Id*. at 10.]

199.   At Analyst Day, Sanghi stated that "[The Transaction] leaked a couple of times in the last month, so I don't think there is a person in the room [stock research analysts and Microchip investors] that hasn't looked at who Microsemi is, unless you're living in a cave." *Id*. at 11.

200.   The March 1, 2018 Press Release further announced that Microchip "plans to finance the transaction with approximately $1.6 billion of cash from the combined company balance sheets, approximately $3.0 billion from Microchip's existing line of credit, approximately $5.0 billion in new debt and $0.6 billion of a cash bridge loan."

201.   According to Dow Jones, in a news story issued on March 1, 2018, shortly after Microchip's announcement of the Microsemi acquisition, the acquisition "comes amid a wave of consolidation in the semiconductor industry as companies seek to cut costs amid fierce consolidation and position themselves for new applications."

41

202. Also on March 1, 2018 after the market for Microchip common stock closed for the day, Sanghi and Microchip's other senior officers, including Bjornholt and Moorthy, conducted Analyst Day via an in-person presentation and question and answer session with investors and at least 14 stock research analysts. Analyst Day was also broadcast via conference call/webcast for those persons who were not invited to attend in person. A transcript of Analyst Day was created by Thomson Reuters Streetevents, and filed with the SEC by Microchip as an attachment to a Schedule 14A on March 5, 2018. A transcript of Analyst Day was also created by Bloomberg and is publicly available.

203. Defendants also presented a PowerPoint presentation/slide deck on Analyst Day (the "Analyst Day Slide Show"). The Analyst Day Slide Show repeated and reinforced the statements by Defendants on Analyst Day. The Analyst Day Slide Show was filed by Microchip with the SEC on March 1, 2018 as an attachment to a Schedule 14A.

204. Sanghi stated on Analyst Day that *[1]*[2]"pro forma net debt to EBITDA leverage starting at transaction close will be 4.7x. And that may look shocking," and that "we'll be generating approximately $1.4 billion of free cash flow per year starting right away." Mar. 1, 2018 Tr. at 13.

205. Sanghi added, *[2]* "[w]e plan to rapidly deleverage post-transaction close through a combination of growth in free cash flow and the EBITDA expansion. So, debt would be coming down, EBITDA would be growing, and coming from both sides, our denominator getting larger and numerator getting smaller, we will get that leverage down rapidly." Mar. 1, 2018 Tr. at 13.

206. On page 31 of the Analyst Day Slide Show, Microchip stated that *[3]* "Pro forma net Debt/EBITDA leverage at transaction close of 4.7x (assumes CQ2 close) - plan rapid de-leveraging post transaction close through a combination of growth and free cash flow (used to paydown debt) and EBITDA expansion."

207. On Analyst Day, Sanghi assured investors of Microsemi's strong financial position, stating that:

---

[2] References to "*[ ]*" are to statements alleged to be materially false and misleading.

1
2
3

*[4]* Fiscal 2017, [Microsemi's] fiscal year ends in September 30, 2017, with a revenue of approximately $1.8 billion....  Fiscal first quarter, which ended in December, their revenue was $468.7 million 63.2% non-GAAP gross margin and 32.2% non-GAAP operating profit.

\*       \*       \*

4
5

*[5]* So Microchip last quarter annualized was almost $4 billion in sales.... *Microsemi was about $1.875 billion annualized*.  [Mar. 1, 2018 Tr. at 11-12.]

6
7
8

208.     *[6]* Page 29 of the Analyst Day Slide Show provided a chart, breaking down the revenue for Microchip and Microsemi, which purportedly demonstrated a "*Highly Profitable Financial Model*" (the title of the slide):

9
10
11
12
13
14

|  | Microchip | Microsemi | Microchip + Microsemi | Long Term Model |
|---|---|---|---|---|
| Revenue ($M) | $3,997 | $1,875 | $5,852 |  |
| Gross Margin (%) | 61.4% | 63.2% | 62.0% | 63% |
| R&D (%) | 12.1% | 18.5% | 14.2% | 13% |
| SG&A (%) | 9.9% | 12.5% | 10.7% | 9.5% |
| Op Income ($M) | $1,567 | $603 | $2,170 |  |
| Op Income (%) | 39.4% | 32.2% | 37.1% | 40.5% |

15
16
17
18

209.     *[7]* The chart was "[i]n millions, except percentages," and "[a]ll figures are non-GAAP and are based on results for the December 2017 quarter.  Revenue and operating income dollars are based on December 2017 quarter results which were annualized by multiplying the December quarter numbers by four."

19
20

210.     *[8]* Sanghi also stated on Analyst Day that the Merger was "*strategically and financially, a very compelling transaction.*"  Mar. 1, 2018 Tr. at 11.

21
22
23
24
25
26

211.     On Analyst Day, Bjornholt stated that *[9]* Microchip has "significant free cash flow generation from the business, which allows us to de-lever the balance sheet very quickly," *Id.* at 33, and that *[10]* "[o]ur cash flow from this business is extremely high and we can de-lever very quickly," *Id.* at 37.  Pages 117 and 138 of the Analyst Day Slide Show reinforced this point, stating, *[11]* "[s]ignificant free-cash flow generation allowing for steady de-leveraging of the balance sheet."

27
28

212.     *[12]* Sanghi responded to questions regarding analysts concerns of adding another $5 billion in debt to Microchip's balance sheet by reassuring investors that

43

Microchip had "stress tested" Microchip's ability to take on this debt, *i.e.* the free cash flow that would be generated post-closing of the Transaction:

> Rajvindra Gill: In terms of financing the deal, you decided to take on more leverage as opposed to issue out equity. And so, given the potential of rising interest rates, I wanted to get a better understanding of kind of the thought process of adding another $5 billion of debt. What's the interest rate component of that and why the decision to maybe use debt versus equity?

> Sanghi: Well, the decision for debt versus equity was pretty simple. The target didn't want equity. So, that one is the easy answer… target didn't want equity, so it's an all cash deal, and it has to be funded day one by a commitment letter from the advisor JPMorgan, and we have a commitment letter for all the money that we have shown you.

> So, if we can fund it with cash, that's really where my preference is. *[13]* And right now, we see that we can fund it with cash, and leverage is high, but there's extreme significant headroom to the covenants. So, I'm not concerned about it. *And we have done stress modeling by taking the interest rate higher and even taking some sort of economic recession, contraction in revenue in a distress scenario to see what happens, and the deal passes all of our tests.* When it doesn't pass the test, I don't do those deals. You've seen one deal that spilled in the public domain was CSR. CSR basically failed the stress test. Everything else was okay, but it failed the stress test, where I couldn't go above a certain amount and Qualcomm paid more.

> *[14]* So, if this deal had failed the stress test, I wouldn't have done this deal either. So, this deal is comfortable. We have a very large covenant amendment backstop from JPMorgan, which gives us significant headroom to the covenant. So, if the rates rise – first of all, rates don't rise in a quarter or two. And we very rapidly deleverage. I talked earlier, starting off, we have $1.4 billion of cash in the year and EBITDA rises during that timeframe. So, you rapidly delever, and even if the interest rates go – goes higher, the deal is still very accretive and *passes all the tests.* [*Id*. at 16.]

> *       *       *

> Vivek Arya:  [O]n the deleveraging aspect, do you have certain milestones? Obviously, you guys have a very strong track record of de-levering as we saw with Atmel. But in this case, the leverage levels are higher than what you have done in the past. So, do you have certain milestones where you plan to be after a year, two years, three years, et cetera?

> Steve Sanghi: Absolutely. We have milestones internally, but we're not able to share it. Basically, if you share them publically today, then when we place the bond, they have to go into that document. And the disclosures are an unlimited headache in that case, where if we think the leverage comes down to, pick a number, 3 times, and it is 3.2 times, and bond happens to be trading

at [ph] $99.5 (01:17:54), then you have exposure, you told me 3 times and it is 3.2 times. So, just the disclosure headache with that is really enormous. So, we're not taking that thing public. *[15]* But yeah, internally, you would expect us to have annualized it to the debt and have milestones not only yearly, but how quarterly it waterfalls and then do a stress test on it and do it again and do it again. That's the kind of management team we have – we are and we have done it. So, we feel comfortable that we have dotted all the Is and crossed all the Ts. [*Id.*]

213.   Bjornholt also expressly discussed Microchip's inventory and its distributors' inventory:

*[16]* Okay, speaking to inventory. So our long-term target for inventory days on Microchip's balance sheet, which is represented by the red bars on this slide, is 115 to 120 days. We ended last quarter with 115 days of inventory and expect, based on our guidance for the March quarter, that we're going to be in that 115 to 120 range. So right where we want to be. I think it positions us very well heading into the stronger quarters of the year, in June and September. And we don't think that we have any sort of inventory issue. We think we're in very good shape right now.

*[17]* The blue bars show what our distributors are holding. Now you know that we recognize revenue today on a full sell-through basis for distribution. We don't push inventory in the distribution. Essentially, they find the level that they think they need to support their customer base. And the target range for distribution inventory is 30 to 40 days. We ended last quarter with 34 days of inventory. It's very normal, based on regular holding patterns for distributors. So overall, inventory is in excellent condition. [*Id.* at 37.]

214.   The Analyst Day Slide Show repeated Bjornholt's discussion of inventory. Page 117 stated "Inventory is appropriately managed and well positioned." Page 136 included a chart titled "Total Inventory (Distributor and Microchip)" on a quarterly basis from the first fiscal quarter of 2009 through the estimate for the fourth fiscal quarter of 2018, and stated the "Inventory Days to Target of Microchip (115-120), Distributor (30-40), and Total (145-160)."

1.   **Defendants' Statements on March 1, 2018 Were Materially False and Misleading**

215.   The statements of Sanghi, Bjornholt, and Microchip in Paragraphs 204-13 above were materially false and misleading.

216.   Defendants failed to disclose that, in Microchip's opinion, inventory levels at Microsemi's distributors were not consistent with good business practices. Rather,

Microsemi maintained approximately four plus months of inventory at its distributors, and induced distributors to purchase inventory by offering price discounts, whereas Defendants determined that approximately 2.5 months of inventory was the appropriate level of inventory, and did not offer price discounts.

217.   By virtue of their due diligence, access to the Data Room, and in-person meetings with Microsemi executives, Defendants knew or were reckless in failing to know that Microsemi maintained an excess amount of inventory in the channel, and had offered distributors special deals and discounts.

218.   In fact, the *Peterson* Plaintiffs alleged that "Microchip and its attorneys wholly neglected to access a large portion of the information and documents in the Data Room prior to the Closing." *Peterson* Complaint ¶101.

219.   Defendants also knew, by virtue of their due diligence and their strong commitment to continue Microchip's inventory practices, that they would need to reduce Microsemi's inventory in the distribution channel to bring it in line with Microchip's business practices, and that process would have a negative impact of $110 million on Microchip's net cash flow, EBITDA, and ability to pay down debt, making the 4.7x net leverage figure disclosed by Defendants materially false and misleading.

220.   The Defendants referenced and discussed Microsemi's reported GAAP net revenue without disclosing that the net revenue numbers were inflated by Microsemi's practice of stuffing the channel, and were not representative of future anticipated revenue on a GAAP or non-GAAP basis.

221.   Simply put, the process of Defendants lowering Microsemi's inventory would necessitate selling less Microsemi product.   During any period where Defendants were reducing Microsemi's inventory in the distribution channel, Microsemi's distributors would be selling product to end users, but Microchip would be selling less product to distributors. Therefore, Microchip would have lower cash flow (or EBITDA, a proxy for cash flow), and lower GAAP revenue, even if the distributors sales could be booked as non-GAAP revenue to end users.

222.   If debt (the numerator in the net leverage ratio) stays constant, but EBITDA (the denominator) decreases, then the net leverage ratio will increase.   For example, ten divided by five is two.  Ten divided by four is 2.5.

223.   Therefore, at the time that Defendants made their statements in Paragraphs 204-13  above, they knew, or were reckless in not knowing, of Microsemi's higher inventory levels, and that Microchip would have less free cash flow, lower EBITDA, and a higher net debt leverage as a result of the Transaction.

224.   Defendants also failed to disclose Microsemi's excessive spending. Defendants knew, or were reckless in failing to know, by virtue of their due diligence that Microsemi's senior officers had excessive spending habits on sporting events, private plane travel and sponsorships.  *See* ¶¶ 381.

225.   Defendants knew, or were reckless in not knowing, at the time the statements were made, by virtue of their due diligence, knowledge of Microsemi's inventory practices, and strong commitment to managing the Microchip business on non-GAAP net sales (sell-through) and other non-GAAP financial results, that the net leverage at the time the Transaction closed would be 5.0x, not 4.7x.

226.   Defendants also misrepresented Microsemi's GAAP revenue (*i.e.*, sales to distributors).  Defendants knew of Microsemi's higher inventory levels.  In fact, Defendants thought those levels were so high that they accused Microsemi executives of "channel stuffing" the distribution channel leading up to the Class Period.  Defendants, however, did not disclose that Microsemi's historical reported GAAP revenue was not representative of true user demand.

227.   Defendants also failed to disclose the known or knowable fact that they anticipated a major miss on GAAP net sales and cash flow due to Microsemi's inventory in the distribution channel.

228.   In addition, Defendants misrepresented Microsemi's non-GAAP revenue (*i.e.*, sales to ultimate customers).   Defendants knew that towards the end of each quarter Microsemi offered direct purchasers discounted prices to induce purchases of what

Microchip determined was excess product.  Defendants knew that those purchasers as well would need to whittle down their inventory and would purchase fewer products from Microchip in the near future than had been represented to investors by Defendants.

> **2.**   **Investors, Analysts, and the Market React Positively to Defendants' False Statements**

229.   The Microsemi Merger announcement was well-received by investors, with Microchip common stock advancing on March 2, 2018 by $2.27 (to close at $91.29) on above average reported trading volume of approximately 8.5 million shares.

230.   Based on that closing price, Microchip had a market capitalization of approximately $21.4 billion, or approximately 2.5 times Microsemi's equity value.  The ratio between the size of Microchip and Microsemi was approximately the same as the ratio between Microchip and Atmel when Atmel was acquired in 2016.  *See* Mar. 31, 2018 Tr. at 6 (Sanghi: "Atmel was nearly 40% of our business when we bought them.").   Thus, Microsemi's size was perfectly suited to Microchip's acquisition strategy.  *See*, *e.g. Id.* at 3 (Sanghi: "with Atmel, we get a significant bump.").

231.   On March 2, 2018, Piper Jaffray raised its price target for Microchip common stock to $110 from $100.

232.   Also on March 2, 2018, KeyBanc Capital Markets, Inc. ("KeyBanc") upgraded Microchip to Overweight from Sector Weight with a $116 price target following the company's acquisition of Microsemi.  KeyBanc saw "significant" earnings accretion and "meaningful" revenue diversification from the deal, and found Microchip's valuation attractive at current share levels.

233.   In a report dated March 2, 2018, Jefferies Group LLC ("Jefferies") issued a price target of $110.00, stating, "[w]e estimate $8 in EPS power in C2021 and see this as conservative as we see upside from revenue synergies on the acquisition and better margins from trends…."

234.   In a report dated March 2, 2018, Morgan Stanley issued a price target of $96.00, noting that the Acquisition, while highly leveraged (net leverage of 4.7x), could

nonetheless "be highly accretive" and that Microchip's management "sounded positive on the current environment."   Morgan Stanley stated that the "100% cash deal was at the insistence of the seller."

235.   Morgan Stanley observed that "Microchip expects the deal to be accretive immediately and exit FY19 at a synergy run rate of $0.75 driving EPS growth of 18%."

236.   In a report dated March 2, 2018, Morningstar Equity Research ("Morningstar") fixed a "fair value" of $112.00 for Microchip stock, stating that it was "encouraged" by the Microsemi deal.  "We are raising our fair value estimate for wide-moat Microchip to $112 per share from $97, as we expect the Microsemi deal to close (management is targeting June 2018) and be highly accretive to the firm," Morningstar noted.

