**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Ronald L. Jackson, | No. CV-18-02914-PHX-JJT |
| Plaintiff, | **ORDER** |
| v. | |
| Microchip Technology Incorporated, *et al.*, | |
| Defendants. | |

At issue are Defendants Microchip Technology Inc., Steve Sanghi, Ganesh Moorthy and J. Eric Bjornholt's Motion to Dismiss Amended Complaint and Motion to Strike (Doc. 36, Mot.), to which Plaintiff Ronald L. Jackson filed a Response (Doc. 39, Resp.) and Defendants filed a Reply (Doc. 42). The Court finds these matters appropriate for resolution without oral argument. *See* LRCiv 7.2(f).

**I.  BACKGROUND**

In this federal securities fraud class action, the Court appointed Ronald L. Jackson, Trustee Under Agreement Dated 01/05/2012 by Ronald L. Jackson, as Lead Plaintiff under Section 21D(a)(3)(B) of the Securities Exchange Act of 1934 ("the Act") as amended by the Private Securities Litigation Reform Act of 1995 ("the PSLRA"), 15 U.S.C. § 78u-4(a)(3)(B), after finding he was the most adequate plaintiff under the PSLRA based on his monetary loss of $214,240 allegedly resulting from Defendants' wrongful conduct. (Doc. 24.) Defendant Microchip Technology Inc. ("Microchip") is a publicly-traded company headquartered in Arizona that manufactures computer chips, and Defendant

Steve Sanghi is its Chief Executive Officer and Chairman of the Board of Directors, Defendant Ganesh Moorthy is its President and Chief Operating Officer, and Defendant J. Eric Bjornholt is its Senior Vice President and Chief Financial Officer.

On March 1, 2018, Microchip announced its intent to acquire Microsemi Corp., another chip manufacturer, for $10.15 billion financed by $8.6 billion in new debt, by way of a press release issued to the public and filed with the Securities and Exchange Commission ("SEC"). Also on March 1, 2018, Sanghi, Moorthy, and Bjornholt "conducted Analyst Day via an in-person presentation and question and answer session with investors and at least 14 stock research analysts," which was "also broadcast via conference call/webcast for those persons who were not invited to attend" and a transcript of which was filed with the SEC. (Doc. 32, Am. Compl. ¶ 202.) Plaintiff alleges that "[i]nvestors and stock-analysts expressed concern with the cost of the transaction and Microchip's ability to service the $8.6 billion in debt." (Am. Compl. ¶ 3.) Microchip publicly discussed the benefits of acquiring Microsemi through a May 8, 2018 press release and conference call; a May 10, 2018 Moorthy presentation; and 2018 SEC Forms 10-K and 8-K. On May 29, 2018, Microchip issued a press release announcing that the acquisition closed, and Microchip continued to communicate with the public about the acquisition through a May 31, 2018 press release and conference call; a June 4, 2018 Moorthy presentation; a June 6, 2018 Bjornholt presentation; and a June 12, 2018 Moorthy presentation. Plaintiff alleges that "Defendants repeatedly assured investors that although the cost of the transaction was steep, the debt would be paid through free cash flow generated by the combined entities after the Merger." (Am. Compl. ¶ 3.)

In the Amended Complaint, the operative pleading, Plaintiff alleges that Defendants made 52 materially false statements or omissions—which the Court will refer to with "FS" throughout this Order—in their communications with the public related to Microchip's acquisition of Microsemi.[1] At base, Plaintiff contends that Defendants knowingly misrepresented the amount of inventory in Microsemi's distribution channel and thus the

---

[1] In fact, the Amended Complaint identifies 53 materially false statements or omissions, but Plaintiff later withdrew one (FS 47). (Resp. at 17 n.19.)

net free cash flow available to pay the substantial debt incurred in the acquisition. Specifically, Plaintiff alleges that

> Defendants misrepresented that the debt was only a 4.7 multiple of [Earnings Before Interest, Tax, Depreciation, and Amortization ("EBITDA")] (a proxy for cash flow) to be generated by the Merger. Defendants failed to disclose that the $8.6 billion in debt was a five times multiple of cash flow expected to be generated by the Acquisition. The Transaction closed on May 29, 2018, and thereafter Microchip and Microsemi reported operations on a consolidated basis. Actual cash flow generated by the Merger, beginning May 29, 2018, was approximately $110 million less than represented to Microchip's investors because of Microsemi's higher inventory levels. These higher levels were caused, according to Microchip, because historically toward the end of each quarter Microsemi had sold inventory to distributors and end users for cash at discounted prices in excess of their current needs.

(Am. Compl. ¶ 4.)