237.   In a report dated March 2, 2018, with the heading "MSCC deal benefits overwhelm our cycle concerns" SunTrust upgraded its recommendation regarding Microchip from hold to buy, increasing its price target from $97.00 to $108.00.  SunTrust stated that it believed that, based on management's statements at Analyst Day, "[w]e believe [Microsemi] will be significantly accretive and will ultimately exceed [management's] guidance."  SunTrust added that "[w]e were surprised to see [Microchip] use all cash and no stock, which puts more leverage on the business…."  The report emphasized that leverage of 4.7x EBITDA was very high for Microchip:  "Leverage is going to 4.7x (!)….  [T]his is almost a turn higher than MCHP went for its ATML acquisition."

238.   In a report dated March 2, 2018, with the heading "Back in the M&A Groove," Credit Suisse stated, on page 1, that it expected Microchip's "strong track record on M&A" to continue "as it remains a clear core management competency to integrate assets."  Credit Suisse cautioned that Microsemi was Microchip's largest and most expensive acquisition ever, and that Microchip was "in the later innings of the M&A cycle making it harder to find cheap assets."   Nonetheless, Credit Suisse emphasized that Microchip "continues to demonstrate an ability to drive accretive transactions."  *Id.* at 1.  Credit Suisse also noted

that Microchip's "[i]nventories remain[ing] lean" and Microchip's "stable" lead times supported a finding of "sustainability" for the Company.

239.   On March 2, 2018, *The Wall Street Journal* also reported that the Microchip acquisition "comes amid a wave of consolidation in the semiconductor industry as companies seek to cut costs amid fierce competition and position themselves for new applications."

240.   *The Wall Street Journal* added that: "The transaction comes at a time when the entire semiconductor sector stands to be reshaped.  In the biggest consolidation move, Broadcom Ltd. is in a hostile pursuit of Qualcomm Inc. that currently values the San Diego chip pioneer at about $117 billion.  If a deal were to be signed, it would be the largest technology takeover ever and could cause other players to seek mergers of their own."

**H.   Defendants Continue Their Due Diligence after the March 1, 2018 Announcement and Before the Merger Closes**

241.   "Immediately after the Merger Agreement was signed, [the *Peterson*] Plaintiffs began providing even more detailed information directly to [the *Peterson*] Defendants.  For example, on March 1, 2018, Pickle emailed Moorthy providing information detailing the revenue from sales by Microsemi's Discrete Products Group to Arrow [one of Microsemi's distributors].   Moorthy responded that this disclosure was 'very helpful.'" *Peterson* Compl. ¶ 106.

242.   Among other things, Microchip needed to assure itself that there was no material adverse change to Microsemi's business prior to closing.

243.   "On March 23, 2018, Little sent an email to Goerner requesting, on behalf of Bjornholt, detailed information regarding Microsemi's distribution processes.  Bjornholt, via Goerner, asked for '[q]uarterly distribution inventory days for the past three years by geography and by distributor,' '[q]uarterly distribution margins for the past three years by geography and by distributor,' 'a general description of the data [Microsemi] receive[s] from [its] distributors,' identification of '[w]hich distributors/business units sell at broken cost

1    and which ones sell on a [distributor cost] basis,' and a description of '[w]hat return rights [
2    ] the distributors have.'" *Id.* ¶ 107.

3           244.    "In response, on or about April 11, 2018, Goerner and Sansone provided to
4    Little a report detailing data on Microsemi's worldwide distribution sales (the "Inventory
5    Report").  The Inventory Report clearly showed the amount of inventory held by all of
6    Microsemi's distributors from 2015 through the first quarter of Microsemi's 2018 fiscal year
7    and revealed that overall inventory levels remained steady throughout this period at, on
8    average, three to four months of inventory." *Id.* ¶ 108.

9           245.    The Inventory Report "Sansone provided [to] Little…in April 2018, well
10   before the Merger closed, show[ed] that there were four months of inventory in the channel
11   and that those inventory levels had persisted with all product lines for many years."
12   *Id.* ¶ 11.

13          246.    The *Peterson* Complaint also states that the Inventory Report, detailing
14   inventory levels, was given to Defendant Bjornholt.  "[O]n or around April 11, 2018,
15   [*Peterson*] Plaintiff Sansone provided a report to [the *Peterson*] Defendants Little and
16   Bjornholt that contained detailed channel inventory levels going back three years by
17   product-line, clearly showing that, for at least the past three years, Microsemi and its
18   distributors kept on average three to four months of inventory in the distribution channel.  In
19   fact, both Goerner and Sansone had follow-up meetings with Little to discuss and explain
20   these details well before the merger closed." *Id.* ¶ 7.

21          247.    "Sansone and Goerner also met with Little to discuss and explain in detail
22   Microsemi's distribution practices worldwide.  Sansone and Goerner explained that, due to
23   the manufacturing lead times for Microsemi's products and the need to ensure a buffer of
24   supply, distributors frequently carried four months of inventory of Microsemi products at
25   any given time.  Little asked questions, listened, and gave every appearance that he
26   completely understood and approved of Microsemi's inventory levels." *Id.* ¶ 109.

27          248.    CW1 became personally involved in due diligence after the March 1, 2018
28   announcement of the Merger.  In April 2018, about ten days from the close of Microsemi's

first quarter 2018, Thomas Grune, Microchip's Vice President of Americas Sales, and Little joined CW1 at Microsemi's quarterly business review meeting at Microsemi's headquarters. High level go-to-market strategies and sales structure were discussed at this meeting.

249.   During the due diligence process, CW1 would "share notes and coordinate" with Sansone in order to be responsive to Grune and Little.

250.   CW2 also recalled a meeting in the second week of April 2018 when Grune and Little came to Microsemi headquarters and met with the Microsemi sales leadership, which included CW2.

251.   According to CW2, later that same day, Grune and Little met with Sansone and Goerner, and Goerner informed Grune and Little about Microsemi's distribution model. CW2 did not attend this meeting, but Goerner informed CW2 of the meeting and that distribution was discussed at the meeting.

252.   Later in April 2018, Grune conducted a week of meetings with CW1 and Microsemi's vertical sales heads and territory managers at Microsemi headquarters.  CW1 specifically recalls telling Grune during this time that Microsemi kept more inventory in the channel than Microchip due to the specialized nature of Microsemi's products.  CW1 was also present for Grune's meetings with the vertical sales heads and territory managers, where "how Microsemi went to market" and general information about how those Microsemi employees present "saw the business" going was discussed.

253.   CW1 stated that while detailed distributor level inventory numbers were not discussed in these meetings, inventory levels were discussed more generally and it was clear from the discussion that Microsemi kept a higher level of inventory in the distribution channel than Microchip.

254.   CW2 also recalled a meeting with Grune around this time.  In or about late April or early May 2018, a few weeks after Grune and Little's meetings with the Microsemi sales leadership and Sansone and Goerner, CW2 met with Grune at Microsemi's headquarters.  In that meeting, CW2 provided Grune with an overview of Microsemi's process of going "to market," Microsemi's sales structure, the headcount of Microsemi's

52

salesforce, and also Microsemi's "distribution models," specifically those distributors with which Microsemi worked the most.  CW2 stated that Grune did not ask probing questions during this meeting.  CW2's supervisor, CW1 came in and went out during the meeting.

255.   CW2 also stated that CW2 was informed by Goerner that Sansone had sent an email to Little with files that included Microsemi's inventory positions.

256.   In late April or early May 2018, CW1 had a 30-minute meeting with Moorthy at Microsemi's headquarters.  CW1 stated that during this meeting, Moorthy was most interested in knowing about Microsemi's sales structure, and that Moorthy otherwise seemed disinterested at the meeting.

257.   CW2 further stated that Moorthy had meetings with Microsemi's business unit managers in April 2018.  These meetings took place at various Microsemi factory and business locations.  CW2 stated that the business unit managers were also knowledgeable about how much inventory for their respective areas of responsibility were in the channel, and believes they would have disclosed those facts truthfully if asked.

258.   CW1 stated that CW1 was and remains "puzzled" by the actions and position that Microchip took toward acquiring Microsemi.  CW1 stated that over the years, Microsemi had conducted many acquisitions and therefore Microsemi's executives, including CW1, were very familiar with the due diligence process.  CW1 stated that to that end, Microsemi made all necessary data available to Microchip in the Data Room, including data about Microsemi's distributor and channel inventory.

259.   CW1 stated that Microchip's due diligence was not nearly as comprehensive or robust as the due diligence that Microsemi had conducted during its own acquisitions.  Microsemi worked very collaboratively with the management of its acquired companies when preparing for the handoff and the acquisition to close.  By contrast, CW1 and Microsemi executives made themselves available to Microchip, but there was no collaboration on the handoff from Microsemi to Microchip.

260.   CW1 stated that while Microsemi and Microchip were definitely complementary companies, they were very different companies.  Microsemi tended to serve

53

a more sophisticated customer base, particularly aerospace and military, that often required more customized products that also had longer manufacturing lead times.  Because the manufacturing lead times were long, Microsemi would be unable to fulfill customer orders by when customers needed products if there was not already inventory available at distributors.  By contrast, Microchip's products were more commoditized than Microsemi's products.  For this reason, the inventory levels at Microsemi's distributors were probably higher than what Microchip's distributors carried.

261.   CW1 discussed Microchip's due diligence of Microsemi with Goerner.  CW1 recalled Goerner saying that Goerner was surprised by Microchip's due diligence and that Goerner would have thought Microchip would be more involved and ask more questions.

262.   "Later in April 2018, Sansone and Goerner met with [Grune] and Michelle Hale, a Microchip Regional Sales Manager.   At that meeting, Goerner and Sansone explained Microsemi's distribution practices in North America, including the [Arrow Supply Assurance ("ASA") program [to smoothly and economically ramp down production of end-of-life ("EOL") products, without jeopardizing the needs of customers that still relied on EOL products], presented data showing the amount of inventory in Microsemi's distribution channels, and explained the reasons for those levels.   Grune noted that Microsemi's four-month inventory buffer in the channel was similar to the levels that Microchip had their own distributors carry.  Grune further commented that ASA was a 'great program' and something that Microchip would look at as part of its own business strategy." *Peterson* Complaint ¶¶ 49, 110.

263.   "Given [the Individual Defendants'] fiduciary duties to truly know what they were buying …Sanghi and the rest of Microchip's Board of Directors were satisfied that their diligence team had requested, and that Microsemi had provided, all of the information that [Microchip] needed in order to understand all material aspects of [Microsemi's] operations, especially its revenue recognition, sales, and shipping practices, and how much inventory Microsemi and its distributors kept in the distribution channel….   Sanghi and

1  Microchip's Board of Director, therefore, concluded that the price Microchip was paying for

2  Microsemi was fair, and the deal proceeded to close on May 29, 2018." *Id.* ¶ 8.

3  **I.      Microchip Releases Fourth Quarter Fiscal 2018 Operating Results**

4          264.   On May 8, 2018, before the market for trading Microchip common stock

5  opened, Microchip issued a press release to discuss its Fourth Quarter 2018 and fiscal year

6  2018 financial results (the "May 8, 2018 Press Release").  The May 8, 2018 Press Release

7  listed Bjornholt as the Investor Relations representative for the Press Release, and was filed

8  by Microchip with the SEC as an exhibit to a Form 8-K on May 8, 2018.  The Form 8-K was

9  signed by Bjornholt.  Because of the significance of the document, Sanghi, as Chairman and

10  CEO, Moorthy, as President and COO (and "co-manager of Microchip"), and Bjornholt, as

11  CFO, would have reviewed the May 8, 2018 Press Release and had ultimate authority over

12  its contents.

13          265.   The May 8, 2018 Press Release stated again reported net sales, gross margins,

14  operating income, net income, and EPS on a GAAP and non-GAAP basis.  Microchip

15  reported an 11% year-over-year increase in GAAP and non-GAAP net sales for the fourth

16  quarter.

17          266.   The May 8, 2018 Press Release reflected again Defendants' focus on

18  inventory.  Bjornholt was quoted in the May 8, 2018 Press Release stating: "Due to our

19  stronger than anticipated net sales in the March 2018 quarter, we ended the quarter with 112

20  days of inventory, modestly below our targeted inventory range of 115 to 120 days."

21          267.   The May 8, 2018 Press Release also stated: "Microchip's inventory days in

22  the June 2018 quarter are expected to be in the range of 106 to 116 days of inventory.  Our

23  actual inventory level will depend on the inventory that our distributors decide to hold to

24  support their customers, overall demand for our products and our production levels."

25          268.   Sanghi again referenced the difference between GAAP revenue (sales to

26  distributors) and non-GAAP revenue (sales to end users) and that non-GAAP revenue was

27  a more significant metric to Microchip.  Sanghi was quoted in the May 8, 2018 Press Release

28

stating that non-GAAP revenue and earnings reflected sell-through to ultimate customers, whereas GAAP revenue and earnings reflected sales to distributors:

> Beginning April 1, 2018, we adopted the new GAAP revenue recognition standard which requires us to recognize revenue at the time products are sold to distributors whereas currently, revenue on such transactions are deferred until the product is sold by our distributor to an end customer.  We are not able to provide guidance on a GAAP basis as we are not able to predict whether inventory at our distributors will increase or decrease in relation to end-market demand.  As evidence of this uncertainty, in recent years, we have seen net inventory at our distributors increase or decrease by a significant amount in a single quarter.  Our non-GAAP revenue will be based on what we believe reflects true end-market demand in which we measure the revenue based on when the product is sold by our distributors to an end customer.

269.    The May 8, 2018 Press Release included additional statements concerning the importance of non-GAAP sell-through results to Microchip:

> Following our required adoption of the new revenue recognition standard effective April 1, 2018, *our Non-GAAP adjustments will include the effect of our distributors increasing or decreasing their inventory holdings.*  Under the new GAAP revenue recognition standard, we are required to recognize revenue when control of the product changes from us to a customer or distributor.  We focus our sales and marketing efforts on creating demand for our products in the end markets we serve and not on moving inventory into our distribution network.  Therefore, the elements of our internal performance and executive and employee compensation metrics that are based on sales and operating results will be measured on a non-GAAP basis using the value of the end-market demand for our products.  We use non-GAAP net sales for these purposes because we do not believe that the underlying value of our business benefits from increases in the value of inventory that is held in the supply chain.  As many of our products are designed into customer applications with relatively long lives, such value is only realized when the end market demand is created and the supply chain sells the inventory to the end customer.  *We believe the use of non-GAAP net sales is also important to investors and users of our financial statements as it reflects the final outcome of our sales activities whereas our GAAP net sales are based on estimates made earlier in (or before the end of) the process of creating and fulfilling demand is complete.*  We also manage our manufacturing and supply chain operations, including our distributor relationships, towards the goal of having our products available at the time and location the end customer desires.  Therefore, we believe that it is useful to investors for us to disclose non-GAAP results that reflect the value of the end market demand for our products.  These non-GAAP results will include adjusting GAAP net sales, cost of sales, gross margin and EPS for the change in distributor inventory holdings.

*        *        *

56

1
2
3
4
5

We are using non-GAAP net sales, non-GAAP gross profit, non-GAAP gross profit percentage, non-GAAP operating expenses in dollars and as a percentage of sales including non-GAAP research and development expenses and non-GAAP selling, general and administrative expenses, non-GAAP operating income, non-GAAP other expense, net, non-GAAP income tax rate, non-GAAP net income from continuing operations, and non-GAAP diluted earnings per share from continuing operations which exclude the items noted above, as applicable, to permit additional analysis of our performance.

6
7
8
9
10
11
12

Management believes these non-GAAP measures are useful to investors because they enhance the understanding of our historical financial performance and comparability between periods. *Many of our investors have requested that we disclose this non-GAAP information, including the effect of changes in distributor inventory holdings because they believe it is useful in understanding our performance as it excludes non-cash and other charges that many investors feel may obscure our underlying operating results and provides better information regarding end-market demand for our products.* Management uses these non-GAAP measures to manage and assess the profitability of our business and for compensation purposes. We do not consider such items when developing and monitoring our budgets and spending.