Defendants explain that,

> [p]rior to 2018, semiconductor companies recognized revenue in different ways: (1) sales to distributors could be recognized upon shipment to the distributor, also referred to as "sell-in"; or (2) sales to distributors could be recognized upon reported resale of the product by the distributors to their customers, the ultimate end users, also referred to as "sell-through." Historically, Microsemi reported its net sales on a "sell-in" basis, and Microchip generally reported its net sales on a "sell-through" basis. Recent changes in revenue recognition reporting rules now provide for uniform reporting of net sales on a "sell-in" basis. Following the changes in revenue recognition reporting rules, Microchip provides [Generally Accepted Accounting Principles ("GAAP")] sell-in net sales and also provides [non-GAAP] sell-through information.

(Mot. at 5.)

Plaintiff alleges that Microchip ultimately concluded that Microsemi could constructively inflate its revenue numbers in a certain reporting period through a practice of "stuffing" its distribution channel with sales to distributors in amounts above the distributors' current needs. (Am. Compl. ¶ 6.) According to Plaintiff, Defendants conducted extensive pre-acquisition due diligence and knew about Microsemi's inventory practices before the acquisition but failed to disclose to investors and stock analysts that Microsemi's "historically reported GAAP revenue was not representative of true user demand." (Am. Compl. ¶ 6.) And Defendants knew but failed to disclose that Microsemi's high inventory levels would "result in lower sell-through (non-GAAP) revenue, lower free

- 3 -

cash flow, lower EBITDA, and a lower ability to delever the combined company through paying down debt." (Am. Compl. ¶ 10.)

Ultimately, "[o]n August 9, 2018, a little more than two months after the Merger closed, Defendants announced the truth that Microsemi had four plus months of inventory in Microsemi's distribution channel and, as a result, Microchip had $110 million less of net free cash flow and higher debt leverage (5.0 v. 4.7 times EBITDA)." (Am. Compl. ¶ 15.) As a result, Microchip would be unable to pay down its debt rapidly, and "Microchip common stock fell $10.67 a share, causing significant damages to members of the Class" who had purchased stock between March 2 and August 9, 2018. (Am. Compl. ¶¶ 1, 17.)

Generally, Plaintiff's allegations of Defendants' false statements and omissions fall into four substantive categories: (1) statements having to do with the strength of Microsemi's business and the compelling nature of the merger between Microchip and Microsemi (Resp. at 4 (listing FS 18, 20–21, 24, 27, 29, 37 & 46; Am. Compl. ¶¶ 270, 278, 291, 307, 318, 330, 337 & 357)); (2) statements regarding Microsemi's inventory and sales practices (Resp. at 4–5 (listing FS 16–17, 32–33, 35–36, 51–52; Am. Compl. ¶¶ 213, 335–36, 362–63)); (3) statements regarding Microsemi's financial results (Resp. at 5 (listing FS 3–7, 9–15, 22–23, 25–26, 31, 50; Am. Compl. ¶¶ 206–09, 211–12, 292, 297, 309, 311, 334, 359)); and (4) statements regarding Microchip's post-merger financial condition, debt leverage, cash flow, and ability to reduce debt (Resp. at 5–6 (listing FS 1–2, 9–11, 19, 28, 30, 34, 38–49, 53; Am. Compl. ¶¶ 204, 211, 277, 329, 332, 335, 345–46, 352–54, 356–58, 367)).)

Plaintiff, on behalf of the putative class, filed this lawsuit on September 14, 2018, to bring two claims against Defendants: (1) securities fraud liability under Section 10(b) of the Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5; and (2) joint and several liability of controlling persons under Section 20(a) of the Act, 15 U.S.C. § 78t(a). Defendants now move to dismiss Plaintiff's claims.

Separately, on October 9, 2018, four former Microsemi corporate officers filed a complaint in California state court to raise claims of defamation, trade libel, and unfair

competition against Microchip and four of its corporate officers, including the three individual Defendants in the present lawsuit. The basis of the plaintiffs' claims is that certain of the defendants' post-merger statements harmed the plaintiffs' professional reputations. (Doc. 38-3 at 19–75, *Peterson v. Sanghi*, No. 18-cv-02000-JLS (C.D. Cal. Oct. 9, 2018) ("*Peterson* Complaint").) Certain of Plaintiff's allegations in the Amended Complaint of this lawsuit refer to allegations from the *Peterson* Complaint, which allegations Defendants ask this Court to strike.

## II. LEGAL STANDARDS

When analyzing a complaint for failure to state a claim for relief under Federal Rule of Civil Procedure 12(b)(6), the well-pled factual allegations are taken as true and construed in the light most favorable to the nonmoving party. *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009). Legal conclusions couched as factual allegations are not entitled to the assumption of truth, *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009), and therefore are insufficient to defeat a motion to dismiss for failure to state a claim. *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1108 (9th Cir. 2010).