13
14
15
16
17
18

270.   The May 8, 2018 Press Release also provided an update on the Microsemi Transaction. *[18]* Defendants provided no update concerning the false and misleading statements made earlier in the Class Period concerning Microsemi's inventory in the distribution channel; the known negative impact lowering that inventory level would have on Microchip's net cash flow, net leverage, EBITDA; or Microsemi's GAAP and non-GAAP net sales.

19
20
21

271.   Rather, Defendants focused on an update to the antitrust clearance process and the Microsemi shareholder vote on whether to approve the Transaction scheduled for May 22, 2018.

22
23
24

272.   Also on May 8, 2018, Defendants conducted an earnings conference call to discuss Microchip's financial results (the "May 8, 2018 Conference Call"). A transcript of the conference call was created by Bloomberg and is publicly available.

25
26

273.   On the May 8, 2018 Conference Call, Sanghi repeated his statement from the May 8, 2018 Press Release about managing Microchip's business for end-user demand.

27
28

As evidence of this uncertainty, in recent years we have seen net inventory at our distributors increase or decrease by a significant amount in a single

quarter.  Our non-GAAP revenue will be based on true end-market demand, so we will report a non-GAAP revenue which will be based on true end-market demand in which we measure the revenue based on when the product is sold by our distributors to an end customer, meaning we will continue to report a non-GAAP revenue based on sell-through.  [May 8, 2018 Tr. at 5-6.]

274.    Sanghi also stated on the May 8, 2018 Conference call that:

During the quarter ending June 30, 2018, we will adopt a new GAAP revenue recognition standard, which will result in recognition of revenue at the time products are sold to distributors, whereas currently revenue on such transactions are deferred until the product is sold by our distributors to an end customer.  We are not able to provide guidance on a GAAP basis, as we are not able to predict whether inventory at our distributors will increase or decrease in relation to end-market demand, and this is not how we manage our business.

As evidence of this uncertainty, in recent years we have seen net inventory at our distributors increase or decrease by a significant amount in a single quarter.  Our non-GAAP revenue will be based on true end-market demand, so we will report a non-GAAP revenue which will be based on true end-market demand in which we measure the revenue based on when the product is sold by our distributors to an end customer, meaning we will continue to report a non-GAAP revenue based on sell-through.

We will continue to manage our business and distributor relationships based on such sell-through revenue recognition.  All of Microchip's bonus programs will continue to work based on sell-through revenue recognition.  Therefore, along with GAAP results, which will be based on sell-in, we will also report our non-GAAP results based on sell-through revenue recognition.

In terms of guidance, we will only provide guidance based on non-GAAP revenue, so we expect total non-GAAP net revenue for the June quarter to be up 1% to 6% sequentially, giving us a midpoint of the guidance at 3.5%.  Given the amount of revenue beat in March quarter, this guidance is modestly better than the expectation we had provided during the Analyst Day.

*     *     *

In addition, given all the complications of accounting for the acquisitions, including amortization of intangibles, restructuring charges, and inventory write-up on acquisitions, Microchip will continue to provide guidance and track its results on a non-GAAP basis.  We believe that non-GAAP results provide more meaningful comparison to prior quarters, and we request that the analysts continue to report their non-GAAP estimate to First Call.  [*Id.*]

275.    Importantly, Sanghi stated, in response to a stock research analyst question, that Microchip was "philosophically" against the GAAP sell-in accounting, and that

Microchip had experienced issues with sell-in revenue from Microchip's previous acquisitions of Atmel and Micrel.

> Christopher Rolland: Thanks, guys, and nice execution on the quarter. So I like the sell-through that you guys are going to report. I wish more people would do that as well. Perhaps you guys can describe how big that difference is between sell-through and sell-in that we've seen in the past. And then, Steve, I almost get the sense that you philosophically are against sell-in. Some people think it creates bad behaviors. You're not going to incentivize your sales force on sell-in. I was wondering if you could talk about philosophically how you view that. Thanks.

> Sanghi: So you're absolutely correct. We are philosophically against sell-in because in sell-in, your relationship with distributors is built on commercial making the deals with the buyers in distribution to stuff the channel essentially. Hey, buy more of my parts, buy more of my parts. In a sell-through, the incentivization of the sales force to your effort is in driving design wins to revenue, so that the parts are going out from distributor shelves to the end customer, and that's the main difference.

> Company after company that we've been involved in, the companies we have bought, Atmel and Micrel and others, they all had sell-in revenue recognition. And now we know their history, we have their records, we have their books, and the amount of managing the quarter that goes on at the end of the quarter by giving distribution deals, from pricing concessions to payment terms to buddy-buddy distribution, please take another $10 million from me, all that happens is really bad behavior, and it doesn't represent demand.

> During the last few years as FASB was looking at defining revenue recognition, we fought that. I think we wrote a paper on it a long time ago, but FASB went down their decision where the revenue recognition for GAAP has to be sell-in. So we lost that battle, and so therefore, we have to announce GAAP based on sell-in, but we're not going to throw our religion away. We're going to manage the business based on sell-through. We're going to create demand. Our motto is drive design wins to revenue. We're going to incentivize our people. All bonus programs will be based on sell-through. We're going to measure distribution based on sell-through, but we'll go through an SEC-required GAAP exercise to report as sell-in. [*Id*. at 14.]

276.    Bjornholt discussed Microchip's financial results, including net sales, on a GAAP and non-GAAP basis for the fourth quarter of and fiscal year 2018.

277.    Bjornholt and Sanghi also discussed Microchip's debt and leverage as it related to the Microsemi Transaction. Bjornholt stated that Microchip's "net leverage excluding our 2037 convertible debentures was 0.95 times [EBITDA] at March 31, 2018,

59

positioning us well for the Microsemi acquisition." *Id*. at 3.  Sanghi again reiterated that Microchip would "rapidly delever" its balance sheet after the Transaction closed:

> *[19]* As you all know, we will be borrowing about $8 billion to close the Microsemi transaction.  I want to assure you that after the closure of Microsemi acquisition, we plan to use all of our cash generation, after dividend and capital, of course, to rapidly delever the balance sheet until the leverage comes down to about 2.5x, which is our long-term target.  [*Id*. at 6.]

278.    Also on the May 8, 2018 Conference Call, Moorthy provided an update on the Microsemi Transaction:

> *[20]* Now a quick update about Microsemi and our progress since our March 1 announcement, integration planning meetings and discussions are occurring between the business units, sales, manufacturing, and support groups of both companies.  Teams at both companies started to identify product cross-selling opportunities that we can pursue after the close and have also identified reference designs that can take advantage of a combined total system approach.  [*Id*. at 4.]

279.    Bjornholt also again addressed Microchip's and its distributors' inventory on the call:

> Moving on to the balance sheet, our inventory balance at March 31, 2018 was $476.2 million.  Microchip had 112 days of inventory at March 31, 2018, down three days from the end of the December quarter.  Inventory at our distributors was at 36 days and up two days from the December quarter.  [*Id*. at 3.]

280.    Sanghi also discussed Microchip's inventory in response to a stock research analyst question on the May 8, 2018 Conference Call:

> The inventory was a little lower than our expectation because sales were higher than our expectation.  Our guidance at the midpoint was minus 1% sequentially.  And based on that, inventory would be slightly higher and in the range of 115 days to 120 days.  Instead, we reported sales which were up 0.8%, so 1.8% beat.  Its net result was the inventory days were slightly lower.

> I think inventory is fine.  Two, three days don't really make that kind of difference.  We're comfortable with the inventory position.  Inventory, there are always products which are showed and the product was a little high.  So there's a continuous effort constantly to get the inventory in the perfect mix.  And there's no such thing as perfect, but our inventory is in good shape.  [*Id*. at 8.]

281.    These statements reiterated Defendants' strong focus on inventory management.

60

282.    The statements by Sanghi, Bjornholt, Moorthy, and Microchip in Paragraphs 270 and 277-78 above were materially false and misleading for the reasons stated in Paragraphs 216-228 above.  Specifically, Defendants failed to disclose that Microsemi had shipped excess inventory, which would impact future cash flow and GAAP and non-GAAP revenue.

283.    Given Sanghi's statements that Microchip was philosophically opposed to sell-in revenue recognition, and the Defendants' focus on inventory and knowledge of the stark difference between non-GAAP sell-through and GAAP sell-in revenue recognition, Defendants' statements were materially false and misleading because they failed to disclose the material deviation at Microsemi between GAAP and non-GAAP revenue.  Either the statements were false because, as the facts suggest, Defendants did extensive due diligence on the Merger and were informed of Microsemi's revenue recognition and inventory practices, or the Defendants did not do proper due diligence into Microsemi's revenue recognition and inventory practices and therefore had no basis to make the statements.

284.    Again, given Defendants' focus on end-user demand and sell-through financial results, its senior officers either knew and failed to disclose on were recklessly indifferent to the fact that Microsemi's GAAP revenue did not reflect "true end-market demand" and accordingly was not representative of the strength of its products.

285.    On May 8, 2018, Microchip common stock closed at $90.65 per share, an increase of $1.81 per share over its May 7, 2018 closing price of $88.74 on above average trading volume of approximately 4.4 million shares.

286.    On May 9, 2018, Microchip common stock closed at $91.86 per share, an increase of $1.21 over its May 8, 2018 closing price on trading volume of approximately 2.7 million shares.

287.    On May 10, 2018, at or about 2:00 p.m., Defendant Moorthy delivered a public presentation at the Jefferies Global Technology Conference (the "May 10, 2018 Presentation,") where he repeated many of the statements made by Defendants earlier in the Class Period.  A transcript of the May 10, 2018 Presentation was prepared by Bloomberg

1    and is publicly available.   Moorthy's slides as part of his presentation were filed on

2    Microchip's investor relations website, and emphasized Moorthy's points during his

3    presentation (the "May 10, 2018 Slide Show").

4        288.   Moorthy's May 10, 2018 Presentation and Slide Show again discussed

5    Microchip's inventory, reiterating the Defendants focus on inventory levels and

6    management:  "Inventory is in good position.  We ticked down in inventory to 112 days

7    against our 115 to 120 target."  May 10, 2018 Tr. at 1.  The May 10, 2018 Slide Show (at 3)

8    made a similar statement.

9        289.   Moorthy also discussed Microchip's EBITDA and Free Cash Flow:

10   Looking at our non-GAAP net sales, so this is the more recent windows from
     2009 or fiscal year 2009, about 17%, 18% compounded annual growth rate on
11   revenue, 18.6% compounded annual growth rate on gross profit, EBITDA of
     a similar 18.3% and a pretty substantial amount of EBITDA that gets
12   generated on a consistent basis and you can see the effects of the accretion
     we've had from more recent acquisitions that have contributed towards that
13   EBITDA.  And free cash flow as a percentage of our revenue at about 30%
     and also nicely up through all of these years.  So on all financial metrics, the
14   company has been executing on all cylinders.  [Id. at 2-3.]

15       290.   Pages 11 and 12 of the May 10, 2018 Slide Show included estimates of

16   EBITDA and Free Cash Flow as a Percentage of Revenue for Microchip's Fiscal Year 2018.

17       291.   Moorthy stated in his May 10, 2018 Presentation that Microchip was confident

18   it could pay down the debt taken on to close the Microsemi transaction:  *[21]* "We need to

19   focus on integrating and integrating effectively the largest acquisition that we have made

20   and de-levering the debt that we are going to take on to complete that acquisition, both of

21   which we're confident we can do but we need to have a laser focus on doing that."  May 10,

22   2018 Tr. at 5.

23       292.   Page 21 of the May 10, 2018 Slide Show repeated the "Highly Profitable

24   Financial Model" slide from Microchip's Analyst Day Slide Show, including *[22]* the

25   materially false and misleading statements concerning Microsemi's GAAP net sales figures

26   for the December 2017 quarter.  *See* ¶ 208 above.

27

28

293.    Moorthy's and Microchip's statements in Paragraphs 291-92 above were materially false and misleading for the reasons stated in Paragraphs 216-28 and 283-84 above.  After including references to inventory, sales, EBITDA, free cash flow, and paying down the debt, Moorthy failed to disclose that Microsemi had a large amount of inventory in the distribution channel, which would necessitate shipping less inventory to distributors and end users in the future, lowering free cash flow, EBITDA, revenue (GAAP and non-GAAP) and the ability to pay down debt, and increasing Microchip's net leverage.

294.    On May 10, 2018, Microchip common stock closed at $93.86 per share, an increase of $1.30 per share from its closing price on May 9, 2018, on trading volume of approximately 1.7 million shares.  The May 10, 2018 closing price is also an increase of $1.56 from the price of Microchip common stock at 2:00 p.m. on May 10, 2018 of $92.30 per share.

**J.    The Fiscal 2018 Form 10-K**

295.    On May 18, 2018, after the market for Microchip common stock had closed for the day, Microchip filed its 2018 Form 10-K for the fiscal year ended March 31, 2018.  The 2018 Form 10-K was signed by Sanghi and Bjornholt.  Because of the significance of the document, Moorthy, as President and COO (and "co-manager of Microchip"), would have also reviewed the 2018 Form 10-K and also had ultimate authority over its contents.

296.    The 2018 Form 10-K included a section titled "Recent Developments," which stated that:

> On March 1, 2018, we entered into [the Merger Agreement] to acquire [Microsemi] for $68.78 per share in cash.  The acquisition price represents a total equity value of approximately $8.35 billion, and a total enterprise value of about $10.15 billion, after accounting for Microsemi's cash and investments, net of debt, on its balance sheet at December 31, 2017.

> \*      \*      \*

> We estimate that the total amount of funds necessary to complete the Merger and the other transactions contemplated by the Merger Agreement will be approximately $10.15 billion, which will be funded through a combination of:

> • the incurrence of loans under a new term loan facility or other debt financing;

• revolving loans under Microchip's amended and restated credit agreement; and

• Microchip's and Microsemi's cash and cash equivalents on hand at closing. [2018 Form 10-K at 35, 50]

297.    Microchip's 2018 Form 10-K's section titled "Management's Discussion and Analysis of Financial Condition and Results of Operations" (the "MDA Section") also included a section on "Recent Developments," in which Defendants discussed the Microsemi Acquisition:

> On March 1, 2018, we entered into the Merger Agreement to acquire Microsemi for $68.78 per share in cash.  The acquisition price represents a total equity value of approximately $8.35 billion, and a total enterprise value of about $10.15 billion, after accounting for Microsemi's cash and investments, net of debt, on its balance sheet at December 31, 2017. Microsemi offers a comprehensive portfolio of semiconductor and system solutions for aerospace and defense, communications, data center and industrial markets.  *[23] Microsemi recorded net sales of $492.2 million for its second fiscal quarter ended April 1, 2018 compared to $442.9 million for its second fiscal quarter ended April 2, 2017 and net sales of $960.9 million for the six months ended April 1, 2018 compared to $878.4 million for the six months ended April 2, 2017.*
>
> *          *          *
>
> We plan to finance the acquisition of Microsemi with a combination of cash and cash equivalents, new borrowings on our line of credit, and the issuance of new debt.  For further details, see the discussion in Liquidity and Capital Resources.  [2018 Form 10-K at 35.]

298.    The MDA Section of the 2018 Form 10-K discussed distribution in the "Results of Continuing Operations" section:

> At March 31, 2018, our distributors maintained 36 days of inventory of our products compared to 33 days at March 31, 2017 and 32 days at March 31, 2016.  Over the past ten fiscal years, the days of inventory maintained by our distributors have fluctuated between approximately 27 days and 47 days.  Prior to our adoption of ASU 2014-09-Revenue from Contracts with Customers (Topic 606) on April 1, 2018, we did not believe that inventory holding patterns at our distributors materially impacted our net sales due to the fact that we recognized revenue based on when the distributor sells the product to their customer.  Upon our adoption of Topic 606 commencing on April 1, 2018, we will be required to recognize revenue from distributors at the time our products are sold to the distributor.  As a result, beginning April 1, 2018, inventory holding patterns at our distributors may have a material impact on our net sales.  [2018 From 10-K at 44.]