A dismissal under Rule 12(b)(6) for failure to state a claim can be based on either (1) the lack of a cognizable legal theory or (2) insufficient facts to support a cognizable legal claim. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). "While a complaint attacked by a Rule 12(b)(6) motion does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). The complaint must thus contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that 'recovery is very remote and unlikely.'" *Twombly*, 550 U.S. at 556 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

Where a plaintiff alleges fraud or misrepresentation, Federal Rule of Civil Procedure 9(b) imposes heightened pleading requirements. While malice, intent, knowledge, and other conditions of mind usually may be alleged generally, the circumstances constituting fraud must be pled with particularity. Fed. R. Civ. P. 9(b). Specifically, "[a]verments of fraud must be accompanied by 'the who, what, when, where, and how' of the misconduct charged." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (quoting *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997)). Furthermore,

> a plaintiff must set forth more than the neutral facts necessary to identify the transaction. The plaintiff must set forth what is false or misleading about a statement, and why it is false. In other words, the plaintiff must set forth an explanation as to why the statement or omission complained of was false or misleading.

*In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1548 (9th Cir. 1994).

The PSLRA, 15 U.S.C. § 78u-4, also imposes more exacting pleading standards in private securities fraud lawsuits such as this one. With regard to alleged untrue statements or omissions of material fact, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

Moreover, under the PSLRA, where recovery depends "on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). The Supreme Court has stated that the "strong inference" standard for pleading "facts evidencing scienter, *i.e.*, the defendant's intention to deceive, manipulate, or defraud," is not satisfied simply through "alleged facts from which, if true, a reasonable person could infer that the defendant acted with the required intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313–14 (2007) (internal quotations omitted).

> Rather, to determine whether a complaint's scienter allegations can survive threshold inspection for sufficiency, a court . . . must engage in a comparative

> evaluation; it must consider, not only inferences urged by the plaintiff . . . , but also competing inferences rationally drawn from the facts alleged. An inference of fraudulent intent may be plausible, yet less cogent than other, nonculpable explanations for the defendant's conduct. To qualify as "strong" within the intendment of [the PSLRA] . . . , an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.

*Id.* at 314.

## III. ANALYSIS

A securities fraud claim under § 10(b) and Rule 10b-5 requires that a plaintiff demonstrate "(1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 603 (9th Cir. 2014). "A defendant who makes misrepresentations or omissions either intentionally or with deliberate recklessness acts with scienter." *Id.* at 607 (internal quotations omitted). Thus, falsity allegations are evaluated "in light of specific contemporaneous statements or conditions that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made." *Ranconi v. Larkin*, 253 F.3d 423, 432 (9th Cir. 2001) (internal quotations omitted). Defendants argue that Plaintiff's claim fails at elements (1) and (2) because Plaintiff fails to adequately plead that Defendants made material false or misleading statements or omissions knowing they were false or misleading and thus with the requisite intent or deliberate recklessness. The Court will examine in turn Defendants' arguments that Plaintiff fails to sufficiently allege actionable misrepresentations and omissions.

### A. The PSLRA Safe Harbor for Forward-Looking Statements

In the PSLRA, Congress created a "safe harbor" from liability for a person who makes a "forward-looking statement," as defined in the subsection, under certain circumstances. 15 U.S.C. § 78u-5(c). Defendants contend that they are entitled to safe harbor protection under the PSLRA for 33 of the alleged false or misleading statements. (Mot. at 10–12 & n.3.)

Under the statute, forward-looking statements include statements expressing (A) "a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items"; (B) "the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer [of securities]"; (C) "future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations"; and (D) "the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C)." 15 U.S.C. § 78u-5(i)(1). Fraud liability for making a forward-looking statement cannot arise if the statement is (1) "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement"; (2) "immaterial"; or (3) not made "with actual knowledge . . . that the statement was false or misleading." 15 U.S.C. § 78u-5(c)(1)–(2). Upon the filing of a motion to dismiss, the Court "shall consider any statement cited in the complaint and any cautionary statement accompanying the forward-looking statement, which are not subject to material dispute, cited by the defendant." 15 U.S.C. § 78u-5(e). "The PSLRA's safe harbor is designed to protect companies and their officials from suit when optimistic projections of growth in revenues and earnings are not borne out by events." *In re Quality Sys. Inc. Sec. Litig.*, 865 F.3d 1130, 1142 (9th Cir. 2017).

A non-forward-looking statement may be embedded in a "mixed statement" that also includes forward-looking content. *Id.* In that instance, a "misleading statement about current or past facts" embedded in a mixed statement is not protected by the PSLRA's safe harbor. *Id.* But a challenged statement should be "examined as a whole," and if that examination reveals that the statement is essentially forward-looking, the statute's safe harbor provision applies to it. *Id.* at 1141 (citing *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1059 (9th Cir. 2014)).