299.    The MDA Section also discussed inventory in the "Results of Continuing Operations" section:

> Our overall inventory levels were $476.2 million at March 31, 2018, compared to $417.2 million at March 31, 2017 and $306.8 million at March 31, 2016. We maintained 112 days of inventory on our balance sheet at March 31, 2018 compared to 103 days of inventory at March 31, 2017 and 110 days at March 31, 2016. We expect our days of inventory levels in the June 2018 quarter to be down six days to up four days compared to the March 2018 levels. We believe our existing level of inventory will allow us to maintain competitive lead times and provide strong delivery performance to our customers. [2018 From 10-K at 45.]

300.    Sanghi's, Bjornholt's, Moorthy's and Microchip's statements in Paragraph 297 were materially false and misleading for the reasons set forth in Paragraphs 216-228, 282-84, and 293, above.

301.    Defendants included the Recent Developments of the Microsemi Transaction in the Form 10-K, and discussing Microchip's inventory levels, and revenue recognition practices for sales to distributors and end users, the aligning of the Atmel and Micrel businesses to Microchip's practice of recognizing revenue when it is sold to the end user, not the distributor, and the negative impact of Atmel's inventory in the distribution channel on Microchip's net sales. Defendants also had an obligation to disclose the material known information on Microsemi's inventory levels and practices, and the negative impact adjusting those levels to Microsemi's business practices would have on Microchip's net cash flow, EBITDA, ability to pay down debt, and net leverage.

302.    Furthermore, the disclosure of Microsemi's $492.2 million in GAAP net sales to distributors for the April 1, 2018 quarter was materially false and misleading because Defendants knew or were reckless in failing to know that those net sales were not representative of the true end-user demand for Microsemi's products. Defendants have repeatedly acknowledged that end-user demand and non-GAAP revenue (the exact information that Microsemi *did not* disclose) was the information most critical to Microchip in managing its business.

303.   Sanghi and Bjornholt signed certifications for the Form 10-K, certifying that, in relevant part:

1. I have reviewed this Form 10-K of Microchip Technology Incorporated;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

\*       \*       \*

4.   The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and l5d-l5(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

\*       \*       \*

 (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation…[Exhibits 31.1 & 31.2.]

304.   Sanghi and Bjornholt also signed Sarbanes-Oxley certifications attached to the Form 10-K, which stated for each of them that they "certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that the Annual Report of Microchip Technology Incorporated on Form 10-K for the period ended March 31, 2018 fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that information contained in such Form 10-K fairly presents, in all material respects, the financial condition and results of operations of Microchip Technology Incorporated."

305.   Sanghi and Bjornholt, by signing certifications attesting to the accuracy of the 2018 Form 10-K, had ultimate control over the contents of the document.

**K.      Defendants File a Materially False and Misleading Form 8-K Updating
Investors on the Microsemi Acquisition**

306.    On May 21, 2018, the next trading day after the 2018 Form 10-K was filed by
Defendants, at approximately 1:06 p.m., Microchip filed a Form 8-K with the SEC updating
investors on the progress of the Microsemi acquisition (the "May 21, 2018 Form 8-K").  The
May 21, 2018 Form 8-K was signed by Defendant Bjornholt.  As with all the SEC filings
referenced herein, because of the significance of the document and the size of the
Transaction, the Individual Defendants, in their roles as the highest level corporate officers
at Microchip, would have reviewed the May 21, 2018 Form 8-K and had ultimate authority
over its contents.

307.    *[24]* Although the May 21, 2018 Form 8-K disclosed certain "risk factors" of
the Merger (Exhibit 99.1), it was misleading in that it failed to disclose the known material
risk factors that (a) Defendants had learned through due diligence that Microsemi had higher
inventory levels in the distribution channel than Defendants deemed appropriate; (b)
Microsemi had, in Defendants' opinion, historically oversold inventory to distributors and
direct purchasers through issuance of price discounts in the third month of each quarter; (c)
Defendants had determined to suspend those business practices and to align Microsemi's
business practices with Microchip's business practices to keep lower levels of inventory in
the distribution channel and not to encourage purchases of inventory "into the channel" by
offering price discounts at the end of a quarter; and (d) accordingly, Defendants anticipated
that for the first two or three quarters after the close of the Microsemi transaction, in the
aggregate, Microsemi would generate reduced GAAP and non-GAAP net sales in excess (in
the aggregate) of $200 million to distributors and end users, and reduced cash flow
exceeding (in the aggregate) $100 million.

308.    Each of the foregoing facts was either known by Defendants or should have
been known by Defendants if not for their reckless disregard of the truth.

309.    *[25]* Further, the May 21, 2018 Form 8-K reported that for the four fiscal
quarters ended April 1, 2018, Microsemi had reported historical net sales of $1,894,300,000.

67

May 21, 2018 Form 8-K Exhibit 99.2 at 4.  The May 21, 2018 Form 8-K also stated that Microsemi's net sales for the year ended October 1, 2017 was $1,811,800,000, and for the six months ended April 1, 2018 and April 2, 2017, were $960,900,000 and $878,400,000, respectively.  *Id.* at 10.

310.   Here too Defendants' statements were materially false and misleading because Defendants knew, or were reckless in failing to know, that Microsemi had accomplished these net sales through quarter-end price discounts that resulted, in Defendants' opinion, in distributors and end users purchasing more product than they needed.

311.   *[26]* The May 21, 2018 Form 8-K contained *pro forma* financial statements combining the historical financial statements of Microchip and Microsemi.  Defendants had spoken repeatedly that GAAP net sales were not representative of future end-user demand and that "in recent years, we have seen net inventory at our distributors increase or decrease by a significant amount in a single quarter."

312.   Yet the May 21, 2018 Form 8-K failed to disclose the known or knowable fact of what Microsemi's non-GAAP net sales were for fiscal 2017 and the first two quarters of fiscal 2018 and 2017.  Defendants had disclosed these numbers for Microchip's business because Defendants considered non-GAAP net sales to be more indicative of end-user demand than GAAP net sales.

313.   If Defendants had disclosed the true facts concerning Microsemi's non-GAAP net sales, investors would have learned that after Defendants adopted its same business practices for Microsemi's business, Microsemi's GAAP net sales and cash flow generation in the first few quarters after the acquisition from Microsemi's business would be materially below Microsemi's prior quarters' GAAP and non-GAAP sales.

314.   Sanghi's, Bjornholt's, Moorthy's, and Microchip's statements in Paragraphs 307, 309, and 311 were also materially false and misleading for the reasons set forth in Paragraphs 216-228, 282-84, 293, and 301-02, above.

315.   When these true facts were disclosed to investors after the Acquisition, Microchip's investors suffered a material decline in the price of their common stock.

316.    On May 21, 2018, at the close of the next trading day after the 2018 Form 10-K and May 21, 2018 Form 8-K were filed, Microchip common stock closed at $93.81 per share, an increase of $1.01 over its closing price on May 18, 2018 of $92.80, on volume of approximately 1.3 million shares.

## L.    The Microsemi Acquisition Closes

317.    On May 29, 2018, at approximately 12:00 p.m., Microchip issued a press release announcing that Microchip had completed its previously announced acquisition of Microsemi (the "May 29, 2018 Press Release").  The press release listed Microchip CFO Bjornholt as the investment relations contact responsible for the press release.  The press release was attached to a Form 8-K filed by Microchip with the SEC on May 29, 2018.  The Form 8-K was signed by Bjornholt.  Because of the significance of the document and the size of the Transaction, the Individual Defendants, in their roles as the highest level corporate officers at Microchip, would have reviewed the May 29, 2018 Press Release and had ultimate authority over its contents.

318.    The May 29, 2018 Press Release stated:

> [27] "We are very pleased to have completed our acquisition of Microsemi," said Steve Sanghi, CEO. "I welcome the Microsemi employees into the Microchip family and look forward to working together to realize the benefits of a combined team pursuing a unified strategy.  The Microsemi acquisition will significantly enhance our product portfolio, end-market diversification, operational capabilities and customer scale."

> Under the terms of the merger agreement, Microsemi shareholders received $68.78 per share in cash for each share of Microsemi common stock.

> The transaction is expected to be immediately accretive to Microchip's non-GAAP earnings per share.  Based on currently available information, Microchip anticipates achieving an estimated $300 million in synergies in the third year after close of transaction.  Microchip financed the transaction with cash from the combined company balance sheets, borrowings from Microchip's existing line of credit, $3 billion from a new term loan and $2 billion from newly issued high-grade secured bonds.  Microsemi's previously outstanding debt was retired in conjunction with the closing of the transaction.

319.    Microchip paid $10.3 billion to complete the purchase of Microsemi.  The equity purchase value was $8.1 billion.  Microchip retired Microsemi's debt for $2 billion

69

1    and incurred transaction-related expenses of approximately $0.2 billion.  To finance the

2    Transaction, Microchip used $1.9 billion of cash from the combined company's balance

3    sheet, $3.4 billion from its revolving line of credit, $3 billion from a new Term Loan B, and

4    finally $2 billion from a new investment-grade bonds.  May 31, 2018 Tr. at 2.

5         320.   The statements of Sanghi, Bjornholt, Moorthy, and Microchip in Paragraph

6    319 above were materially false and misleading for the reasons set forth in Paragraph 216-

7    228, 282-84, 293, 301-02, and 307-13 above.  Among other things, Defendants knew or

8    were reckless in failing to know that Microsemi had excess inventory in the channel and at

9    end users and that Microchip would have reduced cash flow necessary to service its debt,

10   and reduced GAAP and non-GAAP sales going forward.

11        321.   Further, the statements of Sanghi, Bjornholt, Moorthy, and Microchip were

12   materially false and misleading because "[o]n information and belief, on May 30, 2018, only

13   one day after the Closing, Sanghi, Moorthy, Little, Bjornholt, and the rest of Microchip's

14   senior management addressed Microsemi employees."  *Peterson* Complaint ¶124.

15        322.   At this meeting, "[c]omparing the Microsemi and Atmel acquisitions, Sanghi

16   indicated that both Atmel and [Microsemi] improperly encouraged their respective sales

17   force to prioritize their commissions ahead of the best interests of the company.  Sanghi

18   claimed [Microsemi's] poor incentives led to massive inventory stuffing through heavily

19   discounted sales, comparable to 'two monkeys fighting and taking the price down.'"  *Id*. ¶

20   128.  It is reasonable to conclude that the Individual Defendants had this information by

21   March 1, 2018, and certainly one day earlier, when they made their positive statements

22   concerning the Transaction.  *See, e.g.*, ¶¶ 119-27, 212, 275, 318, above.

23        323.   Further, CW1 and the entire Microsemi executive team were terminated

24   immediately upon closing of the Merger, reflecting Defendants' disfavor of Microsemi

25   management.

26        324.   The *Peterson* Plaintiffs made a similar allegation:

27        Microchip terminated [the *Peterson* Plaintiffs] and other Microsemi
        executives and managers on the very day the Merger closed.   Upon
28

70

1

information and belief, Microchip completely purged pre-Merger Microsemi's upper management within a very short time following Closing.  [*Id*. ¶ 113.]

2

3

325.   From that point through August 9, 2018, CW1 heard information from Microsemi employees that remained with Microchip that Sanghi was having meetings with Microsemi employees and was stating in those meetings that Microsemi had shipped inventory that exceeded levels that were appropriate.

4

5

6

326.   On May 29, 2018, Microchip common stock closed at $95.23 per share, a decrease of $0.58 per share from its May 25, 2018 (the previous trading day) closing price of $95.81 on trading volume of approximately 1.8 million shares.  The May 29, 2018 closing price was an increase of $0.71 per share over the price of Microchip common stock at 12:00 p.m. on May 29, 2018 of $94.52.

7

8

9

10

11

327.   On May 30, 2018, Microchip common stock closed at $97.51 per share, an increase of $2.28 per share from its May 29, 2018 closing price on above average trading volume of approximately 3.1 million shares.

12

13

14

**M.**   **The May 31, 2018 Press Release and Conference Call Perpetuates Defendants' False Statements.**

15

16

328.   On May 31, 2018, after the close of the market, Microchip issued a press release updating guidance for non-GAAP net sales and earnings per share for its fiscal first quarter of 2019 ending June 30, 2018, in light of the completion of the Microsemi Acquisition.   Bjornholt was the Microchip investor relations contact listed on the press release.  Because of the significance of the document and the size of the Transaction, the Individual Defendants, in their roles as the highest level corporate officers at Microchip, would have reviewed the May 31, 2018 Press Release and had ultimate authority over its contents.

17

18

19

20

21

22

23

24

329.   The May 31, 2018 press release reported that:

25

26

27

28

Microchip previously provided guidance on May 8, 2018 for consolidated non-GAAP net sales to be up between 1% and 6% sequentially with a mid-point of up 3.5%.  *[28]* Microchip expects non-GAAP net sales based on end market demand from Microsemi to add between $160 million to $180 million to its June quarter results, and now expects consolidated non-GAAP net sales for the June quarter to be up 17% to 24% sequentially.  Microchip expects

Microsemi to add between 2 cents to 6 cents to non-GAAP earnings per share. The combined non-GAAP earnings per share for Microchip and Microsemi is expected to be between $1.41 and $1.55 per share. The original guidance for Non-GAAP earnings per share was between $1.39 and $1.49 per share.

330.    In the press release, Defendant Sanghi stated that *[29]* "Our combined teams are now *laser focused* on delivering the synergies we identified, and to achieve the accretion targets which will enable us to rapidly start reducing our leverage."

331.    Also on May 31, 2018, after the market for Microchip common stock had closed for the day, Defendants convened an analyst conference call to discuss the Microsemi Acquisition (the May 31, 2018 Conference Call"). A transcript of the conference call was prepared by Bloomberg and is publicly available.

332.    Bjornholt revealed on the May 31, 2018 Conference Call that "the combined effective interest rate on the $8.4 billion of borrowing is just over 4%." May 31, 2018 Tr. at 2. Bjornholt also stated that:

> *[30]* As we've stated before, we will take the entire net cash generation from our business after paying for CapEx, dividends, and taxes, and use it to rapidly delever the balance sheet. Our net leverage [total debt/divided by EBITDA] at the end of the June 2018 quarter is expected to be at 4.7 times… We expect to reduce this leverage by about 1 [turn] per year on a go forward basis. [May 31, 2018 Tr. at 2.]

333.    A turn of debt or leverage describes a company's debt to EBITDA leverage ratio, and is also known as yield per turn of leverage. For example, two turns of leverage means that the company's leverage ratio is 2 times (2x), three turns means the leverage ratio is 3 times (3x). Reducing net leverage ratio by one turn per year would therefore equal reducing Microchip's net leverage ratio by 1x per year, or from 4.7x to 3.7x.

334.    Defendant Bjornholt also stated that *[31]* "Microsemi was generating a lot of cash on their own…. *And as synergies come on and both companies grow, that's just going to continue to grow." Id*. at 6. Bjornholt emphasized that "the combined cash flow is very healthy and really all of the excess free cash flow is going to be going to pay down debt very rapidly." *Id*.

335.   Defendant Sanghi acknowledged that his team was analyzing Microsemi's revenue streams, and admitted that sell-through revenue information for Microsemi was available:

As you know, we have really only had a couple of days with Microsemi. *[32]* We have assessed the non-GAAP revenue that Microsemi expected to ship in the quarter under our clock. I also want to remind you that Microsemi reported its quarter under sell-in revenue recognition method.

*[33]* As we told you during our May 8 conference call, we will continue to run our business, provide guidance, and track and compare our results based on sell-through revenue recognition method. At Microsemi, distribution sell-through revenue information is available and it is a true measure of market demand. Microchip will combine Microsemi's revenue with its own based on sell-through revenue recognition method and we will call it our non-GAAP revenue.

*[34]* So, for the June quarter, we expect Microsemi to add approximately $160 million to $180 million to our non-GAAP revenue…. [*Id*. at 3.]

336.   During the call, one analyst asked, "what would be the difference if--from the way they were reporting it is sell-in and the way you're adding on is sell-through—what's the difference between GAAP and non-GAAP revenue with Microsemi?"   Defendant Bjornholt and Sanghi responded as follows:

*[35]* Bjornholt: So, the bottom line is, on a sell-in basis, the quarters tend to be a little bit more back-end weighted than on a sell-through basis. Sell-through, yes, all the distributors are trying to meet their own quarterly numbers. But on a sell-in basis, sometimes the customers or the distributors are awaiting to make a deal at the end of the quarter. So, that tends to be more back-end weighted and that's just not how we run our business. We focus on true end market demand. *I don't have a specific number for you that I could provide on a sell-in basis.* But bottom line is we will report sell-in for GAAP accounting purposes and that will be impacting the first couple of quarters by all the purchase price accounting adjustments.