### 1. Statements about Stress-Testing Results and Merger Benefits

In response to Defendants' argument that 33 of their statements were forward-looking and protected by the PSLRA's safe harbor, Plaintiff argues that four of these statements concerned Microchip's stress-testing of its acquisition of Microsemi, which were "clearly not forward looking, in whole or in part." (Resp. at 15 (listing FS 12–15; Am. Compl. ¶ 212).) On the March 1, 2018 Analyst Day, "Sanghi responded to questions regarding analysts['] concerns of adding another $5 billion in debt by reassuring investors that Microchip had 'stress-tested' Microchip's ability to take on this debt, *i.e.* the free cash flow that would be generated post-closing of the Transaction." (FS 12; Am. Compl. ¶ 212; *see also* FS 13–15.) Plaintiff argues this statement was misleading because Sanghi "failed to disclose the *known* 'stress' factor that Microchip's short-term cash flow would be approximately $110 million less than represented because of excess inventory in the channel." (Resp. at 15.)

The Court agrees with Defendants (Reply at 5–6) that the essential nature of Sanghi's statements in FS 12–15 was forward-looking as contemplated by the PSLRA. Even if the subject Sanghi discussed was the stress-testing Defendants had conducted—which is ostensibly past or current information—the content had to do principally with projections of future earnings and cash flow (and Microchip's ability to delever quickly), as well as certain assumptions underlying those projections in the form of hypothetical future conditions, *i.e.*, stress-testing. (*See* Am. Compl. ¶ 212.) The connection to contemporaneous inventory data that Plaintiff argues can be inferred from Sanghi's statements is too attenuated to make any aspect of the statements non-forward-looking. *Compare In re Quality Sys.*, 865 F.3d at 1147 (noting that the defendants had made mixed statements including specific statements that past and current sales were continually growing when the data the defendants possessed allegedly showed declining sales).

The March 1, 2018 Analyst Day conference call also included a sufficiently meaningful cautionary statement under the PSLRA. (Doc. 38-1 at 124.) As a result, FS 12–15 are subject to the PSLRA safe harbor and not actionable here.

In a similar vein, Plaintiff argues that two of Defendants' statements in the May 29 and May 31, 2018 press releases regarding the benefits of Microchip's acquisition of Microsemi are not forward-looking under the PSLRA. (Resp. at 15–16 (listing FS 27, 29; Am. Compl. ¶¶ 318, 330).) There, Microchip gave projections of an enhanced product portfolio, operational capabilities, customer base, and growth in earnings and value of the company resulting from the Microsemi acquisition. These statements are again forward-looking under the PSLRA; they did not include specific statements concealing Microsemi's alleged past or present inventory stuffing, as Plaintiff contends.[2] Because the press releases also included adequate, meaningful cautionary statements under the PSLRA (Doc. 38-1 at 399; Doc. 38-2 at 3–4), FS 27 and 29 are also subject to the safe harbor and not actionable.

### 2. Statements about the Debt Ratio

Plaintiff contends that eight of the 33 statements Defendants claim are safe-harbor protected were essentially present statements about the Microsemi merger debt ratio and thus not forward-looking. (Resp. at 16–17 (listing FS 1, 3, 30, 38, 42, 45, 48, 53; Am. Compl. ¶¶ 204, 206, 332, 345, 352, 356, 358, 367).) As a representative example, Bjornholt stated in the May 31, 2018 conference call that the "net leverage [total debt divided by EBITDA] at the end of the June 2018 quarter is expected to be 4.7 times." (FS 30; Am. Compl. ¶ 30.) Plaintiff argues that, because the calculation depended on cash flow, which Defendants already knew would be reduced in the upcoming quarters due to Microsemi's excess inventory in the channel, the statement was not forward-looking, but rather a mixed statement of anticipated and existing fact and thus not entitled to safe harbor protection.

The Court again concludes that the statements Plaintiff challenges did not include specific statements of past or present cash flow or inventory levels, which might make the statements akin to the mixed statements in *In re Quality Systems*, 865 F.3d at 1147. Instead, the statements fall quite squarely under the PSLRA's safe harbor provision, because they

---

[2] To the extent Plaintiff implies that Microchip's statement "welcom[ing] Microsemi's employees into the Microchip family" was misleading because Microchip terminated the members of Microsemi's senior management (Resp. at 15 (citing FS 27; Am. Compl. ¶ 318)), Plaintiff neither adequately substantiates that argument nor explains why the alleged false statement is material.

are debt ratio projections for a future date based on certain cash flow assumptions. *See* 15 U.S.C. § 78u-5(i)(1). Because the statements also included adequate, meaningful cautionary statements under the PSLRA (Doc. 38-1 at 124; Doc. 38-2 at 3–4, 22, 60, 96), FS 1, 3, 30, 38, 42, 45, 48 and 53 are also subject to the safe harbor and not actionable.