*[36]* Sanghi: The non-GAAP is really all you can look at. I think if we keep running the business the way Microsemi would have run in June, then in the next 15 days, we'll be making all these deals to put the product in distribution, which they used to call it packages, and all these packages come from all these distributors, discounted product that you can sell before the end of the quarter. If we do all that, then the GAAP revenue, based on sell-in, would be higher than sell-through, because sell-through tends to be a little more linear and sell-in is very back-end loaded. But we're not going to be doing that. We're not going to be trying to push parts into distribution. It lands wherever it lands.

We don't really care about what the GAAP revenue would be.  So, based on the way we do it, I think the GAAP and non-GAAP will be about the same, because there would be just no incentive to put any more parts into distribution than is required.  So, my feeling would be it would be in the similar range as we have guided 160 million to $180 million even if you look at by GAAP, give or take some.  [*Id*. at 8.]

337.  Sanghi closed by saying: *[37]* "We really are pleased and proud to have closed this acquisition in a record time comparing to really what many of the other deals are going through." *Id*. at 9.

338.  Sanghi's, Bjornholt's, Moorthy's, and Microchip's statements in Paragraphs 329-37 were materially false and misleading for the reasons stated in Paragraphs 216-228, 282-84, 293, 301-02, 307-13, 320-325.

339.  Defendants knew or were reckless in failing to know that the statement that Microsemi would contribute between $160 to $180 million in non-GAAP revenue to the June quarter was materially false and misleading because GAAP revenue and cash generation at that time was expected to be substantially lower than non-GAAP revenue disclosed to investors.  Defendants, in stating that the June 2018 Microsemi non-GAAP sales were projected to be between $160 to $180 million, failed to disclose the known fact that Microsemi had pre-recognized non-GAAP revenue in prior quarters through advance shipments to end users.  Defendants' duty to disclose was especially prominent because of its prior disclosure that debt was a 4.7 times multiple of projected EBITDA, which was no longer true.  By May 31, 2018, Defendants knew or were reckless in failing to know that the debt of $8.6 billion was five times EBITDA, not 4.7 times EBITDA.

340.  Although Defendants acknowledged on the May 31, 2018 Conference Call that Microsemi had managed its business through sell-in metrics rather than sell-through metrics, they failed to disclose that this would implicate $200 million plus of future GAAP sales, tens of millions of dollars of future non-GAAP sales, and $100 million plus of cash flow.

341.  Also, Defendants stated falsely that "[o]ur combined teams" were working together, when Microchip had already fired Microsemi's senior management.

342.    Defendants also failed to disclose that Microsemi had a culture of excessive spending.

343.    On June 1, 2018, Microchip common stock closed at $101.05 per share, an increase of $3.67 from its May 31, 2018 closing price of $97.28 on above average trading volume of approximately 2.9 million shares.

**N.    Defendants Continue to Make Their False Statements**

344.    On June 4, 2018, at 8:45 a.m., Defendant Moorthy made a presentation at Needham & Co.  Automotive Tech day (the "June 4, 2018 Presentation").  A transcript of Moorthy's presentation was prepared by Bloomberg and is publicly available.

345.    Moorthy repeated certain of the false and misleading statements from the May 31, 2018 Conference Call at the June 4, 2018 Presentation:

> The aggregate borrowing was $8.45 billion [at a] blended interest rate of just over 4%.  *[38]* And that takes us to a net leverage of 4.7x by the end of June, excluding some very long-term debt that we have that's 2037-denominated. *[39]* And we expect we'll bring that leverage down about 1 turn every 12 months or so.
>
> *[40]* Our Microsemi contribution in the short quarter, so just about a month revenue in the June quarter, is between $160 million and $180 million in revenue.  That's non-GAAP revenue.  And by non-GAAP, we recognize revenue on sell-through, which is through consumption rather than sell-in, which is a change in the GAAP recognition that's happening this quarter. [June 4, 2018 Tr. at 1].

346.    The slides used in connection with Moorthy's presentation were uploaded to Microchip's investor relations website (the "June 4, 2018 Slide Show").  While the June 4, 2018 Slide Show focused mostly on Microchip's technology applicable to the automotive industry, *[41]* Defendant Moorthy began his presentation with a slide 2, which described the Microsemi merger and noted that he expected Microsemi "to add $160M to $180M non-GAAP revenue in FQ1'19, and non GAAP-EPS of $0.02 to $0.06."

347.    Moorthy's statements in the June 4, 2018 Presentation were materially false and misleading for the reasons stated in Paragraphs 216-28, 282-84, 293, 301-02, 307-13, 320-25, 339-42, above.  Specifically, Moorthy misrepresented that debt was 4.7x EBITDA,

1   that debt would be reduced by "one turn" per every 12 months, and that Microsemi's June

2   2018 non-GAAP revenue would be between $160-180 million.  Among other things,

3   Microsemi had sold excessive inventory to distributors and end users so that cash generation

4   and GAAP and non-GAAP revenue would be reduced in future quarters.  Moorthy failed to

5   disclose that Microsemi's non-GAAP net revenue for June 2018 was not representative of

6   Microsemi's GAAP revenue.

7         348.   Moorthy also failed to disclose Microsemi's excessive spending.

8         349.   Moorthy's statements at the Needham conference reflected implicit

9   representations that there was no excess Microsemi inventory in the channel that had been

10   sold to distributors.

11         350.   On June 4, 2018, Microchip common stock closed at $101.41 per share, an

12   increase of $0.36 per share over its closing price on June 1, 2018, the previous trading day,

13   on above average volume of approximately 4.3 million shares.

14         351.   On June 6, 2018, beginning at 12:30 p.m., Defendant Bjornholt made a

15   presentation to investors at the Bank of America Merrill Lynch Global Technology, Media

16   & Telecom Conference (the "June 6, 2018 Presentation").  A transcript of the June 6, 2018

17   Presentation was prepared by Bloomberg and is publicly available.

18         352.   Bjornholt repeated many of the false statements from the May 31, 2018

19   Conference Call at the June 6, 2018 Presentation.  For example, Bjornholt stated: "We closed

20   the acquisition last Tuesday on May 29 with aggregate borrowings of about $8.45 billion

21   and an average interest rate on those borrowings of just over 4%.  *[42]*  We expect to have

22   net leverage of about 4.7 times at the end of June."  June 6, 2018 Tr. at 1.

23         353.   Bjornholt noted that based on *[43]* "sell-out revenue recognition from the

24   distribution channel," management expected from Microsemi "*about $160 million to $180*

25   *million of revenue from May 29th through the end of the quarter.*"  *Id*. at 1

26         354.   Bjornholt further stated *[44]* "June quarter non-GAAP revenue with

27   Microsemi is going to be up between 17% and 24% sequentially."  *Id*. at 3.

28

355.   Bjornholt also commented on Defendants' intention to change Microsemi's revenue recognition to sell-through (which Microchip considered the more significant metric), rather than sell-in:

Microsemi, as I mentioned in my opening remarks was on a [ph] sell-in day system of distribution, and we're changing the way that they get measured internally to really be focused on sell through….

*       *       *

[I]t's really one company with a collective set of goals that we're driving to and all of those things are driven off of what the end market demand is, which is really represented by the sell-through revenue recognition.

So that's what we're going to provide investors on a non-GAAP basis, but all of our GAAP revenue will be reported based on selling. And so, investors will have both sets of data to [ph] work at, which I think is helpful because they are going to be able to see what distribution is doing with their inventory; are they building, keeping it flat. [*Id.* at 7-8.]

356.   Bjornholt also discussed Microchip's leverage and ability to pay down its debt to reduce that net leverage:

we are pretty highly levered today; there's no doubt about that…. **[45]** We have high confidence in the cash flow, not only of Microchip, but also with Microsemi. And with that, we're going to be able to delever very quickly. At about 4.7 times net leverage forecasted for the end of June, we think we'll be able to take that down by about one [turn] per year… we think the cash flow is going to continue to generate at a very high level [*Id.* at 8.]

357.   Bjornholt concluded his presentation by noting that Microchip was "looking forward to this very complex acquisition and starting the integration process" and that **[46]** *"overall, the state of the union at Microchip is very, very strong." Id.* at 4.

358.   The slides to Bjornholt's presentation were filed on Microchip's investor relations website (the "June 6, 2018 Slide Show"). The slides, which touted Microchip's "successful M&A strategy," reinforced Bjornholt's false and misleading statements. For example, page 3 of the June 6, 2018 Slide Show included bullet points stating:

- **[47]** June quarter net sales guidance excluding Microsemi is growth of 1% to 6%, and non-GAAP EPS of $1.39 to $1.49

- We closed the Microsemi acquisition on May 29th; Aggregate borrowing was $8.45B at a blended interest rate of just over 4%

77

- *[48]* Expect net leverage of ~4.7X on 6/30/2018 excluding 2037 convertible debt

- *[49]* Expect Microsemi to add $160M to $180M non-GAAP revenue in FQ1'19, and non GAAP-EPS of $0.02 to $0.06

359.    Page 23 of the June 6, 2018 Slide Show included the same slide from the Analyst Day Slide Show describing a *[50]* "Highly Profitable Financial Model." *See* ¶ 208.

360.    Page 11 of the June 6, 2018 Slide Show contained a graph reflecting "non-GAAP Net Sales" for FY2018.

361.    Page 24 of the June 6, 2018 Slide Show stated that the "June quarter non-GAAP revenue guided to sequential growth of between 17% and 24%."

362.    During the question and answer period, Bjornholt assured investors that the Microsemi acquisition was different than Microchip's previous acquisition of Atmel. Specifically, with respect to a question concerning the "delevering" of debt post-Merger, Bjornholt noted:

> Atmel had a significantly lower business model from an operating margin perspective than Microchip had, but we knew that we can make improvements on that.  And essentially, we're driving in the combined businesses excluding Microsemi to a close to 40% operating margin today.  And so with that our free cash flow is significantly high.  But we had to make significant changes to the Atmel business.  *[51] Microsemi is in a different position than that where they have a good business model already.  We believe that we can make some pretty significant improvements to it, but it's not a crisis situation like Atmel was, where we needed to make rapid changes.*  Here, we're going to make sure that we're growing at a steady pace and getting the synergies that we've laid out for investors, but again, making sure that we don't damage the business in the short-term.  [June 6, 2018 Tr. at 8.]

363.    Bjornholt made a similar statement comparing the Atmel and Microsemi transactions earlier in the June 6, 2018 Presentation:  "[Atmel was] not a very well-managed company…Microsemi was starting from a different spot.  *[52] This is a much better run company....*"  *Id*. at 4.

364.    Bjornholt's and Microchip's statements in Paragraphs 352-54, 356-59, and 362 above were materially false and misleading for the reasons stated in Paragraphs 216-228, 282-84, 293, 301-02, 307-13, 320-25, 339-42, and 347-49. above.  Bjornholt knew or

was reckless in failing to know that Microsemi had over-shipped hundreds of millions of dollars of inventory and that Microchip intended to "make rapid changes" by reducing future shipments to distributors and direct purchasers.

365.   On June 6, 2018, Microchip common stock closed at $103.31 per share, an increase of $1.17 from its June 5, 2018 closing price of $102.14 per share on trading volume of approximately 2.2 million shares.  The closing price is also an increase of $1.06 per share from the price of Microchip common stock at 12:30 p.m. of $102.25.

366.   On June 12, 2018, Moorthy made a presentation at the Stifel Cross Sector Insight Conference (the "June 12, 2018 Presentation").  A transcript of the June 6, 2018 Presentation was prepared by Bloomberg and is publicly available.

367.   Moorthy repeated the false statements from the May 31, 2018 Conference Call concerning leverage and Microchip's ability to pay down debt:

> *[53]* We've still the same confidence in what we had for the cash generation capability and the result in delevering that we have.  We have publicly said we expect that the leverage will be – we'll start at the end of June at about 4.7, and that will delever at a rate of about 1 turn every year and get it back in about a two to three-year window of time back into the 2 to 2.5 times leverage numbers, and no change in what we see there.  [June 12, 2018 Tr. at 5.]

368.   Moorthy's and Microchip's statements in the June 12, 2018 Presentation were materially false and misleading for the reasons stated in Paragraphs 216-228, 282-84, 293, 301-02, 307-13, 320-25, 339-42, 347-49, 364, above.

369.   On June 12, 2018, Microchip common stock closed at $102.69 per share, an increase of $0.29 per share over its previous day's close of $102.40 per share on above average trading volume of 3.1 million shares.

370.   On June 25, 2018, Argus Research Company ("Argus") raised its price target on Microchip from $106 to $115 and kept its Buy rating.  Argus stated, on page 1 of its report, that the combination of the two companies would combine operating efficiencies that will drive margin expansion going forward, and also saw the deal strengthening Microchip's presence in the non-technology markets such as aerospace-defense as well as the fast-growing technology markets like data center and communication infrastructure.  Argus

1   further noted on page 4 of its report that "MCHP shares trade at 12.7-times our FY19 non-

2   GAAP EPS estimate and at 11.4-times our FY20 forecast; the two-year forward average P/E

3   of $12.0 is below the five-year (2014-2018) historical P/E of 14.2."   While noting that

4   "[r]isks associated with acquisition integration have been prominent with Microchip in

5   recent years," and that Microchip had been "lagging" its "Argus-covered semiconductor

6   peers" for 2018, Argus stated, among other things, that "[w]e believe the acquisition of

7   Microsemi, while not cheap, will not unduly strain Microchip's balance sheet" and would

8   be a significant revenue-driver.  Argus June 25, 2018 Report at 2-4.  Valuation on Microchip

9   stood at 11.4-times Argus's expected FY20 EPS, while its two-year average of 12.0-times

10  is below the historical P/E of 14.2-times.

11       371.   In a report dated July 27, 2018, Piper Jaffray raised its price target for

12  Microchip to $150 ahead of the company's Q2 results.  The analyst believed Microchip had

13  "significant room" to continue to beat earnings estimates for several quarters in a row.

14  Further, the analyst's sensitivity analysis showed the company has the ability to generate

15  "significant" free cash flow to meet both dividend and debt obligations, even if the company

16  growth were to slow down to 0% or even potentially decline by 3%.  Piper Jaffray kept an

17  Overweight rating on Microchip shares.

18  **O.      Defendants Reveal the Truth with Respect to the Microsemi Acquisition**

19       372.   On August 9, 2018, after the market for Microchip common stock had closed

20  for the day, Microchip announced first quarter fiscal 2019 operating results for the quarter

21  ended June 30, 2018 (the "August 9, 2018 Press Release").  The first quarter operating results

22  included one month of Microsemi's operating results (from the date of the acquisition):

23       • Record GAAP net sales of $1.213 billion, up 21.0% sequentially and up
24       24.7% from the year ago quarter.  Microchip was unable to provide GAAP net
         sales guidance.

25       • Record Non-GAAP net sales of $1.217 billion, up 21.4% sequentially and
26       up 25.2% from the year ago quarter.  The midpoint of our guidance provided
         on May 31, 2018 was non-GAAP net sales of $1.207 billion.

27       • On a GAAP basis: gross margin of 52.9%; operating income of $132.3
28       million; net income of $35.7 million; and EPS of $0.14 per diluted share,

adversely impacted by $226.9 million of Microsemi purchase accounting, restructuring and other charges.  Microchip was unable to provide GAAP guidance.

• On a non-GAAP basis: record gross margin of 62.2%; record operating income of $473.5 million and 38.9% of net sales; record net income of $405.8 million and record EPS of $1.61 per diluted share, up 22.9% from the year ago quarter.  Our guidance provided on May 31, 2018 was non-GAAP EPS of $1.41 to $1.55 per diluted share.

• Record quarterly dividend declared of $36.40 cents per share.