### 3. Adequacy of Cautionary Statements

Plaintiff does not disagree with Defendants that the remaining 19 of 33 forward-looking statements are indeed forward-looking. (Resp. at 17–18 (listing FS 2, 8–11, 16, 19, 21, 28, 31, 34, 39–41, 43–44, 47, 49, 51; Am. Compl. ¶¶ 205, 210–11, 213, 277, 291, 329, 334–35, 345–46, 353–54, 358, 362).)[3] Instead, Plaintiff argues that the statements are not entitled to safe harbor protection because they did not include meaningful cautionary statements, namely, disclosure that Microsemi had excess inventory in the channel. (Resp. at 17.)

Under the PSLRA, a meaningful cautionary statement must identify "important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)-(2). Defendants' cautionary statements detailed myriad important factors that could cause actual performance to differ from Defendants' projections, including such factors as "the mix of inventory we hold and our ability to satisfy short-term orders from our inventory, . . . the levels of orders that are received and can be shipped in a quarter, the level of sell-through of our products through distribution, [and] changes or fluctuations in customer order patterns and seasonality." (Doc. 38-1 at 124.) The cautionary statements also reference the companies' SEC filings and websites, among other resources, for a more detailed discussion of risk factors. (Doc. 38-1 at 124.) The Court disagrees with Plaintiff that the cautionary statements had to include details about Microsemi's present inventory levels; indeed, this is simply another way of arguing that the forward-looking statements—which Plaintiff concedes are forward-looking—contained or had to contain past or present information.

---

[3] The Court again notes that Plaintiff withdrew FS 47.

Accordingly, FS 2, 8–11, 16, 19, 21, 28, 31, 34, 39–41, 43–44, 49 and 51 are subject to the safe harbor and not actionable.

**B.     The False or Misleading Nature of the Statements**

Defendants contend that the remaining 20 alleged false or misleading statements identified in the Amended Complaint are not accompanied by sufficient allegations to demonstrate that the statements were false or misleading. (Mot. at 13 (listing FS 4–7, 18, 20, 22–23, 25, 50; Am. Compl. ¶¶ 207–09, 270, 278, 292, 297, 309, 359).)

To begin with, the Court agrees with Defendants (Mot. at 13 n.6 (listing FS 16, 17; Am. Compl. ¶ 213)) that Plaintiff does not allege facts to show that statements regarding Microchip's pre-merger inventory level, in and of itself, were false or misleading. Accordingly, FS 17 is not actionable.[4]

Likewise, Defendants' statements of optimism in the corporate acquisition are not actionable. (*See* Mot. at 16 (listing FS 8, 17, 27, 37, 46, 52; Am. Compl. ¶¶ 210, 213, 318, 337, 357, 363).) "Statements of mere corporate puffery, vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers, are not actionable because professional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives." *Intuitive Surgical, Inc.*, 759 F.3d at 1060 (quoting *In re Cutera Sec. Litig.*, 610 F.3d at 1111) (internal quotation marks omitted). Here, Defendants' statements that they are "pleased and proud to have closed this acquisition in a record time" (FS 37; Am. Compl. ¶ 337), "the state of the union at Microchip is very, very strong" (FS 46; Am. Compl. ¶ 357), and Microsemi "is a much better run company" than a previously acquired company (FS 52; Am. Compl. ¶ 363), are feel-good statements of optimism that are not actionable as false or misleading statements.[5]

In the remaining 16 alleged false or misleading statements, Plaintiff's theory of liability reveals itself more directly. (*See* FS 4–7, 18, 20, 22–26, 32–33, 35–36, 50; Am. Compl. ¶¶ 207–09, 270, 278, 292, 297, 307, 309, 311, 335–36, 359).) At base, Plaintiff

---

[4] The Court already found that FS 16 is entitled to safe harbor protection under the PSLRA.

[5] The Court already found that FS 8, 17, and 27 are not actionable for other reasons.

claims that Defendants knew (or were reckless in not knowing) that Microsemi's distribution channel was "stuffed" with excess inventory—a fact that was constructively concealed by Microsemi's practice of reporting revenue on a GAAP (or sell-in) basis—and that many of Defendants' statements regarding Microsemi's inventory and revenue were false or misleading in not disclosing the known or knowable practice of channel stuffing. Defendants argue that Plaintiff's allegations are not sufficient to demonstrate Defendants' statements were false or misleading because the statements simply had to do with Microchip's and Microsemi's historical performance and were reported with transparency—including acknowledging that Microsemi reported revenue on a GAAP (or sell-in) basis—and express warnings of risk factors. (Mot. at 13–15, 17.)