• Completed acquisition of Microsemi Corporation on May 29, 2018.  [August 9, 2018 Press Release, Ex. 99.1 at 1]

373.    The August 9, 2018 Press Release also stated that "Microchip's inventory days in the September 2018 quarter are expected to be in the range of 119 to 127 days of inventory.  Our actual inventory level will depend on the inventory that our distributors decide to hold to support their customers, overall demand for our products and our production levels."  *Id.* at 5.

374.    The August 9, 2018 Press Release repeated verbatim the explanation from the May 8, 2018 Press Release about the importance of non-GAAP revenue recognition and distributor inventory changes.  *See* ¶ 269.

375.    The August 9, 2018 Press Release also repeated Sanghi's statement from the May 8, 2018 Press Release about the April 1, 2018 adoption of GAAP v. non-GAAP reporting, and Microchip's knowledge of large increases or decreases in inventory at distributors.  *See* ¶ 268.

376.    Also on August 9, 2018, after the market for Microchip common stock closed for the day, Defendants convened a conference call to discuss Microchip's financial results for the June 2018 quarter (the "August 9, 2018 Conference Call").  A transcript of the August 9, 2018 Conference Call was created by Bloomberg and is publicly available.

377.    On the August 9, 2018 Conference Call, Bjornholt again emphasized that Microchip managed its business for end-user demand and reported on a non-GAAP basis:

We are not able to provide guidance on a GAAP basis, as we are not able to predict whether inventory at our distributors will increase or decrease in relation to end market demand, as this is not how we manage our business.

81

As evidence of this uncertainty, in recent years, we have seen net inventory at our distributors increase or decrease by a significant amount in a single quarter.  Our non-GAAP revenue is based on true end-market demand, in which we measure the revenue based on when the product is sold by our distributors to an end customer.  We will continue to manage our business and distributor relationships based on creating and fulfilling end-market demand.  All of Microchip's bonus programs will continue to work based on the amount of revenue earned from fulfilling end-market demand, therefore, along with GAAP results based on sell-in, we will also report our non-GAAP results based on sell-through revenue recognition.  [Aug. 9, 2018 Tr. at 2.]

378.    On the August 9, 2018 Conference Call, Bjornholt revealed the previously omitted fact that there was a high level of inventory in the Microsemi distribution channel:

Inventory at our distributors in the June quarter were at 40 days, compared to 36 days at the end of March.  The historical Microchip distributor inventory was actually down by about a day in the June quarter, but the consolidated increase is driven by the high inventory in the Microsemi distribution channel.  We expect the Microsemi distribution inventory to reduce through the end of calendar year 2018.  [*Id*. at 3.]

379.    Sanghi elaborated, disclosing that much of Microsemi's GAAP revenue reported prior to the Merger was not supported by end-user demand, but rather resulted from excess distribution into the channel:

[W]e found that Microsemi management was extremely aggressive in shipping inventory into the distribution channel.  Microsemi's distributors had about four months of inventory whereas Microchip's distributors carry about 2.5 months of inventory.  *While we have seen some excess shipments of inventory into the distribution channel in other acquisitions, we have never seen as much excess as we found in the case of Microsemi.*  [*Id*. at 5.]

380.    Sanghi revealed that Microsemi's practices resulted in the shipment of an excess of approximately $200 million in inventory, and that Microchip had taken immediate measures to reduce inventory in June 2018, which had a negative impact on Microsemi's June GAAP and non-GAAP revenue and anticipated GAAP and non-GAAP revenue for the balance of calendar 2018:

We did not make any deals with the distribution contract manufactures or end customers in the month of June to ship excess inventory.  As a result, we shipped *close to $100 million less in the month of* June than Microsemi ex-management would have shipped.  That was nearly half the inventory correction accomplished in a single month.  We expect to achieve the balance

of the distribution inventory correction in the next two quarters and nearly complete the correction by the end of this calendar year.  [*Id*. at 6].

381.    Sanghi also stated that Microsemi had inflated non-GAAP revenue by excessive shipments direct to contract manufacturers, and therefore non-GAAP revenue for June and the last two calendar quarters of 2018 would also be below company and analyst expectations:

> Microsemi also overshipped into the contract manufacturers by making deals and offering discounts.   This excessive distribution and contract manufacturer's inventory will provide some headwind for revenue for the next couple of quarters.  Our trailing EBITDA and the next two quarters of cash generation will also be impacted by needing to correct this inventory for Microsemi products.
>
> *          *          *
>
> So roughly the $100 million less that we shipped was a combination shipments, lower shipments to distribution, to contract manufacturers and also to direct customers because there were essentially equal opportunity in making deals with everybody and making – shipping excess product into every channel.  So, out of the $100 million, a good portion, more than half of that was a correction in distribution.  We will see another distribution correction in the September quarter and the December quarter, and right now we're expecting that that will complete the majority of the correction. The largest piece got done last month in the month of June, and then the September and December will be two roughly equal pieces.  [*Id*. at 6, 8.]

382.    Later on the call, Sanghi emphasized that Microsemi's business purchases caused excess inventory to be shipped to distributors and to end customers that would be recognized on both a GAAP and non-GAAP basis:

> Every quarter they would take some direct customers and move them to distribution by giving distribution some discount so they could make a margin on it.  *And in doing so, they will take the next couple of quarters of product for that customer and stuff them into distribution*.  [*Id*. at 10.]

383.    Sanghi added (*id*. at 17), that Microsemi's shipments of excess inventory started "about a year or so ago."

384.    Although not credible, Sanghi contended that Microchip first became aware of the Microsemi distributorship condition only after Microchip closed the acquisition:

"This has been the time when we are able to get access to all the company's information that we were not able to get before." [*Id.* at 5].

385.   Another fact that Sanghi contended he only recently learned was Microsemi's culture of excessive spending:

> While excessive shipments into distribution and contract manufacturers has been the main issue at Microsemi, we also found a culture of excessive extravagance and high spending.  The company had millions of dollars of sponsorships in several luxury suites in sports stadiums, luxury private plane travel, and generous sponsorships for many conferences, stadiums and other venues that have wasted their shareholders' money.  We are undoing commitments to all such spending. [*Id.* at 6.]

386.   As of June 30, 2018, Microchip carried significant debt as a result of the Microsemi and prior acquisitions.  Specifically, Bjornholt stated that as of June 30, 2018, Microchip had "$3.3 billion of borrowings under its line of credit, $3 billion of term loan B, $2 billion of high-grade bonds, and $4.5 billion of convertible debt." [*Id.* at 3].

387.   Sanghi acknowledged that as a result of Microchip's need to reduce sales to Microsemi's distributions and original equipment manufacturers, and other companies to which Microsemi had sold direct, Microchip's cash generation in the second quarter was substantially less than projected:  "Our trailing EBITDA and the next two quarters of cash generation will also be impacted by needing to correct this inventory for Microsemi products." *Id.* at 6.

388.   Accordingly, Bjornholt stated that "Microchip's net debt to EBITDA … was 5.0 at June 30, 2018.  Our leverage is higher than we originally projected, primarily due to lower EBITDA from the Microsemi business, driven by needing to correct distribution inventory levels through lower shipment activity." [*Id.* at 3].  Bjornholt stated later in the call that Microchip would no longer be able to pay down its debt to reduce its leverage by one "turn" in the first year.

> So as I mentioned in my prepared remarks, our leverage on a net basis excluding our very long-dated convertible was 5.0 at the end of June.  We had originally guided that we'd have about a turn reduction per year.  And because of the distribution and inventory correction that we need to make, we think that in that first year, we're going to be somewhere in the 0.75 range in terms

of reduction and then get back to the one turn per year.  So it's a little bit slower pace and absolutely we are focused on deleveraging the balance sheet and using 100% of our excess cash generation beyond the dividend to pay down debt.  So it's a focus area of ours.  We know that we have a lot of leverage at this point in time, but we're committed to bring it down.  [*Id*. at 9.]

389.   Sanghi further elaborated:

That reduction from turn to 0.7 turns is largely because of shortage over the next two quarters.  When you look at it on the LTM basis a year from now, the September quarter and December quarter are going through substantial inventory correction.  There is a shortage of the EBITDA.  After that, we get back to one turn.  [*Id*.]

390.   Prior to the August 9, 2018 Conference Call, analysts had projected second quarter fiscal 2019 (period ending September 30, 2018) non-GAAP revenue for Microchip of $1.59 billion based on Defendants' public statements.  Microchip however on the August 9, 2018 call projected non-GAAP revenue for the second quarter at a mid-point of $1.51 billion – $80 million lower than consensus expectations.

391.   Defendants initially represented that debt of $8.6 billion would be 4.7 times EBITDA.  Thus, projected EBITDA was initially projected to be $1.83 billion ($8.6 billion divided by 4.7).  When the true facts were revealed, Defendants acknowledged that debt ($8.6 billion) was 5.0 times EBITDA.  Thus, the revised EBITDA based on the true facts was $1.72 billion ($8.6 billion divided by 5.0) – a full $110 million less based on the true facts known to Defendants during the Class Period.

392.   Analysts were quick to identify the cause of the revenue shortfall as Microsemi's aggressive pre-acquisition revenue recognition practices.  For example, on August 10, 2018, William Stein (the SunTrust research analyst) expressed his concern over the lack of prior disclosure that Microsemi's revenue reporting was front-ended into prior quarters and had cannibalized GAAP and non-GAAP revenue and cash flow:

MSCC revenue appears to be both temporarily (and perhaps somewhat structurally) lower than investors expected, as MCHP points to MSCC's having stuffed everywhere (disty, EMS, and even OEMs).

393.   On August 10, 2018, J.P. Morgan Securities reduced its price target on Microchip from $125 to $113 a share and stated:

85

**[W]e estimate that 70%+ of the revenue miss was from MSCC and attributed to MSCC distribution channel stuffing which implies that true end demand revenue was well below what MSCC had been reporting over the past few quarters.** As a result, we believe Microchip will have to burn >$100M in MSCC channel inventories over the next two quarters. [(emphasis in original).]

394.    When the true facts concerning Microchip's revenues and cash generation post acquisition of Microsemi were revealed, Microchip common stock fell on August 10, 2018 by $10.67 per share from its close on August 9, 2018 of $98.08 to its close on August 10, 2018 of $87.41 per share – a decline of approximately 10.9%.  Reported trading volume of 19.2 million shares was approximately eight times normal trading volume during the Class Period.

395.    On August 13, 2018, Needham lowered its price target for Microchip common stock from $130 to $120, citing worse than expected Q2 outlook and saying Microchip was trying to clear about $100 million in excess Microsemi inventory.

396.    On September 17, 2018, Bank of America Merrill Lynch ("BofA Merrill Lynch") downgraded Microchip common stock to Neutral from Buy and lowered Microchip common stock's price target to $95 from $115 due to several reasons, including Microsemi integration risk.

397.    When CW1 heard about Microchip's August 9, 2018 announcement, CW1 was surprised.  According to CW1, Microsemi had made all the information necessary to understand Microsemi's inventory and distribution channel levels and practices available to Microchip.  CW1 stated that it was "reckless" for Microchip not to have reviewed this information.

**P.    Microchip's Debt is Downgraded Following the Revelations Regarding Inventory**

398.    As discussed earlier (e.g., ¶ 238), Microsemi was, by far, the largest company Microchip had acquired.  Microchip financed the Merger with $8.6 billion in debt.

399.    On May 23, 2018, in anticipation of the closing of the Merger, Microchip announced pursuant to a press release the pricing of two series of notes in the aggregate principal amount of $2.0 billion in an unregistered offering.  Of these $2.0 billion in notes,

$1 billion would bear interest at an annual rate of 3.922 percent, with a maturity date of June 1, 2021 (the "2021 Notes").  The other $1 billion in notes would bear interest at an annual rate of 4.333 percent, with a maturity date of June 1, 2023 (the "2023 Notes").

400.   A Morningstar Equity Analyst Report dated May 29, 2018 was optimistic about Microchip's debt load.  Specifically, Morningstar stated: "Although this new debt brings the firm's leverage to about 4.7 times on a debt/EBITDA basis, we fully anticipate that Microchip's healthy ongoing free cash flow will help bring leverage down to a more manageable level of 2.5 times (the firm's target) by fiscal 2021."

401.   The Individual Defendants were motivated to make false or misleading statements concerning the cash expected to be generated from the Microsemi acquisition to ensure that the Notes were fixed at beneficial terms.  The Individual Defendants were motivated to prevent the market from understanding the short-term risk posed by the Microsemi Transaction, and the reduced cash flow expected in the near term because of Microsemi's over-shipment of inventory to distributors.  The Individual Defendants knew or were reckless in failing to know by virtue of their sophistication that the true facts with respect to reduced cash flow would have had a negative consequence on the terms of the Notes offering.  Had the market reflected the problems with Microsemi that the Individual Defendants were aware of, the interest rates on the bonds would have been fixed higher, requiring Microsemi to pay hundreds of more basis points.

402.   The Notes offering closed on May 29, 2018.

403.   On June 27, 2018 (prior to the truth being revealed) an analyst from CFRA Research ("CFRA") noted that "[w]e see MCHP likely exceeding original accretion targets over the next year given execution in prior deals…and see MCHP utilizing excess free cash flow to aggressively reduce debt levels."

404.   Following the revelations in August 2018 regarding Microsemi's excess inventory, Fitch Ratings Inc. ("Fitch"), a well-known and respected debt rating agency, issued a press release on August 13, 2018 at 4:01 p.m. announcing that it had revised its Rating Outlook for Microchip from "stable" to "negative."  The rating affected $12.8 billion

of total Microchip debt, including the notes issued in May 2018 and Microchip's $3.8 revolving credit facility.

405. Fitch's press release stated that its negative outlook reflected its "downward revision of revenue and profitability" arising from "expectations for lower shipments into the channel over the next two to three quarters to correct meaningful excess inventory at Microsemi…." Fitch also observed that the August disclosures indicated "heightened near-term integration risk." Consequently, Fitch concluded that Microchip's free cash flow, "all of which Microchip has committed to using for debt reduction, may be insufficient to achieve Fitch's negative total leverage sensitivity of 3.5x exiting fiscal 2020."

406. Fitch also noted that the news of "Microsemi's aggressive shipments into the channel pushed months of inventory at distributors to four months compared with Microchip's more customary 2.5 months."

407. Based on Microchip's stated intention to reduce inventory at Microsemi to account for the prior over-shipments, Fitch predicted up to a $200 million adverse impact on free cash flow in the fiscal year of 2019.

408. Consistent with Fitch's observations, the yield on the Notes increased throughout the remainder of calendar year 2018, reflecting greater risk regarding Microchip's debt payments. With respect to the 2021 Notes, the yield increased from 3.802 % on August 6, 2018 to 4.578 % on December 14, 2018, with a corresponding price decrease of the Notes from $100.314 on August 6, 2018 to $98.493 on December 14, 2018. With respect to the 2023 Notes, the yield increased from 4.208 % on August 6, 2018 to 5.174% on December 12, 2018, with a corresponding price decrease from $100.535 on August 8, 2016 to $96.684 on December 12, 2018.

**Q.    The Defendants Acted with Scienter**

409. As alleged herein, each of the Defendants acted with scienter in that they knew or recklessly disregarded that the public statements and documents issued and disseminated in the name of the Company or with the Company's assent were materially false and misleading, knew or acted with reckless disregard that such statements and documents would

1    be issued and disseminated to the investing public, and knowingly and substantially

2    participated and/or acquiesced in the issuance or dissemination of such statements and

3    documents as primary violators of the federal securities laws.

4         410.   In addition to the facts identified below, Defendants were motivated to

5    misrepresent the truth in order to place the $8.6 billion of debt at the lowest possible interest

6    rate. *See, e.g.,* ¶ 401.

7         **1.    The Individual Defendants Knew or Were Reckless in Not Knowing That
               Microsemi Had Shipped Excess Inventory in the Distribution Channel
8              and to End Users and the Negative Impact Such Prior Inventory
               Shipments Would Have**
9

10        411.   Sanghi, Bjornholt, Moorthy, and Microchip were given, through in person

11    meetings with Microsemi executives and the Data Room, information on Microsemi's

12    inventory positions with distributors.  By virtue of these facts, and the due diligence required

13    by signing a $10 billion Merger Agreement (as defined below), Defendants knew or were

14    reckless in failing to know that Microsemi maintained an excess amount of inventory in the

15    channel and was only able to do so by offering its distributors special deals.  *See, e.g.,* ¶¶

16    216-17, above.