The Court agrees with Defendants that some of the statements of historical performance and Microchip's plans for the merger were not misleading on their face, though they do inform or give context to other, more questionable statements. In the May 8, 2018 press release, Microchip included a discussion of its practice of reporting revenue on a non-GAAP (sell-through) basis and an update on the Microsemi acquisition, and Plaintiff claims Defendants had a duty to also disclose Microsemi's inventory practices and current inventory levels together with the other statements. (*See* FS 18, 20; Am. Compl. ¶¶ 270, 278.) The Act and Rule 10b-5 "prohibit *only* misleading and untrue statements, not statements that are incomplete." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). To be misleading, an omission "must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Id.* Here, Defendants' omission of Microsemi's alleged inventory levels did not make what Defendants stated in the May 8, 2018 press release and associated conference call misleading. The information given was of a general nature, and Defendants repeatedly stated that Microsemi employed a GAAP (sell-in) basis to report revenue, in contrast to Microchip's practice of employing a non-GAAP (sell-through) basis. Similarly, Microchip's general statements in its SEC Form 10-K (FS 23; Am. Compl. ¶ 297) were not misleading by omission. FS 18, 20 and 23 are thus not actionable in and of themselves.

But when Defendants' statements regarding Microsemi's historical performance were more specific and tied to Microchip's, Defendants plausibly created a false impression. Although Defendants do not appear to have had historical revenue numbers calculated on a non-GAAP (sell-through) basis for Microsemi, Sanghi reported Microsemi's historical revenue performance numbers on a non-GAAP basis on the March 1, 2018 Analyst Day conference call. (FS 4; Am. Compl. ¶ 207.) Indeed, on a slide entitled "Highly Profitable Financial Model," Sanghi reported Microchip's non-GAAP-based revenue next to Microsemi's presumably GAAP-based revenue—calling all of the numbers "non-GAAP"—and then added the two to present a total revenue number. (FS 6–7; Am. Compl. ¶¶ 208–09.)

Defendants are correct that they were transparent in their communications by saying that Microsemi employed a GAAP basis and Microchip employed a non-GAAP basis. But it is a different matter to conflate the two, report apparently GAAP revenue numbers as non-GAAP numbers, and ultimately to add numbers calculated on different bases to get a sum non-GAAP revenue number. Considering the information Plaintiff alleges Defendants had regarding Microsemi's inventory-stuffed channel, the Financial Model—and particularly the "Microchip + Microsemi" sum revenue number and the calculations derived from it—was misleading. (*See* Am. Compl. ¶ 220 ("Defendants referenced and discussed Microsemi's reported GAAP net revenue without disclosing that the net revenue numbers were inflated by Microsemi's practice of stuffing the channel, and were not representative of future anticipated revenue on a GAAP or non-GAAP basis.") The Court thus finds that Plaintiff has adequately alleged false or misleading statements in FS 4–7 (Am. Compl. ¶¶ 207–09)[6] as well as in the instances Defendants later referred to the Financial Model, namely, FS 22 (Am. Compl. ¶ 292 (Moorthy's May 8, 2018 presentation)) and FS 50 (Am. Compl. ¶ 359 (Bjornholt's June 6, 2018 presentation)).

In the same way, Plaintiff adequately alleges false or misleading statements in the SEC Form 8-K. (FS 24–26; Am. Compl. ¶¶ 307, 309, 311.) There, Plaintiff alleges that

---

[6] The Court reads these alleged statements and omissions together as a group.

"[t]he May 21, 2018 Form 8-K contained *pro forma* financial statements combining the historical financial statements of Microchip and Microsemi," yet the Form 8-K "failed to disclose the known or knowable fact of what Microsemi's non-GAAP net sales were," and if Defendants had disclosed the "true facts" regarding those numbers, "investors would have learned that after [Microchip] adopted its same business practices for Microsemi's business," Microsemi's net sales and cash flow generation after the acquisition would be materially below Microsemi's prior quarters' numbers. (Am. Compl. ¶¶ 311–13.) As thus framed by Plaintiff, Defendants' omission created an impression of a materially different state of affairs than the one that actually existed. *See Brody*, 280 F.3d at 1006. Plaintiff has thus sufficiently alleged false or misleading statements in FS 24, 25, and 26.

On May 31, 2018, two days after the acquisition closed, Microchip published a press release and held a conference call. There, Sanghi reported that Microchip had "assessed the non-GAAP revenue that Microsemi expected to ship in the quarter under our clock." (FS 32; Am. Compl. ¶ 335.) Sanghi stated that, going forward, "I think GAAP and non-GAAP will be about the same because there would be just no incentive to put any more parts into distribution than is required," so revenue "would be in the similar range as we have guided, $160 million to $18 million even if you look at by GAAP, give or take some." (FS 36; Am. Compl. ¶ 336.) Plaintiff claims that, because Sanghi was speaking directly about Microsemi's non-GAAP revenue, he misled investors by failing to disclose a fact that Defendants knew or should have known: "Microsemi had pre-recognized non-GAAP revenue in prior quarters through advance shipments." (Am. Compl. ¶ 339.) Accordingly, Defendants knew or should have known that their prior disclosure—upon which investors and lending banks relied—that debt was a 4.7 times multiple of projected EBITDA was untrue, and debt was actually five times EBITDA. (Am. Compl. ¶ 339.) Again, even taking into account Defendants' transparency as to Microsemi's prior practice of reporting revenue on a GAAP basis, Plaintiff has adequately alleged in FS 32, 33, 35 and 36[7] that the omissions attendant to Defendants' May 31, 2018 statements regarding Microsemi's