17        412.   Sanghi, Bjornholt, Moorthy, and Microchip also knew, or were reckless in

18    failing to know and conduct necessary due diligence on a $10+ billion transaction, that this

19    excess inventory level would require a reduction in inventory in the channel by selling less

20    Microsemi product to distributors in the short term, which would in turn generate less cash

21    during that period.

22        413.   Sanghi, Bjornholt, Moorthy, and Microchip also had access to Microsemi's

23    business information through Microchip's distributors.  As Sanghi admitted on Microchip's

24    August 9, 2018 Conference Call, Microchip's largest distributor (Arrow Distributors), was

25    also Microsemi's largest distributor.  Aug. 9, 2018 Tr. at 18.  In fact, one of Microchip's

26    "guiding values" was that "suppliers, representatives and distributors are our partners."

27    Analyst Day Slide Show at 83.

28

89

414.   Defendants were extremely focused on inventory levels and inventory management, and Bjornholt and Sanghi reported current and expected days of inventory, current inventory value, and current days of inventory at distributors.  *See, e.g.,*  ¶¶ 266-69, above.

415.   Given their professional and business experience, the Sanghi, Bjornholt, and Moorthy were clearly aware that Microsemi maintained excess inventory (or "excessive," at least by Microchip's standards).   To professionals as sophisticated as the Individual Defendants, Microsemi's so-called practice of "stuffing the channel" would have been very apparent.  As Sanghi stated on a November 7, 2018 conference call (Tr. at 6), "In the four quarters prior to being acquired by Microchip, about 57% of Microsemi's sell-in revenue was shipped in the last month of the quarter," compared to 31% of "sell-in revenue for Microsemi products … shipped in the third month" of a quarter.

416.   Alternatively, the Individual Defendants were reckless in failing to familiarize themselves with Microsemi's inventory models when they made statements concerning the Merger in the summer of 2018.

417.   Therefore, by virtue of their sophistication, and focus on the amount of inventory in the channel, and receipt of information concerning Microsemi's inventory positions, Sanghi, Bjornholt, Moorthy, and Microchip knew or were reckless in failing to know of the need to reduce inventory in the channel, and the negative effect the reduction of inventory in the channel would have on GAAP revenue and cash flow.

418.   At the same time Sanghi, Bjornholt, Moorthy, and Microchip made their materially false and misleading statements during the Class Period, they knew that Microsemi's inventory at the distributor level was excessive or were reckless in failing to conduct necessary due diligence on a $10+ billion transaction and to learn that Microsemi's distributors held excess inventory.

419.   Sanghi, Bjornholt, Moorthy, and Microchip, by virtue of their emphasis on non-GAAP net sales and sell-through to ultimate customers, going so far as to say that Microchip was opposed to the sell-in revenue recognition method, knew or were reckless in

1   failing to know that their statements with respect to Microsemi's net sales were misleading
2   because they failed to clarify the amount of Microsemi's net sales that were held by
3   distributors as excess inventory.

4          420.   Microsemi's net sales (revenue) were reported on a GAAP measure, where
5   title passed not to the ultimate customer, but rather only to Microsemi's distributor. *See*
6   Microsemi 2017 Form 10-K quoted in ¶ 134, above. Microchip, on the other hand, reported
7   net sales on a GAAP and non-GAAP basis. That Microsemi reported GAAP net sales and
8   not non-GAAP net sales should have been a red flag to Defendants to scrutinize Microsemi's
9   practices with respect to sales to distributors.

10         421.   Further, in numerous, if not every, public statement, Defendants stated that
11  they manage Microchip's business for end-user demand and therefore looks at non-GAAP
12  (end-user net sales) rather than GAAP (distributor and direct customer net sales). *See, e.g.,*
13  ¶¶ 78-99, above.

14         422.   Moreover, as demonstrated from the Sanghi's, Bjornholt's, and Moorthy's
15  conduct in connection with previous acquisitions, the Defendants were well aware of the
16  potential for excess inventory to remain in the channel, and the risks it posed to Microchip.

17         423.   Defendants learned through the Atmel acquisition the importance of
18  understanding the inventory in the channel of an acquisition target. Sanghi and Bjornholt
19  discussed the inventory issues at Atmel, which negatively impacted Microchip's net sales,
20  on the April 4, 2016 investor conference call. *See, e.g.,* ¶ 124, above. This should have
21  alerted Defendants to examine Microsemi's distribution channel inventory in their due
22  diligence.

23         424.   Sanghi and Bjornholt repeatedly advocated during Conference Calls for the
24  use of non-GAAP methods with respect to products in the inventory channel, and
25  specifically distinguished Microchip's methods from those of Atmel's, and which according
26  to the Individual Defendants, maintained excess inventory in the channel. As Sanghi himself
27  noted, the "sell-in to distribution" model is "a typical peril of sell-in revenue recognition that
28  we have discussed with investors for years."

91

425.   It begs credulity that Sanghi, Bjornholt, Moorthy, and Microchip would do a $10 billion acquisition without investigating Microsemi's business practices and to determine if there were any material discrepancy in Microsemi's business between non-GAAP and GAAP net sales.

426.   Having committed $10 billion to the transaction and in the midst of negotiating terms with lenders, Defendants were motivated to misrepresent the truth to investors and analysts.

427.   Sanghi, in responding to a question from analyst Christopher Rolland of the Susquehanna Financial Group, LLLP ("Susquehanna") on Analyst Day, stated that: "Microsemi is not on the cheaper side.  We paid the highest price to revenue that we have ever paid."  Mar. 1, 2018 Tr. at 40.

428.   Given that Sanghi was saying that Microchip had paid a high multiple to revenue, he was understandably reticent to state that Microsemi's reported revenue was actually inflated.

429.   In announcing the Transaction, Sanghi, Bjornholt, Moorthy, and Microchip knew or was reckless in failing to know the truth that Microchip anticipated lower GAAP sales to distributions and that if it disclosed the truth to investors, both investors and Microchip's financing sources would know that Microchip would receive approximately $100+ million less in GAAP sales to distributors in the short-term, increasing the already substantial costs of the acquisition, and causing Microchip to report lower GAAP sales and profits and higher net leverage.

430.   Defendants were highly conscious of the debt Microchip was assuming and investor and analyst concern with that debt, and were extremely vigilant in assessing the combined entities' cash flow.

431.   Sanghi, Bjornholt, Moorthy, and Microchip, by virtue of their emphasis on non-GAAP net sales and sell-through to ultimate customers, knew or were reckless in failing to know that their statements were misleading because they failed to clarify the quantum of net sales held by distributors as excess inventory.

432.    Sanghi, Bjornholt, Moorthy, and Microchip had this knowledge when they made their statements that, for example, the Transaction would be immediately accretive, would add between $160 million to $180 in revenue for the quarter ending June 2018, and that debt would be 4.7x EBITDA upon closing of the Transaction.  Defendants knew those statements were not true because Microsemi had presold inventory to both distributors and direct customers and therefore Defendants knew or were reckless in failing to know that Microsemi's historical and projected net sales (both GAAP and non-GAAP) were inflated.

433.    Individual Defendants and other Microchip senior officers who participated in the Microsemi acquisition had actual knowledge or acted with reckless indifference to Microchip's lack of due diligence and bases for public statements with respect to the merger.

434.    Defendants give no justification other than fraud for not knowing these true facts with respect to Microsemi.

435.    In fact, the Defendants were primarily motivated, rather than to do adequate due diligence, to sign the merger documents and announce the Acquisition at Microchip's Analyst Day, scheduled in advance on March 1, 2018.  There was no reason to sign the merger documents with such urgency, and without adequate due diligence, other than the Individual Defendants' hubris.

436.    Microsemi represented in the March 1, 2018 Agreement and Plan of Merger by and among Microchip Technology Incorporated, Maple Acquisition Corporation, and Microsemi Corporation, Dated as of March 1, 2018 (the "Merger Agreement") that the "conduct of business [is] in the ordinary course from December 31, 2017 through the date of the [M]erger [A]greement, and the absence since December 31, 2017 of certain changes, including any fact, event, circumstance, change or effect that has had, individually or in the aggregate, a material adverse effect (as described below), as well as other specific actions." Microsemi Proxy at 67-68.

437.    Microchip by virtue of this provision acknowledged that it had the opportunity to do full due diligence at least through December 31, 2017.

438.   The "Material Adverse Change" clause also acknowledged that Microsemi's operation of its business up to closing was a material fact that was subject to due diligence and that Microchip reserved the right to terminate the Merger Agreement if Microsemi failed to operate the business in its ordinary clause.

439.   The Merger Agreement was signed by Sanghi on behalf of Microchip and Peterson on behalf of Microsemi, and was filed with the SEC by Microchip on March 2, 2018 as an attachment to a Form 8-K.  The Form 8-K was signed by Bjornholt.

**2.**   **Sanghi's History of Praising Acquisition Targets When Announcing a Merger, and Then Identifying Problems Immediately After Closing, is Supportive of Scienter**

440.   As discussed above, in Microchip's acquisition of Atmel, Sanghi praised Atmel when the merger was first announced, and then reversed his position and criticized Atmel and its business the day the merger closed for its inventory levels and sell-in revenue recognition.

441.   In addition to putting Defendants on notice of the need to do proper due diligence into these topics, the events of the Atmel acquisition, combined with Sanghi's actions during the acquisition of Micrel, evidence a disturbing pattern of praise and promises when a transaction is first announced, followed by criticism, breaking of those promises, and deflecting blame post-closing.

442.   On May 7, 2015, Microchip announced (at the same time as it announced its fourth quarter and fiscal year 2015 financial results) that it would acquire Micrel, a semiconductor manufacturer based in San Jose, California, for $839 million, with Micrel shareholders being allowed to elect whether to receive $14 per share in cash or Microchip common stock.

443.   In Microchip's press release announcing the Micrel transaction, Sanghi praised the transaction, Micrel, and its CEO and President, Ray Zinn:

> We are pleased to have Micrel become part of the Microchip team…. We believe that combining Micrel's business with Microchip's business will enable significant synergies and cross selling opportunities.  Ray Zinn founded Micrel and has led the company for the last 37 years.  I want to thank Ray for

1    his vision in guiding Micrel from a start-up to almost a quarter billion dollars
     in annual sales.

2        444.    Microchip completed the acquisition of Micrel on August 3, 2015, the same

3    day that Microchip announced its first quarter fiscal 2016 financial results.  Sanghi once

4    again praised Micrel and the transaction in the press release announcing the completion of

5    the deal:

6        We are very pleased to have completed our acquisition of Micrel.  I welcome
         the Micrel employees into the Microchip family and look forward to building
7        a combined organization that will bring the capabilities of both organizations
         to bear in the marketplace.
8

9        445.    However, as the *EE Times* reported in a May 4, 2016 article entitled "Tension

10   Intensifies Over Microchip, Micrel Deal," Sanghi's praise of Micrel and Ray Zinn, the then-

11   former CEO of Micrel, quickly turned to criticism after the transaction closed.  Sanghi told

12   *EE Times* that Micrel "was horribly run."

13       446.    The *EE Times* also interviewed Zinn for a May 3, 2016 article titled

14   "Microchip, Micrel CEOs Duel Over Deal."  Zinn told *EE Times*:

15       When he [Sanghi] visited the company he was glowing and complimentary,
         saying I did a great job and had great people who deserved a pat on the back.
16

17       "When I tried to negotiate with him about layoffs, he assured me his people
         were as worried as mine and if he terminated one of my people he'd also
18       terminate one of his," Zinn said. "*When I asked if I could get that in writing,
         he said he couldn't do that that without filing a disclosure, but I had his word*,"
19       he said.

20       *After the deal was done, he flipped and said I had a terrible company with the
         worst people he'd ever seen*, and I don't think anybody on his side got
21       terminated.  When I talked to him about it later he wrote me this nasty letter
         saying…some very unkind things.
22

23                                    *       *       *

24       "Verbally he made a lot of commitments that didn't materialize because I
         didn't have them in writing.  If you didn't have it in writing and in the term
25       sheet, he didn't have to live by it.

26       447.    This pattern was further on display with how Sanghi and Microchip treated

27   Atmel employees after the Atmel merger.  As stated in an *EE Times* article dated April 11,

28   2016 and titled "Severance Clash in Microchip/Atmel Merger," Microchip reneged on

                                           95

severance benefits Atmel promised its employees during the lengthy negotiations over the Microchip/Atmel merger.  Sanghi "blamed the Atmel board for failing to communicate details of the severance package to the Microchip board."

448.    The *EE Times* also reported in the same article that Sanghi strong armed Atmel employees into taking half of the severance they were entitled to.  Sanghi "offered employees half what Atmel had promised if they signed a letter indemnifying Microchip." One employee told the *EE Times*:  "He [Sanghi] said you can sign the letter or not, and if not don't expect anything because I'll beat you in court.  He used the example many times of a house burning and said you can either help me or the house will burn down and get sold — he said that four or five times."

449.    Sanghi and Microchip have taken a similar tact with Microsemi employees. "Just as Sanghi did with the Micrel and Atmel acquisitions, he is now using [the *Peterson* Plaintiffs] as a scapegoat to get out from his obligations to fairly compensate his employees. Sanghi has informed Microsemi employees that Microchip will not pay bonuses or other incentive or compensation, including commissions, for 2018."  *Peterson* Compl. ¶ 197

### 3.    Defendants Continued to Misrepresent the Truth in Analyst Meetings During June 2018

450.    Although Defendants acknowledge that they learned the truth concerning Microchip's business purchases shortly after acquiring Microsemi on May 29, 2018, and were required to reduce shipments of inventory in June 2018 because they stopped offering special deals, Defendants continued to misrepresent the truth at analysts' conferences on June 4, 6, and 12, 2018.

451.    That Defendants continued making misrepresentations as late as June 12, 2018, is evidence of their intent to deceive.

### 4.    Defendants Were Motivated to Close the Transaction Because of Reduced Revenue and Earnings Growth

452.    Defendants themselves have acknowledged, and as the *Peterson* Plaintiffs and analysts have stated, Microchip, at the time of the March 1, 2018 Merger announcement,

was suffering from reduced organic growth.  ¶¶ 50-51, 59, 182-83, 201, 239.  Microsemi was an excellent merger candidate both in terms of size and because it had complementary, non-duplicative, product lines.  *See, e.g.,* ¶¶ 260.

453.    Among the assertions made by the plaintiffs in the *Peterson* Litigation are that Defendants knew that Microchip's June 30, 2018 operating results would be below expectations, and desired to close the Transaction prior to the end of that quarter so that Microchip could report consolidated earnings results.  Consistent with that thesis, Microchip did not break out legacy Microchip and Microsemi results separately, although they did so with respect to prior acquisitions.  *See* ¶ 182; *Peterson* Compl. ¶ 185.

454.    Thus, notwithstanding Defendants' concern with Microsemi's inventory in the channel, they were motivated not to disclose the true facts but rather to pushes through the transaction as quickly as possible.

**5.    Termination of Microsemi's Executives Evidences Knowledge**

455.    Defendants terminated the *Peterson* Plaintiffs, CW1, and other high level Microsemi executives immediately upon the closing of the Merger, despite the years of institutional knowledge these executives had concerning Microsemi's products, distributors, and business.

456.    "From the Closing [of the Merger] to today [October 9, 2018], neither Sanghi, Little, nor anyone else in Microchip's management has contacted [the *Peterson*] Plaintiffs to discuss Microsemi's business practices, including how Microsemi managed inventory in the distribution channel." *Peterson* Compl. ¶ 114.

457.    These terminations, and failure to contact Microsemi executives, evidences Defendants knowledge of Microsemi's inventory levels in the distribution channel at latest by May 29, 2018 as Defendants either needed someone to blame for the lower cash flow resulting from shipping less Microsemi product to distributors, or concluding that these executives, in Defendants' opinion(s), had acted improperly.