---

[7] The Court reads these alleged statements and omissions together as a group.

non-GAAP revenue were false or misleading. *See In re Scientific-Atlanta, Inc. Sec. Litig.*, 239 F. Supp. 2d 1351, 1362–63 (N.D. Ga. 2002) (noting "a plaintiff may state a claim for securities fraud by alleging that a company materially misrepresented its financial condition by failing to disclose sales practices that encouraged customers to purchase substantial advance inventories of product because such practices could reduce the company's future revenues").

In sum, Plaintiff's allegations are sufficient for the Court to plausibly infer that Defendants made false or misleading statements in FS 4–7, 22, 24–26, 32–33, 35–36, and 50.

### C. Scienter

With regard to the scienter element of Plaintiff's securities fraud claim, it bears repeating that a defendant acts with scienter if the defendant "makes misrepresentations or omissions either intentionally or with deliberate recklessness." *Or. Pub. Emps. Ret. Fund*, 774 F.3d at 607 (internal quotations omitted). Thus, falsity allegations are evaluated "in light of specific contemporaneous statements or conditions that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made." *Ranconi*, F.3d at 432 (internal quotations omitted). Additionally, the Ninth Circuit has stated:

> Where, as here, the Plaintiffs seek to hold individuals and a company liable on a securities fraud theory, we require that the Plaintiffs allege scienter with respect to each of the individual defendants. We may, however, impute scienter to individual defendants in some situations, for example, where we find that a company's public statements are so important and so dramatically false that they would create a strong inference that at least *some* corporate officials knew of the falsity upon publication.

*Or. Pub. Emps. Ret. Fund*, 774 F.3d at 607–08 (internal quotations and citations omitted).

A portion of Plaintiff's allegations concerning Defendants' knowledge of their statements' false or misleading nature is derived from allegations by the plaintiffs—former Microsemi corporate officers—in the *Peterson* Complaint. Plaintiff alleges that the *Peterson* plaintiffs allege "that Microsemi provided all of its inventory, distribution, and sales data to Microchip as part of the due diligence process," and "Sanghi and others falsely

- 16 -

claimed that they only learned of those facts after the Acquisition closed." (Am. Compl. ¶ 72.) Moreover, Plaintiff alleges that Microsemi's Executive Vice President, Frederick Goerner, "gave a PowerPoint presentation to Sanghi and other Microchip executives that detailed Microsemi's relationships with its largest customers and the incentive programs Microsemi had put in place to drive sales, showing the proportion of Microsemi's revenue that was attributable to sales to distributors." (Am. Compl. ¶ 144.)

Defendants request that the Court strike those allegations as unreliable and unproven because they are based on allegations in another lawsuit, relying on a footnote in an Order from another case in this District, *In re Apollo Grp., Inc. Sec. Litig.*, No. CV-10-1735-PHX-JAT, 2011 WL 5101787, at *10 n.5 (D. Ariz. Oct. 27, 2011). (Mot. at 8–10.) But, as Plaintiff points out, in that instance the first plaintiff relied on allegations from another lawsuit in which the second plaintiffs had no first-hand knowledge of the facts underlying their allegations. (Resp. at 7–8.) Here, by contrast, Plaintiff is referring to allegations of facts the *Peterson* plaintiffs had first-hand knowledge of—facts related to actions they themselves took or oversaw.[8] For this reason, the Court declines to strike the challenged allegations in this case.[9] Those allegations can be considered in a holistic manner with related allegations to determine the plausible inferences of scienter against which opposing inferences must be weighed. *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1006 (9th Cir. 2009).

With regard to scienter, Plaintiff also includes the allegations of two Confidential Witnesses ("CW1" and "CW2")—two former Microsemi Sales Vice Presidents who

---

[8] To the extent Defendants argue that some of Plaintiff's allegations related to channel stuffing in this lawsuit contradict those in the *Peterson* Complaint, whether channel stuffing occurred, to what extent, whether it was "improper," and whether Defendants believed it was improper are conclusions to be drawn by a fact-finder based on the sales and inventory information and other facts. That there are differences in the two Complaints does not render the underlying facts related to Microsemi's alleged presentation of its sales and inventory information to Microchip unreliable.