**6.** **Bonuses and Executive Compensation Motivated the Defendants to Complete Acquisitions**

458. On July 12, 2018, Microchip filed its proxy statement for its 2018 Annual Meeting of Stockholders (the "Microchip Proxy").

459. The Microchip Proxy named Individual Defendants Sanghi, Moorthy, and Bjornholt, as executive officers.

460. The Microchip Proxy makes clear that revenue growth, which increases dramatically following an acquisition, particularly one as large as the multi-billion dollar Microsemi acquisition, was a significant factor in the Individual Defendants' base salaries and incentive cash bonuses.

461. For instance, with respect to the Individual Defendants' base salaries, the Microchip Proxy stated that

> *In particular, we consider our overall revenue growth and revenue growth in our strategic business units, non-GAAP gross margins, non-GAAP operating expenses, non-GAAP net income per diluted share, cash generation, expected capital expenditures and other financial considerations in setting our budgets for salaries.*

462. With respect to incentive cash bonuses, the Microchip Proxy stated:

> *Incentive Cash Bonuses.* The Compensation Committee sets performance goals which, if met, result in quarterly payments to our executive officers under the [Executive Management Incentive Compensation Plan ("EMICP")]. Executive officers may also receive quarterly payments under the Discretionary Management Incentive Compensation Plan ("DMICP").
>
> Each of the other performance metrics is reviewed each quarter but may be the same for multiple quarters. The table below sets forth the performance metrics under the EMICP for each quarter of fiscal 2018:

| Target Quarterly Measurement | | | | | |
|---|---|---|---|---|---|
| Performance Metric | Q1 FY18 % | Q2 FY18 % | Q3 FY18 % | Q4 FY18 % | Target % of Bonus |
| Total sequential revenue growth | 1.50 | 1.50 | 1.50 | 1.50 | 10.00 |
| High performance micro-controller sequential revenue growth | 3.00 | 3.00 | 3.00 | 3.00 | 4.00 |
| Analog sequential revenue growth | 2.00 | 2.00 | 2.00 | 2.00 | 4.00 |

| Target Quarterly Measurement | | | | | |
|---|---|---|---|---|---|
| Performance Metric | Q1 FY18 % | Q2 FY18 % | Q3 FY18 % | Q4 FY18 % | Target % of Bonus |
| Licensing sequential revenue growth | 1.50 | 1.50 | 1.50 | 1.50 | 2.00 |
| Gross margin percentage (non-GAAP) | 56.00 | 57.00 | 57.50 | 57.50 | 15.00 |
| Operating expenses as a percentage of sales (non-GAAP) | 26.00 | 25.00 | 24.50 | 24.50 | 15.00 |
| Operating income as a percentage of sales (non-GAAP) | 29.00 | 31.00 | 32.00 | 32.00 | 15.00 |
| Earnings per share (quarterly) (non-GAAP) | $1.00 | $1.20 | $1.23 | $1.15 | 15.00 |
| EMICP Total | N/A | N/A | N/A | N/A | 80.00 |
| DMICP Total | (1) | (1) | (1) | (1) | 20.00 |

(1) Each quarter, the Target Quarterly Measurement under the DMICP is discretionary.

463.   As can be seen from the above table, four of the eight performance metrics were tied to revenue growth.  The Compensation Committee put great emphasis on revenue growth and earnings-per share metrics, which greatly incentivized the Defendants to seek out and close on acquisitions.

464.   Because of the significant impact of revenue growth on Microchip executives' incentive cash bonuses, the Individual Defendants were heavily motivated and incentivized to close on the Microsemi Merger.

465.   There is another discussion in the Microchip Proxy concerning executive compensation that makes clear that the Individual Defendants were motivated to seek out and close on acquisitions.  For example, the Proxy states that the Company's compensation policy for executives is based on a "'pay-for-performance' philosophy" which "emphasizes variable compensation, primarily by placing a large portion of pay at risk."

466.   The Microchip Proxy also noted that, with respect to management's cash bonuses, the Compensation Committee established "performance goals which it believes are challenging, require a high level of performance and motivate participants to drive stockholder value."

467.   The Microchip Proxy also disclosed the compensation of the Individual Defendants, which was high, as reflected below.

468.   In 2018, Defendant Sanghi received total compensation of $7,893,460.  Of this total figure, $4,464,406 constituted the valuation of stock awards and $2,632,141 constituted "non-equity incentive plan compensation."  As disclosed in the Proxy, the ratio of Sanghi's total compensation to the median of the annual total compensation of Microchip employees was 194 to 1.  In 2017, Sanghi's total compensation was $7,305,351, $4,229,482 of which constituted stock awards and $2,395,351 of which constituted non-equity incentive plan compensation.  In 2016, Sanghi's total compensation was $10,760,942, $8,812,155 of which constituted stock awards, and $1,264,648 of which constituted non-equity incentive plan compensation.

469.   The Proxy acknowledged that Sanghi's total compensation was high.  Specifically, the Proxy noted that "the Compensation Committee recognizes that Mr. Sanghi's total compensation package is significantly higher than that of our other executive officers."  Nonetheless, the Compensation Committee believed the high compensation was warranted in light of Sanghi's "superior leadership of Microchip over a long period of time" and, "in particular," the fact that "Sanghi's leadership has been key to the substantial revenue and profitability growth, strong market position and substantial increase in the market value of Microchip since taking Microchip public in 1993."

470.   In other words, the Company was rewarding Sanghi for overseeing acquisition after acquisition since 1993.

471.   According to a March 1, 2018 Form 4 filed with the SEC, Sanghi owned at that time, through Trusts or other entities, 4,587,191 shares of Microchip common stock with a market value of approximately $418.7 million.  Sanghi had acquired those shares either exclusively or primarily through incentive-based stock option or stock grants authorized by Microchip's Board.  According to information available on Bloomberg, Sanghi has not purchased any Microchip common shares on the open market at least since 2004.  Sanghi, having made a substantial fortune off of stock and option grants, was

understandably anxious to consummate the Microsemi Transaction, which was necessary to demonstrate continued revenue and earnings growth.

472. Although Sanghi never purchased Microchip shares on the open market, he periodically sold Microchip common stock at market prices, and sold 20,124 shares on March 6, 2018 at $94.80 per share, for gross proceeds of approximately $1.9 million.

473. The other Individual Defendants also received substantial compensation.

474. In 2018, Defendant Moorthy received total compensation of $3,292,308, $2,252,329 of which constituted stock awards and $589,160 of which constituted non-equity incentive plan compensation. In 2017, Moorthy received total compensation of $3,495,815, reflecting $2,546,515 in stock awards and $556,000 in non-equity incentive plan compensation. In 2016, Moorthy received $4,230,207, of which $3,695,412 was in stock and $187,388 of which was in non-equity incentive plan compensation.

475. In 2018, Defendant Bjornholt received total compensation of $1,068,118, of which $640,938 was stock and of which $145,739 was in non-equity incentive plan compensation. In 2017, Bjornholt received $995,668, of which $597,516 was in stock and of which $133,192 was in non-equity incentive plan compensation. In 2016, Bjornholt received $1,573,584, of which $1,266,751 was in stock and of which $69,433 was in non-equity incentive plan compensation.

**7.** **Restrictive NDAs**

476. Microchip has required that former Microchip and Microsemi employees enter into restrictive NDAs that have chilled the willingness of those employees to cooperate in Plaintiff's investigation of his fraud allegations.

477. Microchip and the Individual Defendants' efforts to restrict cooperation is further evidence of Defendants' guilty state of mind.

**8.** **Microchip's Scienter**

478. As alleged herein, the Individual Defendants were corporate officers of Microchip during the Class Period, when they gained knowledge indicating statements made by them and Microchip were materially false and misleading or reckless as to their falsity.

101

479.   As alleged herein, Little and Grune were corporate officers of Microchip during the Class Period, when they gained knowledge indicating statements by the Individual Defendants and Microchip were materially false and misleading or reckless as to their falsity.

480.   The knowledge of the Individual Defendants, Little, and Grune is imputed to Microchip given their positions as corporate officers.

481.    The scienter of Microchip's employees and agents, including the Individual Defendants, Little, and Grune, is imputed to Microchip under the doctrine of *respondeat superior* and common law principles of agency.  Microchip is liable for the acts of these Defendants.

**R.      Loss Causation**

482.   As alleged herein, Defendants either (i) actively engaged in a scheme to deceive investors during the Class Period by touting the financial benefits of the Microsemi Acquisition when they knew the opposite to be true and/or had no basis to make the statement; or (ii) upon learning of Microsemi's inventory practices and the resulting negative impact on the combined entity's financial results, made no efforts to correct the misinformation placed into the market and instead perpetuated the falsity that the Company had engaged in no fraudulent acts.

483.   From March 1, 2018 (the day Microchip announced its acquisition of Microsemi) to August 9, 2018 (the day Microchip disclosed the truth about Microsemi's inventory practices and their negative impact on Microchip's financial results), Microchip's common stock increased from $89.02 per share to $98.08 per share, reaching as high as $104.20 per share on June 8, 2018.

484.   As such, Defendants' materially false and misleading statements and omissions of material fact, as alleged above in Sections V(G)-(N), caused the price of Microchip's common stock to be artificially inflated, and/or maintained such artificial inflation during the Class Period, operating as a fraud or deceit upon Plaintiff and other Class Period purchasers of Microchip common stock.

485.   Relying upon the integrity of the market price of Microchip common stock and public information relating to the Company, Plaintiff and the other Class Members purchased or otherwise acquired Microchip common stock at prices that incorporated and reflected Defendants' misrepresentations and omissions of material fact, as alleged herein.

486.   Plaintiff and the Class suffered actual economic loss and were damaged when the foreseeable risks of Defendants' fraudulent stock promotion scheme and concealment by Defendants' misstatements and omissions materialized through the public disclosure of new information concerning Microsemi's GAAP and non-GAAP net sales, inventory practices, revenue recognition, $100+ million less of net cash flow, and higher net leverage ratio.

487.   As alleged above in Sections V(O)-(P) and in this section, this corrective disclosure and/or materialization of the foreseeable risks concealed by Defendants' fraud caused foreseeable declines in the price of Microchip common stock by removing portions of the artificial inflation in the price of Microchip common stock that resulted from Defendants' fraud.  The timing and magnitude of the decline in the price of Microchip common stock is in response to the public disclosure of new, Company-specific news on August 9, 2018, as alleged herein, negating any inference that the losses suffered by Plaintiff and the Class were caused by changed market conditions or other macroeconomic factors unrelated to Defendants' fraud.

488.   On August 9, 2018, Microchip common stock closed at a price of $98.08 per share.  After the market for Microchip common stock closed, Defendants revealed for the first time Microsemi's inventory practices, and that Microchip's remedy of those practices would result in $100+ million less net cash flow and higher net debt leverage. *See, e.g.,* ¶¶ 379-380, above.  On August 10, 2018, the next trading day for Microchip common stock, Microchip common stock fell by $10.67 per share to $87.41 per share – a decline of approximately 10.9%.  Reported trading volume of 19.2 million shares was approximately ten times normal trading volume during the Class Period.

489.     Accordingly, Defendants' conduct, as alleged herein, proximately caused foreseeable losses to Plaintiff and the Class who purchased or otherwise acquired Microchip common stock during the Class Period.

490.     The economic loss, *i.e.*, damages, suffered by Plaintiff and the Class are direct and foreseeable results of: (i) Defendants' materially false or misleading statements and omissions of material fact; and (ii) the subsequent significant decline in the price of Microchip common stock when the truth was gradually revealed and/or the risks previously concealed by Defendants' fraud gradually materialized, as set forth herein.

## VI.     CAUSES OF ACTION

### COUNT I

### (Against All Defendants for Violations of Section 10(b) and Rule 10b-5)

491.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

492.     This Count is asserted against all Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

493.     During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

494.     Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

    a.     employed devices, schemes and artifices to defraud;

    b.     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

c.    engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Microchip common stock during the Class Period.

495.   Defendants acted with scienter in that they knew that the public documents and statements made by them, authorized by them, or issued or disseminated in the name of Microchip were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.  These Defendants, by virtue of their receipt of information reflecting the true facts of Microchip and Microsemi, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Microchip and Microsemi, participated in the fraudulent scheme alleged herein.

496.   The Individual Defendants, who were the senior officers of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Microchip personnel to members of the investing public, including Plaintiff and the Class.

497.   As a result of the foregoing, the market price of Microchip common stock was artificially inflated during the Class Period.  Unaware of the falsity of the statements by Defendants, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of Microchip common stock during the Class Period in purchasing Microchip common stock at prices that were artificially inflated as a result of the false and misleading statements by Defendants.

498.    Had Plaintiff and the other members of the Class been aware that the market price of Microchip common stock had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Microchip common stock at the artificially inflated prices that they did, or at all.

499.    As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

500.    By reason of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of Microchip common stock during the Class Period.

## <u>COUNT II</u>

### (Against the Individual Defendants for Violations of Section 20(a))

501.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

502.    Defendant Microchip violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder as alleged herein.

503.    The Individual Defendants named in this count acted as controlling persons of Microchip within the meaning of Section 20(a) of the Exchange Act as alleged herein.

504.    By virtue of their high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of Microchip's operations and/or intimate knowledge of the Company's actual performance, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the materially false and misleading statements alleged herein.

505.    During the Class Period, the Individual Defendants participated in the operation and management of Microchip, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs.   Because of their senior

1  positions, they knew the adverse non-public information about the Company's misstatement

2  and false statements.

3       506.   As officers and/or directors of a publicly owned company, the Individual

4  Defendants had a duty to disseminate accurate and truthful information with respect to

5  Microchip's financial condition and results of operations, and to correct promptly any public

6  statements issued by Microchip which had become materially false or misleading.

7       507.   Because of their positions of control and authority as senior officers, the

8  Individual Defendants were able to, and did, control the contents of the various reports, press

9  releases and public filings which Microchip disseminated in the marketplace during the

10  Class Period.  Throughout the Class Period, the Individual Defendants exercised their power

11  and authority to cause Microchip to engage in the wrongful acts complained of herein.  The

12  Individual Defendants therefore, are "controlling person" of Microchip within the meaning

13  of Section 20(a) of the Exchange Act.

14       508.   By reason of the above conduct, the Individual Defendants are liable pursuant

15  to Section 20(a) of the Exchange Act for the violations committed by Microchip.

16                         **VII.**   **PRAYER FOR RELIEF**

17      WHEREFORE, Plaintiff demands judgment against Defendants as follows:

18      A.    Determining that the instant action may be maintained as a class action under

19            Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the

20            Class representative;

21      B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by

22            reason of the acts and transactions alleged herein;

23      C.    Awarding Plaintiff and the other members of the Class prejudgment and post

24            judgment interest, as well as their reasonable attorneys' fees, expert fees and

25            other costs; and

26      D.    Awarding such other and further relief as this Court may deem just and proper.

27

28

1

## VIII. <u>DEMAND FOR TRIAL BY JURY</u>

2

Plaintiff hereby demands a trial by jury.

3

4

Dated: February 22, 2019

5

6

**BONNETT FAIRBOURN FRIEDMAN & BALINT, P.C.**

7

8

By: *<u>/s/Andrew S. Friedman</u>*
    Andrew S. Friedman, Esq. (005425)

9

    afriedman@bffb.com
    Francis J. Balint, Jr. (007669)

10

    fbalint@bffb.com
    2325 East Camelback Road, Suite 300

11

    Phoenix, AZ 85016

12

    Telephone: (602) 274-1100

13

    Robert C. Finkel (Admitted *Pro Hac Vice*)

14

    rfinkel@wolfpopper.com
    **WOLF POPPER LLP**

15

    845 Third Avenue
    New York, NY 10022

16

    Telephone: (212) 759-4600

17

    *Attorneys for Lead Plaintiff and Lead and Liaison Counsel*

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the foregoing document filed through the ECF system on February 22, 2019 will be electronically sent to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to any non-registered participants.

Dated: February 22, 2019

*/s/ Rose Creech*
An Employee of Bonnett Fairbourn
Friedman & Balint, PC