[9] Relatedly, Federal Rule of Civil Procedure 11(b)(3) requires an attorney to make factual allegations only if they "have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." That standard appears to have been met here, even if one attorney is in part relying on another.

allegedly gave Microsemi's sales and inventory information to Microchip management during the due diligence process. (Am. Compl. ¶¶ 157–72, 248–61.) Defendants argue these allegations do not demonstrate Defendants' knowledge of Microsemi's sales and inventory situation because the CWs were not Microchip employees, they never had personal interactions with Sanghi and Bjornholt, and CW1 had only one 30-minute interaction with Moorthy. However, the CWs do rely on first-hand knowledge, and Plaintiff includes detailed factual allegations regarding the CWs' interactions with Microchip management. The allegations are thus sufficient for the Court to draw some inference of scienter.

Plaintiff also alleges that, in a meeting with Microsemi employees on May 30, 2018, Sanghi stated that, similar to Atmel—a company Microchip had acquired previously—Microsemi's poor sales incentive system "led to massive inventory stuffing through heavily discounted sales, comparable to 'two monkeys fighting and taking the price down.'" (Am. Compl. ¶¶ 321–22.) In light of this admission that Sanghi was already of the opinion that Microsemi had engaged in inventory stuffing, Plaintiff alleges that Sanghi's statements to investors on May 31, 2018, of post-acquisition inventory and revenue levels were misrepresentations.

More generally, Plaintiff argues that Defendants' actions in the Microsemi acquisition must be viewed in the context of the collective experience and sophistication of Sanghi, Bjornholt, and Moorthy, who had acquired 17 companies in the past. In addition, Plaintiff points to allegations of Microchip's "history of difficulties with acquired companies' inventory practices," and specifically the fact that Microchip's acquisition of Atmel had resulted in the same inventory and revenue adjustments. (Resp. at 21–22.) Likewise, Plaintiff contends that Defendants' scienter must be evaluated in the context of the fact that Microchip's $10.15 billion acquisition of Microsemi was the largest in Microchip's history and financed with $8.6 billion in debt. In a situation in which the stakes are so high, Plaintiff contends, it is difficult to conceive that Defendants' due diligence process did not reveal the inventory and revenue issues Defendants only announced on

August 9, 2018—over two months after the acquisition closed—and that at minimum a failure to know and disclose such core information was deliberately reckless.

Of course, each side proffers different theories of Defendants' motives. For their part, Defendants argue that it would be counterintuitive for them to enter into an acquisition that is "plagued with problems." (Mot. at 23.) On the other hand, Plaintiff alleges among other things that Defendants were motivated to make misleading statements regarding revenue generation to obtain notes (issued in May 2018) at favorable rates, and that their compensation regime valued revenue growth as a "significant factor." (Am. Compl. ¶¶ 401, 458–75.)

Defendants contend that they were "continuing to gather information and learn about Microsemi's business through the class period," and thus it is plausible they did not know of Microsemi's inventory and revenue practices until just before their announcement on August 9, 2018. (Mot. at 10.) However, taking Plaintiff's allegations of scienter as a whole, the Court finds the inference that the individual Defendants knew of Microsemi's inventory and revenue practices and yet misrepresented or omitted key information in communications with investors and stock analysts is cogent and at least as compelling as any nonculpable inference proffered by Defendants.

Under the principles of *respondeat superior*, a plaintiff may establish scienter of the corporation through the scienter of its corporate officers or directors. *In re Hienergy Techs., Inc. Sec. Litig.*, 2005 WL 3071250, at *8 (C.D. Cal. Oct. 25, 2005). Here, Plaintiff's allegations are sufficient for the Court to find that Microchip had constructive knowledge of the facts known by the individual Defendants and other corporate officers. According to Plaintiff's allegations, Microsemi gave detailed information about its inventory and revenue practices to Microchip's corporate officers during the due diligence process but the individual Defendants—either intentionally or with deliberate recklessness— misrepresented or omitted core information in its public communications on behalf of Microchip. Plaintiff has thus adequately alleged corporate scienter.

### D. Other Matters

Defendants' only basis for asking the Court to dismiss Count 2, for joint and several liability of controlling persons under Section 20(a) of the Act, 15 U.S.C. § 78t(a), is that Plaintiff failed to state a claim for Count 1. Because the Court disagrees, Count 2 will proceed along with Count 1.

In the Response (Resp. at 25), Plaintiff asks the Court to deny Defendants' request for the Court to take judicial notice of Defendants' Exhibits 1, 2, 18, 19, and 20. Because the Court did not rely on any of those Exhibits to resolve Defendants' Motion, the Court will deny Plaintiff's request as moot.

**IT IS THEREFORE ORDERED** granting in part and denying in part Defendants' Motion to Dismiss Amended Complaint and Motion to Strike (Doc. 36). Plaintiff has stated claims with regard to False Statements 4–7, 22, 24–26, 32–33, 35–36, and 50. The Court grants Defendants' Motion to Dismiss with regard to the balance of the alleged False Statements.

**IT IS FURTHER ORDERED** denying Defendants' request to strike certain allegations from the Amended Complaint. (Doc. 36.)

Dated this 11th day of March, 2020.

Honorable John J. Tuchi
United States District Judge